1                    UNITED STATES BANKRUPTCY COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                              --oOo--

4   In Re:                        ) Case No. LA10-19938-BR
                                   )
5   CAPITOL FILMS DEVELOPMENT,     ) Los Angeles, California
    LLC,                           ) Tuesday, March 30, 2010
6                                  ) 10:00 a.m.
              Debtor.             )
7   _____)
                                   )
8   In Re:                        ) Case No. LA10-19912-BR
                                   )
9   THINKFILM, LLC,                )
                                   )
10            Debtor.             )
    _____)
11                                 )
    In Re:                        ) Case No. LA10-10024-BR
12                                 )
    RWD2, LLC,                     )
13                                 )
              Debtor.             )
14  _____)
                                   )
15  In Re:                        ) Case No. LA10-19929-BR
                                   )
16  CAPCO GROUP, LLC,              )
                                   )
17            Debtor.             )
    _____)
18                                 )
    In Re:                        ) Case No. LA10-19927-BR
19                                 )
    CT-1 HOLDINGS, LLC,            )
20                                 )
              Debtor.             )
21  _____)

22                                  HRG RE EMERGENCY MOTION FOR AN
                                    ORDER APPOINTING A TRUSTEE
23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

*Briggs Reporting Company, Inc.*

ii

1                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE BARRY RUSSELL
2                UNITED STATES BANKRUPTCY JUDGE

3  APPEARANCES:

4  For the Alleged Debtors:        DAVID R. WEINSTEIN, ESQ.
                                   Richardson, Patel
5                                  10900 Wilshire Boulevard
                                   Suite 500
6                                  Los Angeles, California 90024
                                   (310) 208-1182
7

8  For the Movants:                DAVID L. NEALE, ESQ.
                                   Levene, Neale, Bender, Rankin
9                                    & Brill, LLP
                                   10250 Constellation Boulevard
10                                 Suite 1700
                                   Los Angeles, California 90067
11                                 (310) 229-1234

12 For the Adjoining Party:        GLEN ROTHSETIN, ESQ.
                                   Blank, Rome
13                                 1925 Century Park East
                                   Suite 1900
14                                 Los Angeles, California 90067
                                   (424) 239-3403
15

16 For the Alleged Debtor:         LUCIA E. COYOCA, ESQ.
                                   Mitchell, Silberberg & Knupp
17                                 11377 West Olympic Boulevard
                                   Los Angeles, California 90064
18                                 (310) 312-2000

19 For DBA, SAG, WGA, DGA,         PETER DICKINSON, ESQ.
     Pension Health Plans,         Bush, Gottlieb, Singer, Lopez,
20   SAG Pension Health Plans,       Kohanski, Adelstein
     WGA Pension Health Plans,       & Dickinson
21   and the MPIP:                 500 North Central Avenue
                                   Suite 800
22                                 Glendale, California 91203
                                   (818) 973-3222
23

24

25

iii

1   APPEARANCES:  (cont'd.)

2   For the U.S. Trustee:           RUSSELL CLEMENTSON, ESQ.
                                    Office of the United States
3                                     Trustee
                                    725 South Figueroa Street
4                                   Suite 2600
                                    Los Angeles, California 90017
5                                   (213) 894-4505

6   Court Recorder                  Pat Mendoza
                                    United States Bankruptcy Court
7                                   Edward R. Roybal Federal
                                      Building
8                                   255 East Temple Street
                                    Los Angeles, California 90012
9                                   (213) 894-7202

10  Transcriber:                    Briggs Reporting Company, Inc.
                                    6336 Greenwich Drive, Suite B
11                                  San Diego, California 92122
                                    (310) 410-4151

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*

iv

<u>I N D E X</u>

| <u>EXHIBIT</u> | | <u>IDENTIFIED</u> |
|---|---|---|
| 6 | Document | 8 |
| 7 | Document | 8 |
| 2 | Document | 10 |

*Briggs Reporting Company, Inc.*

1

1    <u>LOS ANGELES, CALIFORNIA TUESDAY, MARCH 30, 2010 10:00 AM</u>

2                            --oOo--

3        (Call to order of the Court.)

4              THE CLERK:  Page number one, number one Capitol

5    Films, number two Thinkfilm, three R2D2, four, CapCo Group,

6    five CT-1 Holdings.

7              THE COURT:  As far as appearances, use your own

8    discretion but usually people sitting around the table or

9    close by.  If you're going to say a lot of things state your

10   appearance now but if you're going to say something later

11   just make it when you make or we'll be here all morning just

12   having the appearances.

13             MR. WEINSTEIN:  Good morning, your Honor.  David

14   Weinstein for alleged Debtors on numbers two, three, four and

15   five on your calendar.

16             MR. NEALE:  Good morning, your Honor.  David

17   Neale, Todd Arnold, Irv Gross, Levene, Neale, Bender, Rankin

18   and Brill on behalf of the movants Aramid Entertainment Fund

19   and Screen Capital International.

20             MR. ROTHSTEIN:  Good morning, your Honor.  Glen

21   Rothstein on behalf of adjoining party Foresight Unlimited

22   (phonetic).

23             MS. COYOCA:  Good morning, your Honor.  Lucia

24   Coyoca C-O-Y-O-C-A, Mitchell, Silberg and Knupp on behalf

25   of alleged Debtor Capitol Film Development.

2

1        MR. DICKINSON:  Good morning, your Honor.  Peter
2 Dickinson of Bush, Gottlieb on behalf of the DBA, SAG, WGA,
3 DGA, Pension Health Plans, SAG Pension Health Plans, WGA
4 Pension Health Plans, and the MPIP joiners in the motion.
5        THE COURT:  That was very good by the way.  All
6 right.
7        MR. NEALE:  Thank you, your Honor.  I think
8 perhaps we might be able to start this easily with number one
9 on the calendar, the Capitol Films matter.  We haven't
10 received any objection to the motion in the Capitol Films'
11 case and I'm not sure if that was intentional or
12 unintentional.
13        THE COURT:  Well we're going to find out.  You
14 can see a rather large pile of papers.  So something like
15 this relatively short time.  Who represents them again?
16        MS. COYOCA:  I do, your Honor.  There was an
17 opposition that was filed and it was served as well actually
18 on Mr. Arnold.
19        THE COURT:  Well, I thought so but with the pile
20 of paper I have I better ask.
21        MR. NEALE:  We've not seen that opposition, your
22 Honor.  It doesn't show up on the docket anywhere and we
23 haven't received a copy of it by service or otherwise.  So
24 I'm not entirely sure what Ms. Coyoca is referring to.  If
25 you refer to the docket, the only two things on the Capitol

3

1  Films matter that show up are the declarations of Ms. Coyoca

2  and the declaration of Mr. Dee.  Other than that, there was

3  no opposition that was filed timely or otherwise.

4         MS. COYOCA:  Your Honor, it was my understanding

5  that it was filed and also it was served on the Levene,

6  Neale, Bender firm, and specifically emailed to Mr. Arnold.

7         THE COURT:  Okay.  What I'm going to assume at the

8  moment is it has been.  We can sort it out later but so why

9  don't you proceed.

10         MR. NEALE:  Thank you, your Honor.  Your Honor, I

11 think it's safe to say that this case is I think is akin to

12 the Enron of the entertainment world.  We're dealing with a

13 series of companies that have been operated without regard to

14 corporate formalities by an individual, David Bergstein who

15 has treated this as his own personal -- who has commingled

16 funds, dissipated assets.

17         THE COURT:  And that's been going on for some time

18 according to the papers.

19         MR. NEALE:  Apparently, your Honor, and continues

20 to this day.  The information available to us, at least

21 through January 2010, is that this was a process that ran

22 rampant through the company, that involved a consistent

23 pattern of behavior by Mr. Bergstein in terms of creating new

24 entities, transferring assets from old entities to new

25 entities, transferring cash among entities without any

4

1 controls or accounting function, use of funds for

2 inappropriate purposes outside of the corporation.  These are

3 things which we have been to develop over the last month or

4 so.  When the Court asks has this been going on for years --

5         THE COURT:  The reason I ask is a couple of

6 things.  It goes to the question of how much of a real

7 emergency this is.  It seems reading the papers if what you

8 say is true it's very serious, but it didn't start last week

9 or last month.

10        MR. NEALE:  Yes, your Honor.

11        THE COURT:  It's been going on apparently for a

12 long time.

13        MR. NEALE:  Yes, your Honor.  The flip side of

14 that is it's the question of leaving the fox in charge of a

15 chicken coop.  We are now in an involuntary bankruptcy

16 proceeding.  The merits of that proceeding still remain to be

17 litigated.  The question is during this interim period can

18 Mr. Bergstein be trusted with the administration of this

19 case, of these estates, the management of these assets, the

20 conservation of cash, the accounting functions that are

21 required.

22        Can he be trusted with all of those functions

23 during this gap period?  Our position is, your Honor, based

24 on the evidence that we've seen, historical up to as recently

25 as January of 2010 that there's a real question about that

5

1 and there is a real emergency in that who knows what

2 activities have been stepped up as a result of this

3 involuntary.

4          THE COURT:  How many trustees are you asking for?

5          MR. NEALE:  Well, I suppose that's at the

6 discretion of the Court, your Honor.

7          THE COURT:  Well, no, it's more than just a

8 discretion.  You have to have facts.  I mean what are you

9 asking for?

10          MR. NEALE:  Well, your Honor, we're asking for a

11 single trustee for all of these entities.

12          THE COURT:  You think that -- assuming just for

13 argument sake, and I certainly haven't gotten to that point

14 by any means, that I would feel a trustee be appointed how

15 could I possibly at this stage know any conflicts between the

16 various Debtors?

17          MR. NEALE:  Well, your Honor, we don't know.  This

18 is an interim trustee.  This is not a permanent trustee.  The

19 potential costs and complications of having multiple trustees

20 we think are out weighed by the simplicity and efficiency --

21          THE COURT:  Based on what?

22          MR. NEALE:  Based on -- I'm sorry your Honor.

23          THE COURT:  What facts?  You say obviously

24 multiple trustees cost more than one, at least on the surface

25 anyway, but on what basis would you just have one as opposed

6

1  to five?

2         MR. NEALE:  Well, your Honor, based on the

3  information that we've obtain a much as Mr. Bergstein's

4  declaration.  These entities are part of a conglomerated

5  whole.  They're not operated with the recognition of separate

6  corporate enterprises.  There's a single cash management

7  system.  There's a single party that's charged with the --

8         THE COURT:  But the creditors are not all the

9  same, at least as far as I can tell.

10        MR. NEALE:  There are creditors who span the

11 spectrum.  Obviously, my clients do, the Guilds do.  There

12 are some creditors that over lap.  There are some creditors

13 that don't.  Your Honor, it's not my position to argue with

14 the Court.

15        THE COURT:  I'm not arguing with you.  I'm just

16 asking a question.

17        MR. NEALE:  My point was I'm not arguing whether

18 or not there should be one trustee.  If the Court feels more

19 comfortable appointing five, we're perfectly happy with that

20 result.  We're not weighted to the concept of one trustee.

21 Our concern as creditors is just that we minimize the cost of

22 administration of this estate while this is all going on.  If

23 the Court feels that there are conflicts of interest among

24 the various estates, which there very well --

25        THE COURT:  Well, I don't have much a feeling at

7

1 all at the moment because I don't know a lot of the facts.

2 That's why I was asking you.

3          MR. NEALE:  Yeah, there very well may be conflicts

4 among the various estates and five different trustees may be

5 appropriate.  Based on the declaration of Mr. Bergstein, the

6 facts that have been presented to the Court are that he is

7 the guy.  He is the guy that manages this enterprise.  He is

8 the one that makes decisions about payment of expenses.

9          Again, it's a single cash system that's being used

10 or abused as the case may be.  From our perspective it's

11 difficult to unwind those transactions right now.  So from

12 that stand point given that this is an interim relief we're

13 seeking we thought it made more sense or at least was easier

14 to administer a single trustee at this point.

15          THE COURT:  By the way before I forget this is

16 going to be somewhat painful but there were three evidentiary

17 objections or three documents and I suppose it's as good a

18 time as any for the record to make rulings on them.  I'm not

19 going to have any argument on them.  You can stand there if

20 you want.  You made two of them and Mr. Weinstein made the

21 other.  I'm just going to go through as quickly as I can.

22 Take notes.  Most of the objections we overruled.

23          So the first one is you had made evidentiary

24 objections to the declarations of David Bergstein, Jeffrey --

25 Lucia Coyoca.  You know which one that is and I will just go

8

1 through very quickly.  I will make the rulings and then we'll

2 go back to what you were talking about.  On page two, those

3 three objections are overruled.  Paragraph four will be

4 overruled.  Paragraph seven is sustained.  Paragraph eight

5 overruled.  This is now page four.  Paragraph 14, 15, 17, 18

6 those are overruled.  Paragraph 19 is sustained.  Paragraph

7 20, the next one, is sustained.  21 is overruled.  Actually,

8 the next two on that page, page five, are sustained, that

9 includes paragraph 21 and part of 21, paragraph 24.

10 Paragraph 25 is sustained.

11         As far as the exhibits those will be sustained.

12 Then the declaration of -- how do you pronounce that?

13         MS. COYOCA:  Mr. Dee, Jeffrey Dee.

14         THE COURT:  Dee.  Okay.  Those two objections will

15 be sustained.  As to Ms. Coyoca, those three will be

16 sustained.  That's as to those.  Then the next one you made

17 was to the supplementary declarations.  Page four, as far as

18 there was some objection to timeliness but there are pretty

19 short time frames here so those will be overruled.  As far as

20 page four, the paragraph three two objections there.  Those

21 will be overruled.  Paragraph five will be sustained.

22 Paragraph six, seven and eight will be sustained, as well as

23 Exhibit 6 and 7, those will be sustained.

24         Now getting to the lengthier one -- it might take

25 a couple more minutes.  That was Mr. Weinstein.  The first on

9

1 page three there's an objection to paragraph two.  That will

2 be overruled.  Paragraph three that will be overruled.  Then

3 the next paragraph three, page four, the second objection

4 will be overruled.  Paragraph four that will be overruled.

5 Paragraph five is overruled.  Then page six.  There are two

6 objections and those will be both overruled.  All of those

7 will be overruled.  Then page seven the objections number two

8 to paragraph seven those will all be overruled.  Paragraph

9 eight will be overruled.  Paragraph nine will be overruled.

10 Paragraph 10 will be overruled.

11          Objections to 11 will be all overruled.  You broke

12 them up in (a), (b), (c), (d), (e) and (f).  Those will

13 actually be overruled with the exception on page 11 of

14 objection g that will be sustained.  Paragraph 12 on page 12,

15 the (a), (b) and (c) will be overruled and (d) and (e) will

16 be sustained.  Then on page 13 the objections there (a) and

17 (b) will be overruled, (c), (d) and (e) will be sustained and

18 then next one on the bottom paragraph 14 objection (a) will

19 be overruled, (b) sustained, (c) sustained and (d) sustained.

20          Paragraph 15 is overruled.  Paragraph 16 -- on

21 page 14 and 15 (a) and (b) and (c) overruled, (d) is

22 sustained.  Paragraph 17 those will be overruled.  Paragraph

23 18 those will all be overruled.  Paragraph -- now I jump to

24 the declaration of Jeffrey Gaul.

25          MR. NEALE:  Your Honor, there's an objection on

10

1  the Exhibit 2 to the --

2          THE COURT:  Let's see.  What page was that on?

3          MR. NEALE:  That's on page 16, your Honor.

4          THE COURT:  I haven't got there yet.  On page 16

5  that will be -- yes that will be overruled.  Thank you.  I

6  skipped over that.  Number 16 the paragraph two that will be

7  overruled.  Paragraph three will all be overruled with the

8  exception of (e) on page 18, that will be sustained.

9  Paragraph four, page 18 (a) overruled, (b) overruled, (c)

10 sustained, (d) overruled, (e) overruled and (f) overruled.

11 Then on page 20 it will be overruled.  On page 21 the

12 objection to paragraph six I believe that will be overruled.

13         Paragraph seven the objection is overruled.

14 Paragraph eight is overruled, both objections.  Paragraph 10

15 which is on page 22, 23 that will be overruled.  Paragraph 11

16 is overruled.  Paragraph 12 is overruled.  Paragraph --

17 objections to 13 are overruled.  14 are overruled.  15 is

18 overruled.  16 overruled.  Paragraph 17 on page 26 (a) and

19 (b) are overruled and (c) is sustained.  Page 27 the

20 objections to paragraph 18 are overruled.  Paragraph 19

21 overruled.  Paragraph 20 overruled.  Then 21 all of those

22 objections will be overruled.  22 are all overruled.  23 are

23 overruled.  24 are overruled.  25 are overruled.  26 are

24 overruled.

25         The you have the declaration of Henry Glen

11

1 (phonetic).  First objection as to paragraph three is

2 overruled.  Paragraph four is overruled.  Paragraph five the

3 objections are overruled.  Paragraph six the objection will

4 be sustained.  Paragraph seven will be sustained.  Paragraph

5 eight will be sustained.  Paragraph nine sustained.

6 Paragraph 10 are overruled.  12 overruled.  13 overruled.  14

7 overruled.  15 overruled.  16 overruled.  17 overruled.  Then

8 the next one is declaration of Hans Turner.

9           The first one paragraph two will be overruled.

10 Paragraph three is overruled.  Paragraph four is overruled.

11 Paragraph five overruled.  Paragraph six are overruled, all

12 of the objections.  Paragraph seven overruled.  Paragraph

13 nine overruled.  Paragraph 10 overruled.  Then paragraph 11

14 on page 45 (a), (b), (c) and (d) will be overruled.  The

15 objections (e) and (f) will be sustained.  Page 46, paragraph

16 13 is overruled.  Paragraph 14 overruled.  Paragraph 15

17 overruled.  16 overruled.  Paragraph 17 is sustained.

18 Paragraph 18 is overruled.  19 is overruled.  20 is

19 overruled.  21 overruled.

20           The request for judicial notice those will be

21 sustained for those exhibits and that's it.  I know it's hard

22 to keep track of all that.  After it's said and done, I think

23 the basic facts, at least as far as what each side say, are

24 still pretty much left in tact.  Okay Mr. Neale.

25           MR. NEALE:  Thank you, your Honor.  Yes, I think

*Briggs Reporting Company, Inc.*

12

1 even with the objections that were sustained I think the

2 evidence as presented that the Court paints a pretty clear

3 picture of what's happening here at these entities.  You have

4 testimony of former COO's, former CFO's, people who are

5 charged with the responsibility of understanding how the

6 financial system here allegedly in play is supposed to work,

7 all of whom testified that there was no financial system.  It

8 was a system that was comprised of Mr. Bergstein maintaining

9 a spreadsheet that had cash entries and check registers

10 basically, that all efforts to consolidate financial

11 statements to prepare formal financial documents for purposes

12 of refinancing or audit were failures.

13          The one declaration that was offered in response

14 to that was I believe the declaration of MR. Dee who

15 testified about the Thinkfilm accounting system.  If the

16 Court looks at our papers, you'll see that the one entity

17 that we can see may have some kind of accounting system, this

18 Thinkfilm, and that's largely because it was inherited from

19 the prior management of Thinkfilm.  I think the declaration

20 of Mr. Gurtz establishes that whatever systems were in place

21 when he started were in decline when he left, and the company

22 was spinning out of control, at least as far as all three of

23 our declarants were aware of.

24          Mr. Turner who had been with these companies for

25 six years testified to that.  The testimony all before your

13

1 Honor is that these are entities which are rutterless ships

2 at this point.  There's testimony that cash was removed from

3 an affiliates bank account or pledged from an affiliates bank

4 account to cover personal gambling markers.  There is such an

5 array of facts here that it's hard to know where even to

6 begin.  We set forth the standard for the appointment of a

7 trustee in our papers.  Basically as the Court is aware,

8 we're moving under Section 114(a) which talks about the

9 ability to appoint a trustee as of the commencement of the

10 case which by analogy relates back to 303(g) and the

11 opportunity to appoint an interim trustee pending a final

12 adjudication of the involuntary petition.

13         Now clearly what the alleged Debtors have tried to

14 do here is to throw up a whole bunch of smoke about whether

15 or not these creditors are legitimate creditors, whether or

16 not the order for relief should get entered, all of those

17 issues are fascinating issues and they're all issues that the

18 Court will have to deal with in the context of adjudicating

19 the involuntary petition.  They have absolutely nothing to do

20 with --

21         THE COURT:  Well, I'm not sure I totally agree

22 with that.  What if at the end of the day, and I have no

23 opinion obviously at the moment, you fail, have the

24 involuntary.  Then what happens?

25         MR. NEALE:  Well, your Honor, --

14

1          THE COURT:  It has some relevance.

2          MR. NEALE:  Yes, your Honor and I think that's

3 contemplated by the Bankruptcy Code.

4          THE COURT:  No, I understand that but what happens

5 if let's say I appoint a trustee or multiple trustees and you

6 fail in having orders for relief in the cases.  Then what?

7          MR. NEALE:  Well, your Honor, I think the

8 Bankruptcy Code is pretty clear that the Court has the

9 authority to impose consequences on the petitioning creditors

10 who fail in the pursuit of an order for relief in the

11 voluntary context.  I think my clients certainly were and I

12 think all the other petitioning creditors were certainly

13 aware of those potential consequences.  This is an action

14 that was not taken lightly.

15          THE COURT:  There was a request for a rather large

16 bond in case you do fail.

17          MR. NEALE:  Yes, your Honor I saw that.  It's one

18 of those situations, your Honor, where the bond was requested

19 because of the damaged reputation and the potential harm to

20 this company.  We toyed with the notion, your Honor, of

21 producing the endless articles that have appeared in

22 publications from the Hollywood Reporter, The New York Times,

23 talking about exactly the kind of reputation that Mr.

24 Bergstein enjoys in the entertainment industry.

25          In terms of damage to the company, the only thing

15

1 that's been submitted was rather telling in and of itself.

2 The only thing submitted by Mr. Bergstein was the alleged

3 loss of a sale in Germany with respect to one of the

4 Thinkfilm films, but interestingly if you look at the exhibit

5 that was attached to that declaration, it relates to an

6 entity called Pangia Media I believe or Pangia Holdings.

7 It's not even one of the alleged Debtors.  So the only

8 evidence you see of this alleged harm to the company is the

9 effect on one sale that had nothing to do with any of these

10 entities.

11          THE COURT:  Well, in case you do fail, again

12 obviously I have no opinion at the moment on the merits of it

13 but how do I know your clients are good for it if there are

14 damages?

15          MR. NEALE:  Your Honor, that's all information

16 that they can develop in advance of the hearing on the

17 involuntary petition.

18          THE COURT:  No, I'm asking you now.  If you want

19 me to appoint a trustee or multi trustees and everything

20 falls apart as far as the involuntaries, you say well, you

21 can come after my -- I could order it.  I can order a lot of

22 things but I can't make people do things if they don't have

23 the money.  So how do I know that your people that are

24 petitioning creditors are good for it?

25          MR. NEALE:  Can I ask my client a question about

16

1 whether or not I can disclose certain information to the

2 Court?

3           THE COURT:  I guess so.

4           MR. NEALE:  Thank you.

5           Your Honor, I'm advised, and David Mulner

6 (phonetic) who is one of the principals of my client has

7 advised me and would be prepared to testify that Aramid

8 Entertainment Fund has over $200,000,000 of assets under

9 management and if required to post a bond, would under the

10 appropriate circumstances be prepared to do so.

11           THE COURT:  All right.

12           MR. NEALE:  Your Honor, getting back to the facts

13 that are presented to the Court I think what it's telling us

14 is the information that's been presented is the information

15 that hasn't been presented.  One would assume that in

16 response to many of the allegations that have been made in

17 the motion and the reply, we would be barraged by financial

18 information, financial data from the Debtors.  There's no

19 financial records.  Well, here's a Quickbooks print out.

20 There's no evidence that payroll tax has been paid.

21           Well, here's evidence that payroll tax has been

22 paid.  Just basic information that you would assume is

23 available to a company of this magnitude with these many far

24 flung operations and arms.  The question is why is it not

25 here?  Why isn't it being shown to the Court?  I would refer

17

1 the Court to our reply at pages 11 through 14.  We went

2 through the various issues that we raised that there's been

3 absolutely no response to.  So, for example, we asked whether

4 there was a general ledger system to integrate accounting for

5 all the companies.  No response.  Was there a credible

6 accounting or financial reporting system for the US entities?

7 No response.

8        We alleged that there was inadequate record

9 keeping and financial information was made impossible to

10 acquire because Mr. Bergstein maintained such strict control

11 over who had access to what information.  No response.  The

12 accounting was maintained on a single Excel spreadsheet other

13 than for Thinkfilm.  No response.  The accounting department

14 consistently kept in the dark.  No response.  Payroll taxes

15 not paid since July of 2008.  No response.  No tax returns

16 filed with the IRS.  No response.  Failure to pay critical

17 vendors, film laboratories et cetera just to be able to

18 maintain sales of these corporations.  No response.

19        Failure to pay substantial amounts owed to the

20 Guilds.  We'll, you've seen the Guilds' joinder in the

21 motion, your Honor, so you know the answer to that question

22 and there's been no response by the Debtors to that

23 allegation.  Refuse a legitimate request for financial

24 information for members of the account department, even from

25 the chief operating officer, who Mr. Bergstein himself

18

1 selected to come in and help work on the work out of these

2 companies.  No response.  Even the allegation about using

3 funds to collateralize markers in Las Vegas for personal

4 gambling by Mr. Bergstein absolutely no response.  The only

5 response offered by Mr. Bergstein is well, I haven't taken a

6 salary out of these companies.

7        Your Honor, we would submit that there's no need

8 for him to take a salary out of the company because all the

9 cash is being siphoned off by him anyway.  Under the

10 circumstances, your Honor, when we go back to the question of

11 cause for the appointment of a trustee, the standards I think

12 are pretty straight forward.  We laid them out in our papers

13 and they include conflicts of interest and inappropriate

14 relationships among the entities.

15        Well, your Honor, one of the things we've asked

16 for and we noted in our reply brief is when the alleged

17 Debtors filed their responsive papers they were obligated to

18 file a corporate ownership statement.  They failed to do

19 that.  They still have failed to do that.  We asked why that

20 is, your Honor, and we think it's because when the ultimate

21 ownership structure of all of these entities as ultimately

22 brought to the Court's attention, you're going to see a vast

23 interconnected web of companies that ultimately, we believe,

24 will lead to an action for substantive consolidation if an

25 order for relief here is granted.

19

1          As I said, your Honor, these companies have been

2  operated as a person fiefdom for David Bergstein.  Corporate

3  formalities have been completely ignored.  There are inter

4  company claims.  There are inter company issues that would

5  have to get adjudicated.  Ownership of rights has been

6  muddled by virtue of the various structures that Mr.

7  Bergstein has come up with.  In fact, your Honor, even the

8  existence of this Pangia entity that now all of a sudden

9  surfaced in the email train that Mr. Bergstein attached to

10  his declaration, what's Pangia?  What relationship does it

11  have to the Debtors?  Why is Pangia selling the Debtors'

12  films?  Where is the agreement that entitles Pangia to do

13  that?  Is Pangia owned by the same owners as the Debtors?  We

14  have no answers to any of these questions.

15          Mr. Bergstein testified about a foreclosure sale

16  scheduled by LAAC.  How does Mr. Bergstein know about the

17  foreclosure by LAAC against these very Debtors?  The Debtors

18  that he owns and controls are now subject to a foreclosure

19  sale that he's administering.  There's a UK administration --

20  an insolvency proceeding in the UK that Mr. Bergstein

21  commenced.  He's now created three or four different entities

22  to approach the UK administrator about foreclosing on assets,

23  purchasing assets, transferring assets, anything he can think

24  of to create this confusion of rights and obligations so that

25  it makes it virtually impossible for creditors to pursue

20

1 these companies effectively.

2        Second, your Honor, the misuse of assets and funds

3 of the estate.  I won't belabor the point, your Honor.  I

4 think we've established that through the testimony that we've

5 supplied.  Some very serious concerns about what the cash of

6 these assets is being used for.  Number three, your Honor,

7 inadequate record keeping and reporting.  Again, your Honor

8 where is the response?  We say the books and records of this

9 company are maintained on a single Excel spreadsheet.  If

10 that's not true, where are the records?  They haven't been

11 produced because they don't exist.

12        Lack of appropriate cost controls.  Again, your

13 Honor, it's a black box.  If we don't know what the cash is

14 being used for, we can't say whether there's appropriate cost

15 controls.  Certainly not going to pay the Guilds.  Certainly

16 not going to pay laboratories.  Certainly not going to pay

17 producers.  So the question is maybe he's current on his

18 Arrowhead water bill but the people he relies on in order to

19 run this business are not getting paid, and we believe that

20 that will established in connection with the hearing on the

21 merits of the involuntary petition itself.

22        Your Honor, the next standard is the question of

23 fraud or dishonesty.  You know those are serious allegations,

24 your Honor.  We take them very seriously.  The evidence that

25 we've adduced, your Honor, at least gives rise to questions

21

1 about the honesty and the reputable nature of Mr. Bergstein,

2 whether he's appropriately operating these companies, whether

3 he's being honest with his creditors, whether he's proceeding

4 in a manner other than a fraudulent manner.  Those are all

5 issues that we believe a trustee needs to investigate, your

6 Honor, because only a trustee once in place will have access

7 to the interior workings of these companies, to be able to

8 track the money, see where the cash has gone, see what Mr.

9 Bergstein has done with these things, understand what the

10 rights are.

11       These are all things that as outsiders it's

12 virtually impossible for us to do with any certainty because

13 even through discovery it would be difficult for us obtain

14 truthful answers to some of these questions without being

15 able to probe extensively into the books and records of this

16 company.  Finally, your Honor, the last standard is lack of

17 credibility and creditor confidence.  We had 13 petitioning

18 creditors then these petitions were filed, your Honor.  Since

19 then, I believe we've had three creditors join in the

20 involuntary petitions and I think 10, 11 or 12 creditors have

21 filed joinders in this motion.

22       Mr. Bergstein talks about well, 95 percent of the

23 creditors aren't complaining.  Well, your Honor, a very

24 significant percentage of the creditors are complaining,

25 including some of the major creditors of this estate,

22

1 including the Guilds.  This is not an attack by a disgruntled

2 creditor or an incompetent employee, all the things that have

3 been leveled at the petitioning creditors at the declarants

4 by Mr. Bergstein through the alleged Debtors and their

5 response.  This is an overwhelming ground swell of creditors

6 who have simply had enough.  This is the comeuppance that Mr.

7 Bergstein has been generating for years as the Court noted at

8 the out set of the hearing.

9         These are problems that have developed over the

10 years to the point where creditors have gone out, obtained

11 judgments against Mr. Bergstein and now to have the Debtor in

12 the response to the motion talk about well, yeah there's a

13 liquidated judgment but there might be other sums that are

14 due.  Therefore, there's a bonafide dispute.  Those are the

15 kinds of things, your Honor, that create such problems in the

16 market place for these entities.  Every ball that can be kept

17 in the air.  Every mud that can slung against the wall.

18 Every smoke that could be generated has been generated in

19 order to try to keep these creditors at bay for an extremely

20 long period of time.

21         The day has come, your Honor.  The day has come

22 that the light of day has to be shown on the operation of

23 these companies, that the Enron of the entertainment world

24 has to be brought down just like the real Enron was brought

25 down and we need a trustee to get to the bottom of these

23

1 things.  There's no creditor that's shown up here today to

2 say you know, David Bergstein is reputable and I want him to

3 remain in control of these companies.  The only information

4 you've received from creditors, your Honor, and it's a pretty

5 wide spectrum of creditors, is that we need Bergstein removed

6 from the operation of these companies and a trustee appointed

7 immediately.

8         THE COURT:  Thank you.  Anybody else from the

9 movant side?

10         UNIDENTIFIED SPEAKER:  No, your Honor.

11         THE COURT:  Okay.

12         MR. WEINSTEIN:  Thank you, your Honor.  It's not

13 surprising that Mr. Neale skipped over at least two of the

14 critical points that your Honor asked him about.  Starting

15 with why is this such an emergency?  If you -- obviously we

16 haven't been able to kind of go through and reconcile your

17 Honor's evidentiary rulings.

18         THE COURT:  I understand.

19         MR. WEINSTEIN:  I know you're aware of that.

20         THE COURT:  I overruled most of them.

21         MR. WEINSTEIN:  Right.  So we accept that the

22 record contains a lot of the accusations about Bergstein's

23 style and management style and personal style.

24         THE COURT:  But I gather from the Debtors' stand

25 point that he is in control.  I mean I hadn't seen anything

24

1 that he is not from your side.

2           MR. WEINSTEIN:  That's correct.

3           THE COURT:  All right.

4           MR. WEINSTEIN:  But we're here on -- and if you'll

5 allow me a moment into the vernacular something of a fire

6 drill.  Your Honor asked about why does this have to be now?

7 Why does this have to be on such short notice?  Well, your

8 Honor has two stacks --

9           THE COURT:  Of course, their answer is because

10 this has been going on for a long time and they filed

11 involuntaries and they've had enough.

12           MR. WEINSTEIN:  Right but that's not a standard

13 for emergency action.

14           THE COURT:  We are here.

15           MR. WEINSTEIN:  Understood.

16           THE COURT:  I had no idea obviously when I saw it

17 what would transpire but here we are.

18           MR. WEINSTEIN:  The urgency of bears, to a certain

19 extent, upon the give and take of the record if you will and

20 the depth of the record, and I think just for a moment of

21 context, which maybe isn't directly related to the urgency

22 contention, but what's equally undisputed is number one this

23 has been -- what they say has been going on has been going on

24 for a long time.

25           We have something of a blow up in December 2009,

25

1 January 2010 where some accounting professionals leave and a

2 long time lawyer left.  We know the long time lawyer --

3 certainly we're entitled to assume and this Court is entitled

4 to assume that that long time lawyer had knowledge of, if not

5 participation in, that long standing set of circumstances

6 that they're complaining about.  We know that she left.  We

7 know there was clear communications about getting this going.

8 Now we haven't been able to take anything resembling

9 depositions.  We haven't been able to do a lot of that

10 because we've been put on this fire --

11         THE COURT:  Let me ask you, assuming you're

12 correct, and I have no opinion on it, that she did divulge

13 confidential things, how does that affect what I have to do

14 today?  Again, I don't know if that's true or not but even if

15 it were true, how does that affect the motions before me?

16         MR. WEINSTEIN:  Because I think, and maybe I will

17 have to come back to this --

18         THE COURT:  It's kind of like criminal law.  The

19 fruit of the poison tree.  It's not like I could suppress the

20 testimony.  So I guess my question is if it happened it would

21 not be a good thing but my question to you as far as

22 affecting me today what difference does that make?

23         MR. WEINSTEIN:  Because I think -- and maybe in

24 listening to your Honor's question I should come back to the

25 point in a minute to better answer but it's going to

26

1  ultimately add very important dimension to why we're here on

2  such a short notice, and what have we not been able to

3  address and what do they not want you to address because of

4  the urgent context?  It ultimately looks like it really is

5  about, as the evidence reflects, bringing down David

6  Bergstein and nothing that Mr. Neale has said here today

7  suggests that that's in any way incorrect.  That's not an

8  appropriate use of the involuntary petition and that brings

9  me to one of a couple essential issues here.

10         Involuntary cases are, especially contested ones,

11 are comparatively unusual.  Appointment of a trustee in a

12 regular Chapter 11 case while certainly much more common than

13 that is, at least by case law and I think by experience -- is

14 extraordinary by case law and certainly not common by

15 experience.  An interim trustee in an involuntary environment

16 is almost unheard of.  Almost 35 years into the Code there's

17 probably three published cases out there that even begin to

18 talk about this.

19         So we have this environment where I'm not going to

20 argue to you that at least under Section 105 the Court

21 doesn't have the power to do this.  We start from that

22 premise but given the complete absence of any kind of

23 knowledge if you will, case law knowledge, even treatise

24 knowledge on what this is, it has to be taken in context.

25 Everything they've said would be a much different argument if

27

1 this was one or more voluntary cases and we were arguing --

2 I'm still not sure we'd have the emergency factor, but this

3 whole set of arguments where there's an existing case where

4 the Court has all of its jurisdiction and a debtor in

5 possession has all of its obligations, this is a very

6 different environment.  There is no debtor in possession.

7 The alleged Debtor has no reporting obligations.

8          It's entitled by case law and statute to conduct

9 business as usual.  The premise that creditors are suffering

10 all they're doing at one level is reciting what happens a lot

11 outside of bankruptcy.  There are single cash management

12 systems.  There may or may not be perfect or even far from

13 perfect accounting systems that judges and lawyers in

14 bankruptcy cases look back and go, how did they even get this

15 far?

16          THE COURT:  Let me ask you.  Mr. Bergstein, what

17 does his response say in a nutshell as far as what the

18 accounting system is?  He's in charge so he would know better

19 than anybody.  What does he reply?

20          MR. WEINSTEIN:  I'm sorry?

21          THE COURT:  What did he reply as to these pretty

22 serious allegations, people who basically ran these

23 companies.  What's his reply?

24          MR. WEINSTEIN:  He certainly denies that all of

25 this is run on one spreadsheet.  There's testimony that --

28

1        THE COURT:  What does he say is actually happening

2  then?

3        MR. WEINSTEIN:  That there's a separate accounting

4  system for the English company or companies which they have

5  contended is all -- and he has no control and does not

6  dictate that money.  I'm sorry dictate, manage use of that

7  money.  There are accounting systems.  I'm sorry I don't know

8  the names of those details.  Ms. Coyoca may have a little bit

9  better information on that.  She's been around the case and

10 around the alleged Debtor clients a little bit longer than I

11 have so I'm not going to pretend I know all of those details.

12        THE COURT:  No, I'm just asking you what he said.

13        MR. WEINSTEIN:  Well, he --

14        THE COURT:  In his declaration -- well one at a

15 time.

16        MR. WEINSTEIN:  We have to --

17        THE COURT:  That's all I ask.  I'm not asking for

18 your knowledge.  Your knowledge of what he said.

19        MR. WEINSTEIN:  I don't have any more information

20 on that other than what's in the papers.  He denies that it's

21 simply one spreadsheet and that it's handled that way.  It's

22 handled in a much more responsible manner.  There are some

23 record keeping but I'm not going to pretend, your Honor, that

24 I'm able to answer you any better than that.

25        THE COURT:  Again, all I was asking you was your

29

1 knowledge of what he said not any other knowledge.

2           MR. WEINSTEIN:  And I've given you that.

3           THE COURT:  Okay.

4           MR. WEINSTEIN:  I think, again, we must consider

5 the context of the proceedings that they've instigated here.

6 Particularly to come back for its use to the urgency issue,

7 they're in effect trying to boot strap a trustee by arguing

8 only about things like cash management and selected persons

9 who are at odds with Mr. Bergstein.  For context, among other

10 things, your Honor has to please understand that a lot of

11 what this enterprise has done -- it's business model if you

12 will.  Perhaps I'm being a little bit too precise but its

13 business model has been to acquire film libraries through

14 purchasing debt and foreclosing on film libraries.  That's a

15 business model that alienates and irritates a lot of people

16 in any industry.

17           THE COURT:  But it's usually not your own people

18 who are running your company.

19           MR. WEINSTEIN:  True enough.

20           THE COURT:  I mean what you say is true.  It's a

21 competitive field but there are limits to that.

22           MR. WEINSTEIN:  But then again the ones we're

23 hearing from for the most part, particularly when you start

24 talking about dollar volume are not the people who are inside

25 the company.  As a matter of fact the people you heard from

30

1 as declarants they all claim to be in the tens of thousands

2 of dollars claimants, and most of them aren't even

3 petitioners.  So obviously what your Honor says is true if

4 you will a 5,000 foot level, but we can't overlook the

5 context, and that is -- Mr. Neale has accused us of sort of

6 not answering the when did you stop beating your spouse

7 question by coming in on the run with all sorts of corporate

8 details and structure.

9         Particularly given the fact that there are no real

10 ground rules for this relief.  There's no real precedent.

11 There's very little in the way of rules out there that would

12 guide your Honor apart from discretion and all --

13         THE COURT:  No, I'm not asking for the rules.  I'm

14 asking just for the facts as you understand them to be.

15         MR. WEINSTEIN:  The facts are that they have to --

16 in our view they would have to make some material threshold

17 showing that this involuntary is going to be sustained.  Now

18 exactly what the level of that -- this is very roughly --

19         THE COURT:  Well, there is testimony from the

20 various witnesses in a nutshell, correct me if I'm wrong,

21 that say essentially, at least in recent past, very few if

22 any at least of the people that are talking are getting paid.

23 I'm just paraphrasing the testimony and that therefore -- the

24 basic test is you need so many creditors and the Debtor is

25 not paying the debts as they become due.  That would give a

31

1  pretty strong indication at least from their side that most

2  of the things are simply not getting paid.

3          MR. WEINSTEIN:  Well, the problem --

4          THE COURT:  I'm asking is that -- I've read the

5  declarations and that seems to me what they're saying.  These

6  are people that are the inside that are at times running

7  these business.  So I'm only addressing your point as to the

8  relevance which I had asked first thing, Mr. Neale, right off

9  the bat as far as -- I don't know whether or not I'd grant

10 the order for relief which is basically what involuntaries

11 are all about.  There is at least from the one side a lot of

12 evidence, isn't there?

13         As far as the numbers of creditors, they keep

14 coming in every day.  I haven't looked lately but as far as

15 getting three.  Three with judgments.  I can tell you from my

16 stand point if you got a judgment -- the fact you may owe

17 other things doesn't mean that judgment is in dispute.  So

18 that argument doesn't weigh very well with me.  It could be

19 as far as paying the other things but a judgment is a

20 judgment.  So the numbers of creditors, three or more, given

21 the numerous debts apparently for these Debtors the only

22 thing left is is the Debtor generally paying the debts as

23 they become due.

24         We're not here for the hearing on the involuntary

25 but I'm saying just looking at the evidence that was

32

1 presented one would get the -- and I'm probably one of only

2 two neutral people in here, the U.S. Trustee and myself and a

3 couple of my law clerks.  Other than that, everybody seems to

4 have obviously an opinion but that is what the evidence is at

5 least from their side, isn't it?

6        MR. WEINSTEIN:  Well, I have to beg to differ with

7 you on some important details.

8        THE COURT:  Okay.

9        MR. WEINSTEIN:  Let's take the hardest one first

10 and then move to the ones that in a way more striking.  A

11 judgment is a judgment but they haven't produced -- they

12 haven't even offered into evidence what the judgment is.  I

13 beg to differ with the very general -- a judgment is -- they

14 didn't even say it's a money judgment and there is evidence.

15 Judgments can be a lot of things.  Judgments can say --

16        THE COURT:  I don't want to pursue that too much.

17 I'm simply saying the argument was made that if you have a

18 judgment and other debts are due, therefore the judgment is

19 in dispute.  That's my only point.

20        MR. WEINSTEIN:  But, again, that was a

21 mischaracterization of a responsive argument.  We didn't say

22 there might be something else.  What we said is the judgment

23 provides for an amount which they didn't provide and that

24 there are continuing components to that claim.

25        THE COURT:  So that claim may be being reduced

33

1 because of other things.

2        MR. WEINSTEIN:  And, therefore, it is disputed as
3 to amount.  The standards were changed in 2005 and any
4 material dispute -- it doesn't actually say material but I
5 think I have to concede that.  Any material dispute as to
6 amount disqualifies the petitioners.  So the 303(b) issue is
7 if not larger it's at least first here.  Even if we don't go
8 and ask what about the text of the judgments that's only with
9 respect to one company.

10        THE COURT:  Right.

11        MR. WEINSTEIN:  All of the other ones are clearly
12 disputed and worse with respect to the petitioners who line
13 up.  One it pervades all of the -- virtually all of cases,
14 the Screen Capital claim.  Well, in the petition it said
15 $594,000.  We had to guess at what that was so the client
16 sort of estimated what that must have been.  We responded to
17 that and said that was disputed.  They said oh no.

18        First of all, it's not that and it's a whole
19 different number and it's based on a power of attorney and
20 it's based on what they call an irrevocable or nonrefundable
21 cash advance from a company.  Anyone who is an assignee who
22 is a petitioner is disqualified automatically by rule if they
23 acquired the claim for purposes of filing an involuntary.  If
24 you acquire it for purposes of filing an involuntary -- I'm
25 sorry if you acquire a claim that is represented -- I'm sorry

34

1 if you require by assignment a claim that is part of a

2 petition, you have a burden to at least disclaim and prove by

3 some sort of declarative evidence that it wasn't.

4          We didn't get a power of attorney.  In the reply,

5 they came up with a power of attorney that says -- first of

6 all, it's not on the form that Rule 9010 requires.  It's not

7 on the bankruptcy form.  It's not date.  It doesn't seem to

8 say that the attorney under the power of attorney is

9 authorized to file an involuntary petition and there is

10 reference to a collection agreement dated March blank 2010.

11          So that is certainly more than the beginning of

12 evidence that the Screen Capital claim looks very much like

13 an assignment.  It looks very much like an assignment for

14 purposes of bringing these cases.  Involuntary cases are

15 disfavored in this environment.  They are not suppose to be

16 squeeze the debtor.  They are not suppose to be make it very

17 difficult to defend or to explain to the market place,

18 therefore, you cry uncle and concede.  That is specifically

19 what the case law makes very clear they're not suppose to be.

20          By running here and skipping over the 303(b)

21 issues in particular, they really are trying to get to that

22 with -- they're addressing that -- maybe it's not a two party

23 dispute but that state law dispute environment without

24 dealing with it.  Mr. Neale would say there's nothing that

25 says you have to look at that.  That's true.  But there's

35

1 also nothing that says you can appoint a trustee.  Again, we

2 concede that as a matter of bankruptcy practice and policy

3 that has to be a power of the court.  Just because it doesn't

4 say you need to look at 303(b) somewhere in this process,

5 particularly in an emergency environment.

6         I submit, your Honor, that that has to play a

7 material role and it would be the petitioners or in this case

8 the moving party's burden to show that.  Exactly what level

9 of proof I don't know because there's no ground rules for

10 this but I'd liken it to provisional remedies in the state

11 court.  I'd liken to an attachment or a TRO.  We all know

12 what those standards are likely to prevail.  Likely to

13 prevail on what?  Likely to prevail on the petitioner's

14 claims are not disputed.  They are unliquidated.  They're not

15 contingent.

16         These claims are discussed in the most ethereal

17 broadest unsatisfied, aggravated, frustrated terms possible.

18 No one has produced an invoice, an unpaid invoice.  The

19 closest you come -- and again it winds up being telling is a

20 lawyer named Terry Zimon is a petitioner in one of the cases.

21 I'd have to find where she is.  She put in -- her claim

22 stated on the petition is $22,000 and change.  We challenged

23 that.  They came back and said here's W2 forms I guess they

24 were from 2009 showing $44,000 and some was paid to her, and

25 a bounced check for $3,200 and change.

36

1          Well, there's no way to get that to -- now there

2 may be in her deposition or in testimony at trial some day,

3 there may be some way for her -- but here not only did they

4 not give anything that shows the $22,000 is liquidated,

5 undisputed as to amount and undisputed as to liability, but

6 the few items of evidence that they did give don't hang

7 together at least not on their face.  Again, there may be a

8 second or third -- and that's just one of several that are

9 like that.

10         We have questions about -- questions are raised

11 about the 2019 disclosures.  That's where we first learned

12 that number one the Screen Capital claim was not $594,000 and

13 it was not related to guarantees of two film special entity

14 productions, but rather an entirely different one and it's

15 some number less than half of that and it same from Salter

16 (phonetic) who is an appraisal company that has nothing to do

17 with film development or film marketing as such.  They're a

18 vendor to those who market films.

19         I submit to you that there 303(b) issues are much

20 more significant than the petitioners want you to think.

21 There's a reason that they're skipping over that and yet

22 someone who puts a petition together -- even if you don't

23 come in for a trustee or in an emergency really needs to have

24 that all ready before they sign the petition.  When we're

25 asked rhetorically well, what about -- why didn't you deny

37

1  this?  Why didn't you deny that?  Why didn't you deny the

2  other thing?  I think that goes at least equally back at the

3  petitioners if you will, and it's their burdens to deal with

4  these things first.

5          I mean we all know the defendants or respondent --

6  in theory what -- people don't normally treat it this way, in

7  theory defendants don't have to prove anything until some

8  measure of showing has been made by the instigating party.

9  Now it's often too risky for lawyers and litigants to

10 actually play it that way but analytically when we get to

11 actually now examining what is in the evidentiary pool and

12 the burdens are applied, I think that is how it has to be

13 done.  They haven't shown any -- I could go through in more

14 detail.

15          Virtually every one of the petitioners -- again, I

16 heard your Honor's remark about the judgment creditors.  I do

17 think there's a related issue but why not -- again, who

18 didn't produce what on the run, why not produce copies of

19 these judgments to show that they're just money judgments.

20 They're done.  They're final.  They're not appealed.  That

21 would be easy for someone who is signing a petition.

22          Even if your Honor disagrees or continues to

23 disagree with me on exactly how that should go, all of these

24 other ones are clearly disputed, objectively disputed and the

25 fact that they're coming out of an environment of dissonance

38

1 and disapproval of Bergstein's style, personal style,

2 management style.  He's too cavalier.  He's too arrogant.

3 He's to whatever words you want to fill in there.   That

4 doesn't justify this with at least some material showing that

5 this is the right -- if this was a voluntary case with debtor

6 in possession obligation so on, it would be a very different

7 argument.  I mean we may have had to do depositions on the

8 run but in this environment that threshold has got to be

9 addressed, and they simply haven't done it.

10          Another example I have to give you under the CapCo

11 case, one of the petitioner's name is David Tuckerman.  He

12 asserted in the petition that is claim is unpaid

13 compensation.  I forgot if he used the term wages or

14 something.  Well, we produced a written agreement that his

15 compensation agreement was with another entity.  They're the

16 ones who are both complaining and using this sort of

17 imprecise environment but it's not unusual at all in a large

18 corporate family for there to be less than perfect --

19 bankruptcy lawyers and bankruptcy judges look back on that

20 and want to unwind it or at least deal with it in a

21 bankruptcy environment but that happens all the time in the

22 commercial world.

23          So we produce this agreement with Mr. Tuckerman

24 that he signed with Pangia as his obligor if you will and

25 their answer is he always understood otherwise.  That's not

39

1 competent evidence that does anything with that contract.

2 That's not anything.  That negates his ability, if anything.

3 At a threshold level at least that negates his ability to be

4 a qualified petitioner.  Your Honor is correct, of course,

5 that on its face there are sufficient numbers of petitioners.

6 Maybe there is even evidence -- I would even disagree with

7 you -- there is evidence pending to prove not failure to pay

8 debts as they come due but certainly not anything that would

9 sustain that burden if we got there because that's a whole

10 different -- we need comparative -- what sorts of things are

11 not being paid.

12          The Guild claims arise from film -- again, your

13 Honor may not have been able to communicate this.  These

14 Debtors are not film production companies.  These don't make

15 films.  So they don't have direct relationships with the

16 Guilds.  Their business model, wise or otherwise, is to

17 acquire film libraries by foreclosing out other failures.  So

18 the foreclosed out entities may have obligations to the

19 Guilds and this has been apparently a bone of contention in

20 litigation between the Guilds and these sorts of business

21 plans for a long time.  Some of them get settled.  Some of

22 them get litigated.

23          All the evidence they put in shows disputes in

24 arbitration and so on.  So they have all of -- so on the

25 generally paying debts issue yes, there's some level of

40

1  almost conversational evidence that debts are not being paid

2  but nothing with this percentage compared to the entirety of

3  the debt structure.  This type, whether it's Sparkletts water

4  or critical material vendors or --

5         THE COURT:  You're right.  This is not a hearing

6  on the involuntary.  Go on.

7         MR. WEINSTEIN:  Well, I think I probably should

8  hand the podium to Ms. Coyoca.  We left unresolved -- if

9  there's any more information to be had with respect to some

10 of the Bergstein responses if you will.  Again, we've made

11 the point that the threshold here and the urgency issue here

12 which is the other threshold have really not been satisfied,

13 and we really ought to get to the involuntary merits first.

14        THE COURT:  Thank you.

15        MS. COYOCA:  Your Honor, I want to address certain

16 of the factual issues and questions that were raised.  I'd

17 like to first specifically address the issue of the

18 accounting systems.  It is flatly untrue that we have not

19 produced evidence with respect to the maintenance of

20 accounting systems.  We have produced such evidence.  It is

21 the Great Plains accounting system that is a very complex

22 sophisticated accounting system that is utilized for the two

23 operating entities that were involved during the pertinent

24 time period with respect to the distribution activities of

25 the Thinkfilm and Capitol Film libraries.

41

1          I would like to also lay over a corporate

2    structure that I think is helpful and useful because there

3    has been so much atmospherics and sound bite statements made

4    that I think we may be losing focus with respect to the

5    particular factual issues that I think need to be considered

6    in looking at this motion.  There are five different alleged

7    Debtors.  Each of them needs to be analyzed in the context in

8    which it sits visavis the other entities.

9          Out of these five alleged Debtor entities, only

10   one is an operating entity and that is Thinkfilms, LLC.  R2D2

11   is the funding entity for the various structures that are

12   underneath R2D2 and is set forth in the Bergstein

13   declaration.  R2D2 owns CT-1 Holdings.  CT-1 Holdings is the

14   holding company for the various film companies that are

15   underneath the R2D2 CT-1 Holdings.

16         Of course, those particular entities are not

17   operating companies that are actively involved in the

18   distribution of films directly and, therefore, it is of no

19   surprise that there will not be necessarily accounting

20   systems that record the flows of distribution monies earned

21   from the licensing of films into R2D2.  That doesn't happen

22   because they don't license films.  The two entities during

23   the pertinent time period that did license films that were

24   the operating companies for the distribution of these

25   libraries is Capitol Films Limited which is the UK entity

42

1  that is owned indirectly by the CapCo Group, LLC and

2  Thinkfilms which is an alleged Debtor here in this particular

3  group of companies.

4          The testimony with -- excuse me the evidence

5  that's been submitted with respect to the accounting systems

6  that are in place for the two operating entities that

7  actually are involved in the licensing and distribution of

8  these films is set forth in the declarations of Robert Fox

9  and of Jeffrey Dee.  As to the Thinkfilms accounting

10 structure, what has been explained is that Thinkfilms was

11 acquired from a Canadian group of owners back in 2006, that

12 it as the accounting systems and the distribution agreements

13 and the distribution revenues were being accounted for and

14 transferred into the overall structure of this enterprise, it

15 was realized that they had inadequate accounting systems,

16 that they were not accounting on a picture by picture basis

17 as was appropriate in this business model of film

18 distribution, and that they migrated over into the Great

19 Plains accounting system so that as much detail as possible

20 could be recorded with respect to the payment of monies and

21 the recording of expenses that were being attributed to the

22 distribution of the Thinkfilm entities.  That information,

23 contrary to the suggestion of Mr. Neale is set forth in the

24 declarations of Mr. Bergstein and in the declaration of Mr.

25 Dee.

43

1          With respect to the other operating entity, that

2  is the Capitol Films Limited entity in the UK, the

3  information with respect to their use of the Great Plains

4  accounting system is set forth in the declaration of Mr. Fox.

5  It is quite detailed in terms of the level of detail and

6  minutia that is recorded with respect to the distribution of

7  these films.  So for there to be a suggestion that there is

8  unrebutted in the record the concept that there is a single

9  Excel spreadsheet controlled by Mr. Bergstein's assistant it

10 simply flatly untrue.

11          It is not correct.  It is not accurate and instead

12 there has been evidence to the contrary that has been

13 provided.  I'd like to address now specifically the three

14 factual declarations that were submitted by three either

15 former employees or consultants to the enterprise and that is

16 Mr. Gall's declaration, Mr. Turner's declaration and Mr.

17 Gurtz' declaration.  What we have submitted is the evidence

18 to show that Mr. Gurtz, the supposed individual who uncovered

19 all of this purportedly, Mr. Gurtz was brought in to assist

20 with respect to the transition of a single licensing company

21 to be used, the Pangia Media Group, to be used for purposes

22 of the distribution of these films.

23          Mr. Gurtz was brought in to try to assist and

24 oversee with respect to these activities.  Mr. Gurtz, who is

25 at the end of his business career, was having financial

44

1 difficulties of his own, had had previous --

2        THE COURT:  Where did you get that last comment?

3        UNIDENTIFIED SPEAKER:  None of this is in the

4 evidence or --

5        THE COURT:  I don't recall seeing that.  Am I

6 wrong?

7        MS. COYOCA:  No, your Honor, it is in the

8 declarations.  It's in the Bergstein declaration.  It's set

9 forth in the Bergstein declaration.

10        THE COURT:  Who was having financial problems?

11        MS. COYOCA:  Mr. Gurtz.

12        THE COURT:  Maybe I missed that.  Can you point

13 that out to me?

14        MS. COYOCA:  This is in the Bergstein declaration.

15 Yes, it is, your Honor.

16        THE COURT:  All right.

17        MS. COYOCA:  Mr. Gurtz -- Mr. Bergstein was

18 approached and asked if he would retain Mr. Gurtz and bring

19 him into the company by a mutual friend.  He did so.  He

20 brought him in.  Mr. Gurtz was with the company for less than

21 four months.  He was there from September of 2009 until the

22 end of the year.

23        THE COURT:  While you are doing that, maybe you

24 can have Mr. Weinstein find that portion of Mr. Bergstein's

25 declaration.  I'm not saying it's not there but I don't

45

1 recall it.  So while you're talking I'd like to see that.

2        MS. COYOCA:  Understood, your Honor.  Perhaps my

3 co-counsel can locate that for me.  Mr. Turner's declaration.

4 Mr. Turner was demoted.  Mr. Turner is a disgruntled employee

5 who was demoted from his overall position of being CFO to

6 being just in charge of producer participant reporting

7 because of the concerns that Mr. Bergstein had with respect

8 to his performance.  None of that is addressed in the

9 declarations that had been provided by Mr. Gall, Mr. Turner

10 or Mr. Gurtz.

11        None of the information has been rebutted that we

12 have submitted that has said look these were amounts that

13 were disputed because of either performance issues or because

14 of lack of attentiveness to their job duties or because they

15 were with the company for such a short period of time but

16 attempted to take extended longer periods of vacation when

17 they had only been with the company for four or five months

18 et cetera.

19        What we have submitted in the Bergstein

20 declaration is evidence to suggest that indeed these amounts

21 that these individuals are claiming are due are in fact

22 challenged, are in fact questioned by Mr. Bergstein and by

23 the Debtor, by the alleged Debtor entities.  They don't stand

24 simply undisputed but yes these amounts are owed.  To turn

25 briefly now, and I don't want to take up too much of the

46

1 Court's time, but I think it's very very telling if we go

2 through on an entity by entity basis with respect to each of

3 the alleged Debtors, the companies, the petitioning creditors

4 that have sought to put them in.

5        With respect to the first entity, R2D2.  The three

6 creditors that were a part of the initial filing were Aramid,

7 an Aramid affiliate, Screen Capital and AIB, Allied Irish

8 Bank.  With respect to Aramid, Aramid is a lender, was a

9 lender to various of the Capitol entities so that they could

10 engage in their business of film distribution.  I want to

11 also just briefly point out there is a Capitol entity that is

12 involved in the production of films but it's one entity.  The

13 bulk of their business is involved in the licensing and

14 distribution of films, the acquisition of film libraries of

15 films that already have been made and then licensing those

16 films for distribution throughout the world.

17        With respect to the R2D2 filing, the Aramid

18 claim -- the question of whether or not that is a fixed

19 amount certain that is not subject to dispute as is my

20 understanding, although I am not a bankruptcy lawyer, is the

21 question here.  Aramid has filed in the last two weeks three

22 lawsuits against these entities, other entities, Mr.

23 Bergstein and Mr. -- individually because they contend that

24 they have disputes and the Capitol entities, in response

25 back, have raised and will raise issues with respect to the

47

1 serious nature of the interest charge, the interest penalties

2 and payments that have been charged.  These are amounts that

3 are very much in dispute as is evidenced by the fact that

4 they filed no less than three lawsuits in the space of the

5 last two weeks with respect to the debts that they claim are

6 due and owing from R2D2.

7          With respect to Screen Capital, my co-counsel, Mr.

8 Weinstein, addressed that briefly but I just want to bring

9 the point home.  Screen Capital is the entity of Mr. David

10 Mulner who is an agent as represented on the web site for

11 Aramid Entertainment Fund, LP that is does business for and

12 on behalf of Aramid.  He has submitted a claim.  Screen

13 Capital has submitted a claim in the amount first of $594,000

14 and then was reduced, and it was characterized as an agent

15 claim.  We had no knowledge.  R2D2 had no contractual

16 relationship with Screen Capital.

17          There was no conversation that they could elude to

18 that said we will be paid an agent fee as a result of the

19 placement of the loans through Aramid.  There was simply a --

20 factual information to try to assess how it is that Screen

21 Capital could claim it was owed some amount of money by R2D2

22 when there was simply no contractual or otherwise

23 relationship to establish the foundation for such a debt, let

24 alone a disputed debt.

25          After we submitted our opposition, we come to find

48

1 out no, the Screen Capital debt is actually an amount that

2 was received as a result of some type of transfer from the

3 Roy Salter Valuation Group which values film libraries to

4 Screen Capital.  Again, it is my understanding that such an

5 assignment for purposes of bringing an entity into bankruptcy

6 is not permitted under the Bankruptcy Code, and yet that

7 appears based on the documents that they submitted that that

8 is exactly precisely what has occurred.

9          With respect to Allied Irish Bank and the debt

10 that purportedly claimed is due and owing to Allied Irish

11 Bank by R2D2.  Yes, it is correct that there has been

12 litigation and a judgment that has been entered in that

13 matter.  However, the judgment, which has not been made a

14 part of these bankruptcy filings, indicates that it is

15 subject to reduction as a result of the amounts that are paid

16 by the various sub distributors for the licensing of the film

17 Edge of Love, and those payments have substantially reduced

18 that AIB amount that is claimed due and owing but there is

19 absolutely no mention in the record here of the fact that

20 that debt is reduced, has been reduced, continues to be

21 reduced and no foundation to establish the basis for this AIB

22 debt that is supposedly is claimed, due and owing.

23          I can go through the same analysis with respect to

24 each of the other alleged Debtors if it is of assistance or I

25 can stop here.

49

1        THE COURT:  If you wish.

2        MS. COYOCA:  Okay.  I'll keep going then, your

3 Honor.  Let me take the next entity, the Capitol Films

4 Development entity.  That entity is the only entity as to

5 which the Guilds have made, and there have been two of them,

6 Studio Transportation Drivers and Writers Guild.  The rest of

7 the Guilds they submitted papers but they submitted papers on

8 Friday and on Monday.  We have not yet had an opportunity,

9 your Honor -- we have less than four days less then two

10 business days in order to put together a response.

11        Dealing with what was filed on a timely basis, the

12 Studio Transportation Drivers Guild and the Writers Guild

13 submitted claims against Capitol Films Development.  To

14 clarify, Capitol Films Development is an entity that is

15 involved in the development of films and the production of

16 films.  It takes ideas for films, writes the films et cetera

17 and then spends money to develop them to decide whether or

18 not it is a viable project that should be forward and

19 ultimately be made into a film.

20        The Studio Transportation Drivers Guild and the

21 Writers Guild are alleging that they are owed amounts by

22 Capitol Films Development but if you go through and parse

23 each of the films as to which the Guilds claim they are owed

24 monies, they are not for films that Capitol Films Development

25 had an obligation to pay the Guilds on.  Instead, Capitol

50

1 Films Development had acquired projects that already had been

2 developed and those amounts were already incurred with

3 respect to other third party entities.  They had pursued

4 their claims against those other third party entities.  They

5 had received whatever judgments et cetera they had received,

6 but they were not obligations that were specifically directed

7 to or incurred by Capitol Films Development and there is

8 nothing in the record to suggest otherwise.

9        It is of no surprise that this is the case because

10 as Mr. Weinstein pointed out the Capitol entities are in the

11 business of acquiring distressed film assets, attempting to

12 monetize those assets by entering into distribution deals,

13 putting in the amounts of money that is necessary to get

14 these film project or get these film libraries back up and

15 running.  To the extent that Screen Capital is claimed to owe

16 this debt, there has been no submission of evidence that with

17 respect to specific films on a film by film basis that there

18 was an obligation owed the Guilds that was not paid.

19        Instead, there has been this monolithic catch all

20 declaration that has been submitted to the effect of well,

21 Mr. Bergstein does not pay his obligations that are owed to

22 the Guilds, does not pay residuals et cetera as opposed to

23 taking into account and looking at the particular films that

24 are in issue and the particular film companies as to which

25 the obligation attached.  The other entities that are alleged

51

1 Debtors with respect to Capitol Films Development is a

2 gentleman by the name of Steve Altman and then the Screen

3 Capital entity.  I've already addressed the Screen Capital

4 entity with respect to the R2D2 filing, and I would also note

5 that this is the same Screen Capital debt claim.

6         It is alleged to be an alleged creditor of not one

7 of but instead all five of these entities, these alleged

8 Debtors, the same amount.  Whether it's the $594,000 or the

9 $200,000 is alleged to be in support of the R2D2 filing, the

10 Capitol Group filing, the CT-1's filing, the Capitol Films

11 Development filing and the Thinkfilms filing which again I

12 understand is not permissible under the bankruptcy rules.

13        Just briefly, your Honor, CapCo International

14 Group we've already addressed.  The three entities that are

15 alleged to be Debtors in that instance Screen Capital

16 International Group, Terry Zimon and David Tuckerman are the

17 alleged Debtors.  We've covered Screen Capital.  Terry Zimon,

18 as we have pointed out, this is a debt that we absolutely

19 dispute is due and owing.

20        Mr. Weinstein touched on the issue of Ms. Tredub

21 (phonetic) and Ms. Tredub's participation in these

22 proceedings and we are addressing this in a separate issue in

23 a state court action that has been filed.  We are seeking

24 expedited discovery in that context but it raises very

25 serious issues with respect to the use of privileged

52

1 attorney/client information and the breach of the fiduciary

2 obligation that enures to every attorney not to do or say

3 anything that is going to be adverse to their client's

4 interest unless under Business Professions Code 6038 you

5 believe eminent bodily harm or death is likely to result.

6         There is no allegation of death here.  We're

7 talking about money.  We're talking about money that people

8 claim is owed but yet that attorney/client information was

9 utilized.  To direct our comments specifically to the Zimon

10 claim, Ms. Zimon claims she was owed money directly by CapCo

11 Group and she claims she was an employee.  She has no written

12 records to demonstrate that.  She has no written fee

13 agreement et cetera.  Instead, she worked for Ms. Tredub.

14 Ms. Tredub was an outside law firm that was within the

15 Capitol overall.  She maintained a separate professional

16 corporation and she maintained a separate client trust

17 account, and she had a separate email address.

18         Ms. Zimon utilized that email address and took her

19 direction from Ms. Zimon.  In any event as we have indicated,

20 the $22,000 that Ms. Zimon claims that she is owed is

21 rebutted by her own W2 form that she has submitted that shows

22 that the grand total sum of her claim, such as it is, is less

23 than $4,000 as opposed to the $22,000 that is alleged here.

24 We challenge that.

25         We've already addressed the David Tuckerman issue,

53

1 that his claim -- he claims that he was working for CapCo

2 Group.  We have a written agreement signed by the parties to

3 be charged that says that that agreement is with Pangia but

4 not with CapCo Group, LLC.  We have no specific evidence to

5 rebut that particular factual state of the record and

6 evidence as it has been submitted.  The only other entity

7 that I have not specifically addressed is Thinkfilms.

8         With respect to Thinkfilms, there have been five

9 alleged Debtors that were alleged as of the time of the

10 initial filing.  We've addressed one of them, Screen Capital.

11 With respect to the remaining, one of the, Allied

12 Advertising, is a debt that was incurred by -- Allied

13 Advertising provides advertising for films that were being

14 distributed by Think.  There was a dispute with respect to

15 payment and that amount has been reduced to judgment.

16         With respect to the others, Solar Film Works, 10th

17 and Wolf, some judgments some not.  Some still in a disputed

18 state of evidence.  With respect to whether those debts are

19 due and owing, still in litigation.  In addition, are still

20 subject to reduction as a result of the licensing fees and

21 distribution amounts that are being on those films on a going

22 forward basis.

23         So, your Honor, just in summary not to belabor the

24 point I think it's very important because of the high

25 atmospherics that this matter has generated and the amount of

54

1 comments that have been made by the media and the other

2 allegations that have been leveled at Mr. Bergstein, this is

3 not about Mr. Bergstein.  This is about a film business that

4 is in charge of and is involved in distributing over 1,300

5 films.  It generates revenues.  It generates monies.  There

6 are employees that are paid.  There are contracts that have

7 been entered into around the globe to come --

8           THE COURT:  How many employees are there by the

9 way?

10          MS. COYOCA:  Excuse me?

11          THE COURT:  How many employees are there?

12          MS. COYOCA:  I'm sorry, your Honor, I don't know.

13          THE COURT:  Approximately.

14          MS. COYOCA:  I don't know the direct answer to

15 that question.  I believe in sum total there's approximately

16 30 to 35 but the reason I'm equivocating is because I don't

17 know with respect to Capitol Films Limited in the UK.  I

18 believe there are approximately 30 to 35.  There may be

19 others.  The point I am making is that there are business

20 relationships that will be disrupted as a result of this.  It

21 is no secret here that this filing is all about and has been

22 backed by a financier, Aramid Entertainment Fund, LP that is

23 disgruntled about how its loans are being handled by this

24 enterprise.

25          This is an attempt on its part to take that

55

1 dispute out of the regular litigation system and to instead

2 insert it into the bankruptcy.  Frankly on less than four

3 days notice, that is not appropriate, your Honor, under any

4 circumstances or any stretch if you go through you parse the

5 actual factual information that's set forth in the petitions

6 and in the declarations that have been submitted.  Thank you,

7 your Honor.

8        THE COURT:  All right.  Did you ever find that

9 reference to the financial stability?  Mr. Weinstein, did you

10 find anything?

11       MR. WEINSTEIN:  I'm showing her what we have and

12 we don't have.

13       MR. NEALE:  Your Honor, we looked and we couldn't

14 find it.

15       THE COURT:  Again, I don't recall.  I've read a

16 lot of papers but I was just curious to see if it there was.

17       MR. NEALE:  No, your Honor.  Your Honor, let me

18 start with Ms. Coyoca's comments just because I think they're

19 of a different nature than Mr. Weinstein's.  You know it's

20 not unusual I think when you're faced with troublesome facts

21 to attack the bringer of those facts.  I think what we've

22 heard here is every single declarant is disgruntled.  Every

23 single declarant has an ax to grind.  Former attorneys have

24 an ax to grind.  Creditors have an ax to grind.  Every

25 creditors claim is disputed.  There's no legitimate claims

56

1 here before your Honor.  This involuntary petition has no

2 hope of surviving et cetera.

3           Your Honor, I think the evidence in the record,

4 especially following the Court's evidentiary rulings, is 100

5 percent to the contrary.  We're not dealing with disgruntled

6 employees.  We're dealing with employees who left a company

7 spiraling out of control because they weren't getting paid,

8 because they couldn't get information to do their jobs,

9 because they were frustrated by Mr. Bergstein's, as Mr.

10 Weinstein calls it, management style.

11          This is not a situation where you've got one or

12 two disgruntled creditors who file an involuntary petition as

13 a substitute for a state court action to collect.  These are

14 creditors who have gone through that process already and, for

15 the most part, have judgments that they've been trying to

16 enforce against these entities in some cases for years with

17 no success despite representations by Mr. Bergstein and

18 promises of payment et cetera.

19          When there's this attack on the petitioning

20 creditors, when there's an attack on the merits of the

21 involuntary all that will be developed before your Honor as

22 part and parcel of the ultimate decision on whether or not an

23 order for relief should get entered.  Because they can't

24 really address the merits of the trustee motion instead they

25 pack all these other issues.

57

1        Your Honor, every one of those petitions is
2  executed by petitioning creditors under penalty of perjury.
3  There's no question that there's a dire consequence to the
4  execution of those petitions.  The petitioners knew what they
5  were getting into when they signed those petitions.  If they
6  believe there are objections to their claims, that there are
7  bonafide disputes and not just we don't want to pay these
8  people or we think they're wrong, these have to be bonafide
9  disputes.  As the Court knows, it's not enough to just simply
10 say well we don't agree.  Basically that's what we've seen is
11 well we don't agree.  We've got someone saying well, they
12 were employed by a different entity but the pay stubs
13 attached to Mr. Tuckerman's declaration all come from CapCo,
14 and yet the allegation is he's employed by Pangia.

15        I could go on and on.  Ms. Zimon supplied a
16 declaration to show that her pay stubs were from CapCo.  She
17 had a check return for insufficient funds. These are all
18 facts that go to the solvency or insolvency of these
19 entities.  Frankly, your Honor, to minimize the claims of
20 former employees and say well, that's just a $20,000 claim,
21 that's just a $10,000 claim.  The Bankruptcy Code doesn't say
22 you have to have only big claims.  The Bankruptcy Code sets a
23 threshold that you have to overcome for the number of
24 petitioning creditors that can be comprised of a hundred $500
25 claims.  It doesn't matter

58

1          The issue is you have creditors in these cases who

2 are not getting paid.  There's really no dispute about that.

3 Turning to Mr. Weinstein's comments I thought it was ironic

4 that the basic argument that they're making here is that

5 there is no emergency because after all this has been going

6 on for years.  It's kind of astounding to me to have that be

7 the basis for an opposition to a trustee motion.  The whole

8 point of the trustee motion is this is someone who can't be

9 trusted with the operations of these businesses because this

10 has been going on for years.  He has an established track

11 record of how he's managed these companies and while Ms.

12 Coyoca may argue well, this is not about David Bergstein.

13 The trustee motion very much is about David Bergstein.

14          It's about an individual who exercises total

15 control over the operations of these companies, exercises

16 total control over the flow of cash, total control over the

17 flow of information, total control over the payment to

18 creditors.  This is David Bergstein's kingdom.  That's what

19 this is about.  So to say this is not about Mr. Bergstein I

20 think your Honor is 100 percent missing the point.  The

21 second thing that troubled me about Mr. Weinstein's comments

22 is well, there's no emergency because it's been going on for

23 years and, after all, a Debtor during the gap period can

24 continue to conduct business as usual.

25          Well, again, your Honor, that's exactly the

59

1  problem.  We're concerned about this Debtor to continue to

2  conduct business as usual because business as usual is

3  siphoning off cash, failing to maintain accounting records,

4  failing to account for inter company transactions, not paying

5  creditors, making promises about payment that aren't kept, et

6  cetera.  I could go on and on.  It's all in our papers.  Most

7  of it I think survived the Court's evidentiary rulings.  So

8  what we've developed here is a picture of a company that's

9  spiraling out of control.  To say, what's another month, two

10 months or three months.  Let's let it spiral and we'll see

11 what happens I don't think is a fiduciary type responsibility

12 type approach to the management of these companies.

13          To simply say well David Bergstein has been

14 mismanaging them for years so he should continue to mismanage

15 them again, your Honor, I think that defies logic and it also

16 contradicts the whole notion of what an interim trustee is

17 supposed to do.  An interim trustee is supposed to step in in

18 these very types of circumstances to take control of these

19 companies that are spinning out of control, to gain some

20 accountability, to gain access to records.

21          Ms. Coyoca talked about the accounting systems

22 that are in place.  Your Honor, if you look at the Bergstein

23 declaration there's only one reference to an accounting

24 system.  I believe it appears on page four, paragraph 11. He

25 talks about the accounting systems being something more than

60

1 just a spreadsheet but, your Honor, the comment is limited

2 and pertains exclusively to Thinkfilm.  As we said, your

3 Honor, we don't debate that at some point in time Thinkfilm

4 had an operating accounting system.  It was then moved to Los

5 Angeles and that accounting system was completely disrupted

6 and destroyed by Mr. Bergstein.

7         At one point in time, there was a Thinkfilm

8 accounting system.  There was Great Plains software but I

9 think as Mr. Turner testified in his declaration they never

10 had the money to be able to pay people to train anyone on the

11 Great Plains software.  So to say you have Great Plains

12 software on your computer, I have lots of programs on my

13 computer at home.  I have no idea what they do.  It's

14 entirely possible and it's entirely likely based on the

15 testimony that that's exactly what we're dealing with here.

16         We have no sophisticated accounting that's being

17 performed by these companies and it's very easy to stand up

18 and alleged well, those aren't really operating companies.

19 They don't really do anything.  Well, we have creditors who

20 have come forward and said yeah they really do things.  They

21 borrow money from me and they don't repay it.  There are

22 claims that have been generated by those companies based on

23 some form of operation.  So to simply say that they're

24 holding companies and there's no harm here I think is

25 disingenuous, your Honor.

61

1        In addition, they spoke of two operating

2 companies.  They spoke of Capitol Films UK and Thinkfilm.

3 Capitol Films UK is currently under administration by an

4 administrator in the United Kingdom.  It's in a bankruptcy of

5 its own.  It's in a bankruptcy supervised and run by an

6 independent essentially trustee in the UK.  That's their

7 example of a company that has adequate accounting and

8 adequate access to financial information.  A company in

9 insolvency in the UK being administered by an independent

10 trustee.

11        Then they say Thinkfilm also has this adequate

12 information and so on and so forth.  Thinkfilm is the only

13 entity that they can't discredit the creditors for.  They've

14 made all kinds of allegations about all the other creditors

15 in all the other cases but Thinkfilm they kind of come up

16 against the brick wall because we've got at least five

17 petitioning creditors in Thinkfilm.  They can see that there

18 are judgments, that the amounts have been reduced to judgment

19 and there's no objection to that.  So you've got over the

20 hurdle in 303(b) with the number of petitioning creditors,

21 and we think the evidence will show that Thinkfilm is

22 certainly not paying its debts as they come due.

23        The two operating entities that they're holding up

24 as examples of what this company can do and why it's so

25 important that these operations be protected and so on and so

62

1 forth, one of them is already in a bankruptcy.  We think

2 Thinkfilm should be in a bankruptcy and should be operated to

3 the same extent that Capitol Films UK is being operated i.e.

4 by an independent trustee.

5        Your Honor, there's been a description of Mr.

6 Bergstein's management style as taking advantage of

7 distressed debt and then foreclosing.  In this circumstance,

8 your Honor, we think that Mr. Bergstein is responsible for

9 the creation of the distress.  This is something that is a

10 self contained system.  This is not an instance where Mr.

11 Bergstein went out and bought debt of film company XYZ and is

12 now attempting to foreclose on film company XYZ.  This is an

13 instance, your Honor, where Mr. Bergstein went out and

14 acquired debt secured against or enforceable against the very

15 entities that he's charged with running.

16        The foreclosure sale that was scheduled to occur

17 was by an entity called TFC library I believe was the name of

18 the entity.  Mr. Bergstein testifies in his declaration about

19 TFC library and the foreclosure sale.  The notice attached to

20 Mr. Lan's (phonetic) declaration was all about TFC library.

21 So the sale is being administered by Mr. Bergstein.  This is

22 an individual who has created this confusion, who has created

23 morass and is now attempting to exploit that, to foreclose

24 out legitimate creditors, to buy assets at a significant

25 discount, to avoid obligations to the Guilds, to avoid

63

1 obligations to producers and distributors.

2       This is not a situation where well, it's just a

3 management style and it's a business strategy that alienates

4 people.  All that may be true but that's not what we're

5 talking about here.  In addition, your Honor, there's been a

6 lot of talk about my firm's Rule 2019 statement.  I'm happy

7 to address those issues.  I think frankly it's a side line

8 and it's a red herring for today's proceedings.  My client,

9 Screen Capital International has a power of attorney.  A

10 power of attorney is not an assignment of claim.

11       An assignment of claim is an assignment of claim.

12 Mr. Weinstein and Ms. Coyoca attended law school just like I

13 did and we learned that an assignment has specific language.

14 It requires an agreement.  There's no assignment agreement

15 here.  It's not -- you don't get to argue that it's a quasi

16 assignment.  It's kind of like an assignment.  It is what it

17 is.  It's a collection agreement with a power of attorney

18 attached to it.  That's what it is.  That's what's been

19 disclosed.

20       I'm hesitant to even go down the path of dealing

21 with the whole arguments about Ms. Tredub.  As you saw, we

22 dealt with that in our papers by simply saying it's

23 inflammatory.  It's not something we want to -- it's between

24 them and Ms. Tredub.  Frankly, there has not been identified

25 one single fact in any declaration or pleading that's been

64

1 filed that they can point to and say aha this is the product

2 of attorney/client privileged information.  The reason for

3 that, your Honor, is there's no information like that that's

4 contained in any of the papers.  Again, that's an issue for

5 them to decide.

6        We don't think it's appropriately brought before

7 your Honor as the Court I think correctly noted there's no

8 such thing as the fruit of the poisonous tree in civil

9 litigation.  So I'd like to sort of take that red herring off

10 the table, just like I'd like to take the red herring of the

11 Rule 2019 statement off the table and focus just on the

12 issues that are before the Court today.  Having said that,

13 your Honor, I've taken up a lot of the Court's time and

14 dominated the podium.  I don't know whether there are other

15 creditors.

16        There are a significant number of creditors who

17 have joined in our motion.  I don't know if they want to be

18 heard today.  I don't think that anything that Mr. Weinstein

19 said or anything that Ms. Coyoca said gets away from the

20 fundamental issue which is before the Court today, namely the

21 appointment of a trustee.  We may face a fight on the

22 involuntary petition.  Frankly, I think when the smoke --

23        THE COURT:  You may?  I think that's pretty clear.

24        MR. NEALE:  Your Honor, I say that only because

25 when the smoke clears I don't think there's going to be

65

1 anything to any of these things that are being argued.  There

2 are judgments.  There are agreements.  There are

3 acknowledgments of liability.  The Screen Capital agency

4 relates to a series of obligations where there's a letter by

5 Mr. Bergstein admitting liability to the Salter Group.  So

6 things like that will be developed as we deal with the

7 involuntary petition.  That's why I'm not going to address

8 all those issues today.  We'll have an opportunity to talk

9 about that with your Honor, and I think when the dust settles

10 you'll see there really are not infirmities with these

11 petitioning creditors.

12          Having said that your Honor, unless you have

13 questions of me with regard to our papers, I'd like to open

14 it up to anyone else who would like to argue.

15          THE COURT:  Well, that's my call.

16          MR. NEALE:  That's why I asked if you had

17 questions.

18          THE COURT:  This is not a town hall meeting.

19          MR. NEALE:  We do have joinders in the motion,

20 your Honor.

21          THE COURT:  I understand that.  Anything from

22 anybody on this side?

23          MR. NEALE:  These are my partners.

24          THE COURT:  I understand.

25          MR. NEALE:  If they say anything, I'll kill them.

66

1           THE COURT:  I noticed they were dutifully silent.

2  All right.

3           MR. NEALE:  Thank you.

4           THE COURT:  I am going to appoint a trustee.  I

5  can tell you it's extraordinary.  When this all started out I

6  thought the likelihood of me doing that is very small but

7  from what I've heard, pretty overwhelming evidence from one

8  side even though on shortened notice, and the response from

9  Mr. Bergstein, the person in charge was not overwhelming at

10 least as far as the issues.  I'm not deciding of course today

11 the involuntary but it also appears, at least on its face,

12 that there's a substantial amount of evidence.

13           As counsel pointed out, as far as any defense to

14 it who knows.  It may be at the end of the day, and that's my

15 big hesitation but I'm going to do it anyway, the hesitation

16 is what if they don't -- they fail.  I'm not going to require

17 a bond either because it's quite clear at the end of the day

18 that if the Debtor, or it could be any one of them, succeeds

19 I think that the people on the other side, petitioning

20 creditors, are liable at a minimum costs and if in bad faith

21 a lot more.  I think that that will take its course.  I don't

22 know how that will play out.  I think all in all it's clear

23 to me that this is a case that cries out for somebody

24 independent in there reporting exactly what in the world is

25 going on.

67

1          My only concern is how many to appoint.  I see the
2    U.S. Trustee out there, representative if you have any
3    thought.  That's a tough one and I'm not quite sure what to
4    do about that.
5          MR. CLEMENTSON:  Thank you, your Honor.  Russell
6    Clementson for the U.S. Trustee.  Our thought was that the
7    Court can simply order the appointment of a gap period
8    trustee in each of these five cases.  I don't have authority
9    to tell the Court whether we would appoint one or five but I
10   think given the role of a gap period trustee it may be that
11   there's not a conflict in having a single gap period trustee,
12   where there may be a conflict down the road once an order for
13   relief is entered and you have to bring money back and forth.
14         THE COURT:  That's where I'm sort of at.  I don't
15   want to multiply the complexity or the cost.  I'm going to
16   order the appointment of a single person in all five.  The
17   nature of the people that no doubt who you will choose at
18   this stage more in the nature of what an examiner is.  Just
19   figuring out -- I'm not appointing an examiner.  I suppose I
20   could do that I guess.  My guess is and my hope is that this
21   individual -- I hope you would appoint -- because again these
22   are five independent cases.  So I'm authorizing and order the
23   appointment of a trustee in each and I'll leave it in your
24   discretion but I think at this point it might be better to
25   have one person.  The vast majority of the trustees that

68

1  appear before me, and in fact virtually all of them, for

2  their own sake if nothing else is they see that there are

3  potential conflicts -- and I have no idea.  I suspect that

4  maybe but I have no idea because of the lack of accounting

5  information as to the inter company transfers, obligations,

6  debts, what have you.  There may very well be conflicts.  At

7  this stage, I'm satisfied that one person could look at it

8  and in a reporting will indicate -- where we're at by the way

9  on this is I think some time there's a status conference in I

10 think --

11         MR. NEALE:  May 25th, your Honor.

12         THE COURT:  Right.  What I will do in this

13 particular case and this is for both sides, multiple sides.

14 Certainly the Debtors as well as the petitioning creditors.

15 I intend to move this as quickly as possible.  I think it's

16 to everybody's advantage to get to the heart of it.

17 Obviously I've heard arguments about whether these are

18 disputed claims.  That may be, may be not.  We'll find out

19 soon enough but I don't intend to allow this to proceed over

20 any extended period of time.  We've got the status conference

21 set for the 25th.  At what time?

22         THE CLERK:  At 10.

23         THE COURT:  At that point there will be status

24 reports required.  I want you to be thinking very seriously

25 about -- I don't have it in front of me.  20 days to answer

69

1  the petition I assume.  I don't recall that has been done yet

2  but I assume it will be.  Every case is different.  It may be

3  as you point out they're not all equal in the sense of what

4  they do.  So any number of things may happen as far as the

5  nature of these cases.  I want you to be thinking very

6  serious because I'm very serious about moving these along

7  very rapidly.  The issues are quite straight forward on the

8  involuntary, and I intend to set hearings on those as soon as

9  possible.

10          So I want you to be thinking about what you need.

11  I would not think -- this may be incorrect but I would think

12  from the alleged -- it's actually not alleged Debtors.  One

13  would think that but the statute doesn't distinguish.

14  They're Debtors even though they're not actual Debtors but

15  the statute refers to them and the rules as Debtors.  I

16  wouldn't think there would be a lot of discovery on the

17  Debtor's stand point because if you feel these are -- you

18  know if the Debtors are paying their debts as they become

19  due.  That's all within the knowledge of the Debtors, and if

20  you feel they are subject to bonafide dispute.  You know that

21  information.

22          Thinking off the top of my head I want to ask you

23  right now, even though this is not a status, am I wrong or

24  what kind of discovery would you have?  By the way as far as

25  the attorney, I have no opinion on that whatsoever.  If she's

70

1 done bad things so be it but that in my opinion would not

2 effect this case.  It may effect obviously other things.

3 Have you thought about it yet what you would need for

4 discovery?  Two main issues are all within your knowledge,

5 that is the Debtor's knowledge.

6          MR. WEINSTEIN:  Well, your Honor, I think in

7 concept that's largely correct.  It's a little bit too soon

8 to give you a complete -- I can tell you I'm going to request

9 production of all documents relative to the claims asserted

10 by Screen Capital and the Salter Group that you heard

11 something about today.  That one for sure.  If we're going to

12 need 30 days and three days for mail service and all this

13 stuff, we'll have to deal with that.  That for sure.  I know

14 that one is going to be requested no matter what.  I'm sorry.

15          THE COURT:  That's okay.  It was may be an unfair

16 question.  This is not status but that was my assumption.  So

17 there may be -- let me ask the same question of you Mr.

18 Neale.  The petitioning creditor stand point at least you

19 know what your claims are but as far as not paying the debts

20 as they come due that's a little different.  I would presume

21 for your clients sake of good faith that you have a pretty

22 good idea at least from your stand point that the Debtors are

23 not paying the debts.

24          MR. NEALE:  We do have a pretty good idea, your

25 Honor.  Obviously given the allegations that have come out in

71

1  the course of this, we'd like to see these accounting records

2  that supposedly exist.  So obviously that will be a document

3  production request that we'll be making, as well as probably

4  a deposition of Mr. Bergstein.  Other depositions and other

5  discovery, again from our perspective probably also we need

6  some time to reflect on that.

7          THE COURT:  This is for both sides, for the

8  creditors as well as the Debtors.  I intend to move this as

9  quickly as possible and so that's why I asked the question.

10 I would strongly suggest to both sides -- well, more than two

11 sides but that you start doing immediately what you need to

12 do because I intend to -- I don't have a date in mind

13 obviously but to actually have hearings on this as soon as

14 possible.

15         MR. NEALE:  Thank you, your Honor.

16         THE COURT:  Okay.  Thank you very much.

17         MR. NEALE:  Your Honor, should we prepare an order

18 or is that prepared by the U.S. Trustee's office?

19         THE COURT:  No, I think the petitioning creditors

20 would prepare the order.  Well, correct me if I'm wrong.

21 There's really two.  One is the order for the appointment and

22 then there is the order approving the person you choose.  It

23 doesn't matter to me.  What would you prefer?

24         MR. CLEMENTSON:  I have both forms on my computer,

25 your Honor.

72

1          THE COURT:  All right.

2      (Proceedings concluded.)

3

4          I certify that the foregoing is a correct

5 transcript from the electronic sound recording of the

6 proceedings in the above-entitled matter.

7

8 /s/ Holly Martens_____          4-1-10_____
  Transcriber                      Date
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25