1   JOSEPH A. KOHANSKI (SBN 143505)
    jkohanski@bushgottlieb.com
2   DAVID E. AHDOOT (SBN 245133)
    dahdoot@bushgottlieb.com
3   MELVIN YEE (SBN 241569)
    myee@bushgottlieb.com
4   BUSH GOTTLIEB SINGER LÓPEZ
    KOHANSKI ADELSTEIN & DICKINSON
5   A Law Corporation
    500 North Central Avenue, Suite 800
6   Glendale, California  91203-3345
    Telephone:  (818) 973-3200
7   Facsimile:  (818) 973-3201

8   Attorneys for Creditors
    Directors Guild of America, Inc., Screen Actors
9   Guild, Inc., Writers Guild of America, West, Inc.,
    Directors Guild of America- Producer Pension
10  and Health Plans, Screen Actors Guild-Producer
    Pension and Health Plans, Writers Guild -
11  Industry Health Fund and Producer-Writers Guild
    of America Pension Plan, and Motion Picture
12  Industry Pension and Health Plans

13              UNITED STATES BANKRUPTCY COURT

14               CENTRAL DISTRICT OF CALIFORNIA

15                  LOS ANGELES DIVISION

16  In re                              **CASE NO. 2:10-bk-19912-BR**

17  THINKFILM, LLC,                    **Chapter 11**

18          Alleged Debtor.            **MEMORANDUM OF UNION ENTITIES**
                                       **IN OPPOSITION  TO MOTION FOR**
19                                     **RELIEF FROM THE AUTOMATIC STAY**
                                       **BY LIBRARY ASSET ACQUISITION**
20                                     **COMPANY, LTD; DECLARATIONS OF**
                                       **JOSEPH A. KOHANSKI, JANA**
21                                     **CAMPEAU-PRZEBIEDA, ANTO**
                                       **PATANIAN AND ANTHONY HOWS IN**
22                                     **SUPPORT THEREOF; REQUEST FOR**
                                       **JUDICIAL NOTICE IN SUPPORT**
23                                     **THEREOF**

24                                     Judge:   Hon. Barry Russell
                                       Date:    October 26, 2010
25                                     Time:    2:00 p.m.
                                       Ctrm.:   1668
26                                              255 E. Temple Street
                                                Los Angeles, CA 90012
27

28

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California  91203-3345

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     THE RELIEF MOTION REQUIRES HEIGHTENED SCRUTINY AS
        LAAC HAS NOT ADEQUATELY DISCLOSED ITS RELATIONSHIP
        WITH DAVID BERGSTEIN, RONALD TUTOR AND THE DEBTORS ............. 2

III.    THE LAAC RELIEF MOTION IS PURPOSEFULLY PREMATURE ................... 7

        A.    Immediate Relief from Stay is Inappropriate in a Multi-Debtor Case
              Featuring Complex Collateral, Common Control of Insiders Over
              Debtors and Enmeshed Non-Debtors, and in Which an Order for
              Relief Has Only Recently Been Entered for Two out of Five Debtors ........... 7

        B.    The Relief Motion Cannot be Evaluated by Interested Parties Until
              The Debtors, LAAC and Other Affiliated Entities Provide
              Transparency Concerning The Pertinent Relationships, Transactions,
              and Assets .................................................................................................... 8

IV.     EVEN IF THIS WERE A SIMPLE CASE, LAAC HAS NOT PROVIDED A
        *PRIMA FACIE* CASE FOR RELIEF FROM STAY ......................................... 10

V.      THE RELIEF MOTION REQUIRES HEIGHTENED SCRUTINY AS
        LAAC HAS MISREPRESENTED ITS RELATIONSHIP TO THE
        COLLATERAL ................................................................................................. 14

        A.    FPLAC Had Actual Notice of The Existence of Guild Liens and
              FPLAC's Lenders Knew or Should Have Known of Them As Well .......... 14

        B.    Perfected Guild Liens in the FPLAC Library are Undeniably Senior to
              any LAAC Position ..................................................................................... 17

        C.    The Guilds Likely Hold Perfected Liens Senior to any LAAC Position
              with Respect to Many Other Titles Upon Which LAAC Seeks Relief
              from Stay ..................................................................................................... 18

VI.     RELIEF FROM STAY IS INAPPROPRIATE WHEN TRANSACTIONS
        UNDERGIRDING THE PURPORTED RIGHTS OF LAAC ARE
        SUBJECT TO SUBSTANTIAL ATTACK ......................................................... 19

        A.    Questionable Transactions in the United States ........................................... 19

        B.    Questionable Transactions in the United Kingdom ..................................... 20

VII.    IF THE COURT ORDERS RELIEF FROM STAY, RELIEF SHOULD
        EXTEND TO ALL SECURED CREDITORS WITH AN INTEREST IN
        THE PURPORTED COLLATERAL OF LAAC .................................................. 23

VIII.   CONCLUSION ................................................................................................. 24

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California 91203-3345

i

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

1

# <u>TABLE OF AUTHORITIES</u>

2

Pages

3  CASES:

4  In re AEG Acquisition Corp.,
       127 B.R. 34 (Bankr. C.D. Cal. 1991) ...................................................... 11

5
6  In re A Partners, LLC.,
       344 B.R. 114 (Bankr. E.D. Cal. 2006) .................................................... 11

7  In re B.E.S. Concrete Products, Inc.,
       93 B.R. 228 (Bankr. E.D. Cal. 1988) ...................................................... 10
8
9  In re Bialac,
       694 F.2d 625 (9th Cir. 1982) ................................................................... 19

10  In re Bialac,
        712 F.2d 426 (9th Cir. 1983) .................................................................. 11
11
12  In re Coastal Plains, Inc.,
        179 F.3d 197 (5th Cir. 1999) ................................................................. 10

13  In re Elmira Litho, Inc.,
        174 B.R. 892 (Bankr. S.D.N.Y. 1995) ............................................. 11,13
14
15  In re Enterprise Acquisition Partners, Inc.,
        319 B.R. 626 (9th Cir. BAP 2004) ......................................................... 3,7

16  In re eToys, Inc.,
        331 B.R. 176 (Bankr. Del. 2005).......................................................... 10
17
18  In re Marquam Inv. Corp.,
        942 F.2d 1462 (C.A. 9 1991)..................................................................... 3

19  In re Palmdale Hills Property, LLC,
        423 BR. 655 (9th Cir. BAP 2009) .......................................................... 19
20
21  In re Poughkeepsie Hotel Associates Joint Venture,
        132 B.R. 287 (Bankr. S.D.N.Y. 1991) ..................................................

22  In Re Peregrine Entertainment, Ltd.
        116 B.R. 194 (C.D. Cal.  1990) .............................................................. 11
23
24  In re Plaza de Retiro,
        417 B.R. 632 (Bankr. D. N.M. 2009) ..................................................... 10

25  In re Plumberex Specialty Products, Inc.,
        311 B.R. 551 (Bankr. C.D. Cal. 2004) ................................................... 11
26
27  In re Sanchez,
        372 B.R. 289 (Bankr. S.D. Tex. 2007) ................................................... 10

28

ii
MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California  91203-3345

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Bush Gottlieb Singer López Kohanski Adelstein & Dickinson
500 North Central Avenue, Suite 800
Glendale, California 91203-3345

Pages

In re T-H New Orleans Ltd. P'ship,
    188 B.R. 799 (Bankr. E.D. La. 1995) ...................................................... 10

In re V. Savino Oil & Heating Co., Inc.,
    99 B.R. 518 (Bankr. E.D. N.Y. 1989) ...................................................... 10

In Re World Auxiliary Power Company,
    303 F.3d 1120 (9th Cir. 2002) ................................................................ 11

Pepper v. Litton,
    308 U.S. 295 (1939) ................................................................................. 3

Wilson v. Huffman,
    712 F.2d 206, 210 (5th Cir. 1983) ............................................................ 3

Winstar Communications, Inc.,
    554 F.3d 382 (3rd Cir. 2009) ................................................................... 6

STATUTES:

    11 U.S.C. 362(d) ..................................................................................... 11

    Fed. R. Bankr. P. 3001 ............................................................................ 11

    Fed. R. Bankr. P. 3001.  Rule 3001(d) ................................................... 11

    USCO, Section 205(d) of the Copyright Act [17 U.S.C. §205(d)] ........................ 17

PUBLICATIONS:

    Collier on Bankruptcy, 16th Ed., §362.10 ................................................ 13

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California 91203-3345

1  The Directors Guild of America, Inc. ("DGA"), Screen Actors Guild, Inc. ("SAG"),

2  Writers Guild of America, West, Inc. ("WGA") (collectively, the "Guilds"), their

3  respective Pension and Health Plans (the "Guild Plans"), and the Motion Picture Industry

4  Pension and Health Plans ("MPIPHP") (the Guilds, Guild Plans and MPIPHP collectively,

5  the "Union Entities") hereby object to the motion (the "Relief Motion") of Library Asset

6  Acquisition Company, Ltd. ("LAAC") for relief from the automatic stay with respect to

7  certain income streams relating to Debtor[1] ThinkFilm, LLC ("ThinkFilm") and Debtor CT-

8  1 Holdings ("CT-1"), and as a predicate toward proposed foreclosure on a body of motion

9  picture rights (the "TFC Library") held by TFC Library, LLC ("TFC Library, LLC").

10  **I.    INTRODUCTION**

11  The Relief Motion arises at a time when obfuscation and confusion, largely sown through

12  the efforts of the Debtors' former management, reign supreme.  Orders for relief have been

13  entered for two of five involuntary Debtors, but the remaining three Debtors continue their

14  aggressive resistance to the involuntary petitions.  The Trustee, and other parties propounding

15  discovery, appear thwarted in their efforts to determine Debtor assets, liabilities and prospects.

16  Meanwhile, a Confidentiality Order obscures the view of third-party creditors, and the Trustee

17  labors with no cash at his disposal.  Within this dynamic, LAAC seeks to take monies payable by

18  a licensee of  certain Debtors and other entities, and presents a series of transactions in support of

19  its right to do so.

20  However, the Relief Motion does not disclose the extent to which LAAC is controlled by

21  the same principals who controlled the Debtors, who control various Pangea entities, and who

22  control other entities enmeshed in the transactions leading to LAAC's purported position in the

23  applicable collateral.  These are the same principals behind LAAC and Pangea Media obtaining a

_____

25  [1] The Union Entities acknowledge that the Court has not yet ordered entry of relief for the estates of CT-1,
26  R2D2, LLC, and CapCo Group LLC, whereas orders have been entered for ThinkFilm and Capitol Films
Development LLC.  However, in the interests of clarity, throughout these papers the Debtors/Alleged Debtors shall be
referred to as the "Debtors" or "Debtor" where appropriate, and Interim Trustee/Trustee Ron Durkin shall be referred
27  to as the "Trustee."  To the extent not otherwise defined herein, all capitalized follow the definitions set forth in the
Relief Motion.

28

1

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

1  Confidentiality Order that limits creditor knowledge of the Debtors' affairs, who continue to

2  contest certain involuntary petitions, and who are less than forthcoming in a wide range of

3  discovery disputes.  Moreover, review of the transactions introduced into evidence by LAAC

4  shows that LAAC rights largely flow from a series of transactions among some of the Debtors and

5  numerous other entities controlled by the same principals, with troubling consequences for

6  interests not within this charmed circle.  LAAC also misrepresents its relationship to the collateral

7  by erroneously asserting a senior secured interest in all such collateral, when one of those

8  principals has known otherwise, for years – specifically, that the Guilds hold senior security

9  interests with respect to certain pictures.

10      Given these facts, this Court should examine the Relief Motion with the rigorous scrutiny

11  accorded to insider transactions and situations where movant credibility is suspect.  But even

12  without resort to this standard, this Court will find that LAAC has not presented a *prima facie* case

13  for relief from stay, and will also find grounds to deny this motion as premature given procedural

14  gridlock largely created by LAAC's principals.  This Court will also have reason to deny relief

15  from stay based on the range of affirmative defenses and counterclaims that will attach to prior

16  transactions -- both here and in the United Kingdom -- upon which LAAC relies in staking its

17  claim for relief.

18  **II.    THE RELIEF MOTION REQUIRES HEIGHTENED SCRUTINY AS LAAC HAS
        NOT ADEQUATELY DISCLOSED ITS RELATIONSHIP WITH DAVID
19      BERGSTEIN, RONALD TUTOR AND THE DEBTORS**

20      The Relief Motion generally describes convoluted transactions that purportedly entitle

21  LAAC to foreclose on the TFC Library, and to pursue receivables from Image Entertainment.

22  However, the Relief Motion fails to disclose the extent to which LAAC and virtually all entities

23  involved in the underlying transactions – other than Image Entertainment and the third-party

24  lender positions ultimately transferred to LAAC – are owned or controlled by Mr. David Bergstein

25  ("Bergstein") and/or Mr. Ronald Tutor ("Tutor").  This lack of candor, filtered through

26  increasingly serious allegations concerning prior actions of the Debtors, Bergstein and Tutor, as

27  well as the current 'stonewall' tactics of Bergstein, Tutor and their non-Debtor entities in

28  connection with investigation of Debtor affairs, indicates the Relief Motion should be viewed with

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California  91203-3345

2
MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

1    the "rigorous scrutiny" applicable to insider transactions.  In re Enterprise Acquisition Partners,

2    Inc., 319 B.R. 626, 631 (9th Cir. BAP 2004); *partially citing to* Wilson v. Huffman, 712 F.2d 206,

3    210 (5th Cir. 1983); Pepper v. Litton, 308 U.S. 295, 306 (1939);  In Re Marquam Inv. Corp. 942

4    F.2d 1462, 1465 (C.A. 9 1991)(an insider's dealings with a bankrupt corporation must be

5    subjected to rigorous scrutiny.) [2]

6        LAAC is owned and controlled by Tutor and Bergstein.  Each of the transactional

7    documents, attached to the *Declaration of Evan Warshawsky In Support of Motion For Relief*

8    *From Stay* ("*Warshawsky Decl.*") and intended to support LAAC's right and title in the relevant

9    assets, is executed by Bergstein or Susan Tregub[3] as "Director" or "Manager" of LAAC.[4]  Thus

10   Bergstein had direct control, on LAAC's behalf, over the negotiation and closure of all

11   transactions engendering the structure underpinning LAAC's claims.

12       Moreover, papers filed by Bergstein and Tutor in certain related litigation further

13   demonstrate Bergstein and Tutor's ownership and control of LAAC, although the nature of that

14   close relationship varies from filing to filing.  According to a Corporate Disclosure Statement filed

15   by LAAC on March 31, 2010, in a Central District Court case entitled *Aramid Entertainment Fund*

16   *Limited v. Library Asset Acquisition Company Ltd.* [Case No. 2:10-cv-02258],  LAAC is 50%

17   owned by Tutor, and 50% owned by an entity named Veritum, Ltd. (UK) ("Veritum") – which in

18   _____

19       [2] Many of the pertinent entities are incorporated in Delaware; information regarding corporate ownership and
     structure is therefore unavailable as a matter of public record.  Nevertheless, through review of the Debtors' and
20   LAAC's exhibits and minimal disclosures in this and other matters, the Union Entities have been able to piece
     together instances of control and/or ownership by Bergstein and/or Tutor. [*See generally*,  *Declaration of Anto*
21   *Patanian (the "Patanian Declaration")*]

22       [3] Throughout the transactional documents attached to the Warshawsky Declaration, only one other individual
     executed on behalf of the Bergstein/Tutor interests: Susan Tregub.  As we have seen throughout these proceedings,
23   LAAC, Pangea, and the Debtors have repeatedly  posited a close professional relationship between Bergstein and
     Tregub during the time in which these documents were executed by her; if true, these signatures further demonstrate
24   Bergstein control over the applicable entity.

25       [4] *See,* the Amendment No. 2 To The Note Purchase and Sale Agreement [*Declaration of Evan Warshawsky
     In Support of Motion For Relief From Stay* ("*Warshawsky Decl.*"), Ex. 6, p. 55 of 73], the Assignment [*Warshawsky
     Decl.*, Ex. 7, p. 7 of 15], the Global Amendment [*Warshawsky Decl.*, Ex. 9, p. 6 of 10], the Tranche C Intercreditor
26   Agreement [*Warshawsky Decl.*, Ex. 10, p. 17 of 21], the Administrative Agency Appointment and Assignment
     [*Warshawsky Decl.*, Ex. 11, p. 5 of 6], the Lender Consent To Assignment and Assumption are all executed by
27   Bergstein as "Director" or "Manager" of LAAC.  As a side note, the Amendment No. 1 filed with this Court does not
     contain a signature on behalf of LAAC [*Warshawsky Decl.*, Ex. 6, p. 44 of 73.

28

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California  91203-3345

3

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California 91203-3345

1  turn, is 100% owned and controlled by Bergstein. [*Request for Judicial Notice, concurrently filed*

2  *by the Union Entities* ("RJN") p. 2, ¶1, Exhibit A; *Patanian Decl.*, p. 4, ¶5(h), Exhibit J ]  On the

3  other hand, according to a Declaration filed by Bergstein on March 25, 2010, in a Los Angeles

4  Superior Court case entitled *David Bergstein, Ronald Tutor, et al. v. Susan Tregub* [Case No.

5  BC434558], Bergstein claims he is "the manager of Plaintiff R2D2... R2D2, in turn, owns Plaintiff

6  CT-1…which is the direct or indirect holding company for certain entities including…Library

7  Asset Acquisition Company, Ltd…"  [*RJN*, p. 2, ¶1, Exhibit "B"]  Notwithstanding the

8  discrepancies between Bergstein and LAAC's representations, each of these documents

9  demonstrates direct control and ownership of LAAC by Tutor and Bergstein: a salient fact that has

10  not been disclosed by LAAC.[5]

11        The Relief Motion describes LAAC collateral as including rights in 570 motion pictures,

12  with those rights held by TFC Library LLC by virtue of assignment of film rights from FPLAC,

13  Zoopraxis Film Assets, LLC, ThinkFilm LLC, CT-1, CFA, and CTFH (per the Relief Motion

14  "Library Assignors") [*Relief Motion,* pp. 7-8, lns. 23-10].  We know that FPLAC, Zoopraxis and

15  ThinkFilm were controlled by Bergstein; as attached to the Warshawsky Declaration, each of the

16  transaction documents in this regard are all executed by Bergstein as "Manager" of FPLAC,

17  Zoopraxis and ThinkFilm.[6]  Moreover, according to articles of incorporation filed with the

18  California Secretary of State as of December 13, 2006, Bergstein is designated as FPLAC's

19  "Principal,"  [*Patanian Decl.,* p. 3, ¶5(d), Exhibit E ] and Bergstein executed the FPLAC

20  _____

21      [5]  To be fair, the Relief Motion mentions that "proof that Ronald Tutor paid DBZ for LAAC's acquisition of
the ThinkFilm Credit Facility," which implies that Tutor may hold an interest in LAAC.  [*Relief Motion*, p. 14, ln. 11].

22  But given the prominent role of Bergstein and Tutor throughout this case, this hardly rises to adequate disclosure of
the potential for insider dealing.

23      [6]*See,* the Amended and Restated Credit Security Agreement [*Warshawsky Decl.*, Ex. 1, p. 51 of 54], the First
Amendment To Credit Agreement [*Warshawsky Decl.*, Ex. 2, p. 39 of 56], the Fourth Amendment To Credit

24  Agreement [*Warshawsky Decl.*, Ex. 2, p. 39 of 56], the Note Purchase and Sale Agreement [*Warshawsky Decl.*, Ex. 6,
pp. 29-30 of 73], the Amendment No. 1 To The Note Purchase and Sale Agreement [*Warshawsky Decl.*, Ex. 6, pp. 48-

25  49 of 73], the Amendment No. 2 To The Note Purchase and Sale Agreement [*Warshawsky Decl.*, Ex. 6, p. 59 of 73],
the Sixth Amendment to Credit Agreement [*Warshawsky Decl.*, Ex. 8, p. 6 of 25], the Tranche C Intercreditor

26  Agreement [*Warshawsky Decl.*, Ex. 10, p. 18 of 21], the Administrative Agency Appointment and Assignment
[*Warshawsky Decl.*, Ex. 11, p. 5 of 6], the Asset Purchase Agreement [*Warshawsky Decl.*, Ex. 12, p. 28 of 48], the

27  Bill of Sale and Assignment [*Warshawsky Decl.*, Ex. 13, p. 4 of 17], the Assignment and Assumption – Loan
Agreement [*Warshawsky Decl.*, Ex. 14, p. 6 of 6].

28

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California  91203-3345

1  documentation in connection with the  bankruptcy of  Franchise Pictures, LLC.  [*Declaration of*

2  *Joseph A. Kohanski (the "Kohanski Decl.") at ¶¶6,7* ]

3      We also know that CT-1, CFA, and CTFH were controlled by Bergstein.  Unsurprisingly,

4  Bergstein executes each applicable documents on behalf of CT-1, CFA, CTFH, oftentimes as

5  "Manager."[7]  Moreover, according to corporation documents filed with the California Secretary of

6  State, Bergstein is designated as a "Principal" of CT-1.  [*Patanian Decl.,* p. 3, ¶5(b), Exhibit C.]

7  We thus know that Bergstein had direct control over the negotiation and closure of all transactions

8  engendering the pertinent structure on behalf of the Library Assignors.

9      TFC  Library LLC, the assignee of film rights from  the Library Assignors [*Relief Motion,*

10  pp. 7-9, lns. 23-2] appears in three exhibits to the Warshawsky Declaration: the Asset Purchase

11  Agreement [*Warshawsky Decl.*, Ex. 12, p. 28 of 48]; the Bill of Sale and Assignment

12  [*Warshawsky Decl.*, Ex. 13, p. 4 of 17]; and the Assignment and Assumption – Loan Agreement

13  [*Warshawsky Decl.*, Ex. 14, p. 6 of 6].  In all three of these documents, either Bergstein or Tregub

14  execute as TFC Library's "Manager."  Indeed, the most striking example of the insider nature of

15  these dealings appears on the signature page of the Asset Purchase Agreement.  This document

16  purports to transfer film rights from the Library Assignors to TFC Library, for consideration that

17  is unclear and likely inadequate,[8] but only one signature appears on behalf of the six Sellers and

18  one Buyer – David Bergstein.

19      Finally,  as evident throughout this case, the Debtors, --including CT-1 and ThinkFilm,

20  were also controlled and owned by Bergstein and, at least until January of 2009, R2D2 was co-

21  owned by Tutor.  *See e.g.*, *Omnibus Opposition of Interim Trustee,* Filed on July 6, 2010, in Case

22

23      [7] *See*, the Amended and Restated Secured Continuing Guaranty [*Warshawsky Decl.*, Ex. 3, pp. 12-13 of 13], the Amended and Restated Security Agreement [*Warshawsky Decl.*, Ex. 4, p. 14 of 19], the Note Purchase and Sale

24  Agreement [*Warshawsky Decl.*, Ex. 6, p. 30 of 73], the Amendment No. 1 to the Note Purchase and Sale Agreement [*Warshawsky Decl.*, Ex. 6, p. 49 of 73], the Amendment No. 2 to the Note Purchase and Sale Agreement [*Warshawsky Decl.*, Ex. 6, p. 60 of 73], the Sixth Amendment to the Credit Agreement [*Warshawsky Decl.*, Ex. 8, p. 12 of 25], the

25  Global Amendment [*Warshawsky Decl.*, Ex. 9, p. 9 of 10], the Tranche C Intercreditor Agreement [*Warshawsky Decl.*, Ex. 10, pp. 19-21 of 21], the Asset Purchase Agreement [*Warshawsky Decl.*, Ex. 12, p. 28 of 48], the Bill of

26  Sale and Assignment [*Warshawsky Decl.*, Ex. 13, p. 4 of 17], the Assignment and Assumption – Loan Agreement [*Warshawsky Decl.*, Ex. 14, p. 6 of 6].

27      [8] *See, infra*, Section IV, pp. 20-21, lns. 15-4.

28

5

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

No. 2:10-bk-19927-BR, Docket No. 136, pp. 25-27, lns. 1-8. The record in these bankruptcy proceedings is replete with uncontroverted testimony demonstrating Bergstein's absolute control over these entities; perhaps in recognition of that evidence, Bergstein has been designated as the Representative of the Alleged Debtors under FRBP 9001(5).

In sum, the Relief Motion, the exhibits to the Warshawsky Declaration and the data tabulated through the Patanian Declaration all demonstrate the extent to which Bergstein and Tutor are "insiders" in connection with the Relief Motion. As a self-described "manager," "director" or person in control, Bergstein – and in some instances, Tutor as well – is certainly a statutory insider under Bankruptcy Code §101(31) with respect to many entities relating to the Relief Motion, including the Debtors.[9] Whether LAAC itself is formally an "insider" of the Debtors is marginally less clear, but this can hardly *not* be the case. When an entity exerts control or influence over the action or actions of a debtor, it is an insider for bankruptcy analysis. In re Winstar Communications, Inc., 554 F.3d 382 (3rd Cir. 2009)[Appellate court affirmed BK court finding that Creditor was insider when Creditor exercised control and influence over Debtor]. Based solely on contracts engendered through common control, LAAC asserts that CT-1 is a fiduciary and sales agent to administer rights owned by others, that any monies received by CT-1 must be held in trust for the benefit of LAAC, and that ThinkFilm's rights with respect to the Image Agreements are "equally limited." [*Relief* Motion, p. 1, lns. 15-22] Moreover, insider status "*per se*" will obtain on an alter-ego basis if there is a unity of interest between the applicable

---

[9] Bergstein's relationship with various 'Pangea' named entities is also pertinent. One Pangea entity is called Pangea Media Group, LLC – an entity that the Trustee has targeted for a Rule 2004 exam, and which the Debtors have recently revealed to be a wholly owned subsidiary of R2D2. [*See e.g., Debtor's Reply In Support of Imposition of A Bond*, filed on September 29, 2010, in Case No. 2:10-bk-19927, Docket No. 288, p. 21-23]. Another Pangea entity, Pangea Media Holdings Limited, is pertinent given Bergstein and Tutor's movement of film assets across international borders. In the Warshawsky Declaration, reference is made to a UK entity called Capitol Films Limited. [*Warshawsky Declaration*, p. 4-5, ¶15]. As discussed in further detail below, Capitol Films Limited has been in administration in the UK, and through the course of those proceedings it has become clear that Bergstein purported to transfer film assets from Capitol Films Limited to Pangea Media Holdings Limited. Bergstein has proven to be the "Director" of Pangea Media Holdings Limited, which is wholly owned by Veritum – an entity wholly owned by Bergstein. [*Declaration of Anthony Hows* (the *"Hows Declaration"*), p. 4-5, ¶¶11-13; *Patanian Decl.* p. 3, ¶5(h), Exhibit I]. Pangea Media Holdings Limited has been dissolved, and for the sake of completeness, there is another UK Pangea entity named Pangea Media Limited – also wholly owned by Bergstein through Veritum (with Bergstein as "Director") – that remains an operating entity. [*Id.*]

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California 91203-3345

1  individuals or entities, and if an inequitable result will follow from recognizing the corporate

2  form. In re Enterprise Acquisition Partners, Inc., 319 B.R. 626, 634 (9th Cir. BAP 2004).  The

3  obvious unity of interest among LAAC, the Debtors and other Bergstein/Tutor entities is the

4  enrichment of Bergstein and Tutor, and as discussed below, inequitable results will certainly occur

5  if these corporate forms are honored.[10] For all these reasons, the taint of insider dealing is difficult

6  to ignore; the Relief Motion should thus be subjected to the "rigorous scrutiny" applicable to

7  insider transactions in bankruptcy.

8  **III.  THE LAAC RELIEF MOTION IS PURPOSEFULLY PREMATURE**

9      **A.  Immediate Relief from Stay is Inappropriate in a Multi-Debtor Case**
10         **Featuring Complex Collateral, Common Control of Insiders Over Debtors and Enmeshed Non-Debtors, and in Which an Order for Relief Has Only Recently Been Entered for Two out of Five Debtors.**

11

12      In a "normal" Chapter 11 case, relief from stay can be relatively simple to evaluate.  The

13  Court is presented with argument as to why relief should obtain under Bankruptcy Code §362(d).

14  The debtor responds, based on its knowledge of its own business affairs, and perhaps a creditors

15  committee chimes in, based on its own analysis and perspective.

16      However, this series of cases is anything but normal.  First, the Trustee charged with

17  responsibility for Debtor affairs has only now been conferred with full authority for two Debtors,

18  as orders for relief are being entered with respect to ThinkFilm and Capitol Films Development,

19  LLC.  No creditors committee has yet been formed with respect to either of these two Debtors.

20  Meanwhile, the remaining three Debtors continue to contest their bankruptcy status, including CT-

21  1, which is at the heart of the Relief Motion.  Moreover, the Trustee's stewardship of these

22  Debtors is complicated given that knowledgeable employees of the Debtors are thin on the ground

23  and immediate cash resources are effectively non-existent.  Then there is the question of

24  cooperation between former management and the Trustee, which has spawned considerable

25  difficulty.

26

27      [10] See Section VI, *infra*.

28

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California  91203-3345

7

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California 91203-3345

1      These procedural impediments, standing alone, more than amply justify denial of relief

2  from stay until management of the Debtors – and of Debtor resources – has stabilized to the point

3  where the essential issues of Debtor equity in contested collateral and the prospects for

4  reorganization can be addressed meaningfully by parties other than those owned or controlled by

5  insiders like Bergstein and Tutor.

6      But there is more.  The particular collateral in question is complex: rights in 143 distinct

7  motion pictures, and rights to receipts under a distribution agreement with Image Entertainment

8  that, through interpretation of Paragraphs 48 to 63 of the Warshawsky Declaration, appears

9  complicated.  Moreover, there is the looming prospect of  LAAC planning a foreclosure on 570

10  titles, which will likely have a substantial impact upon the rights of each Debtor.  Also consider

11  the extent to which transactions underlying the LAAC position may be subject to legal attack.  The

12  series of transactions revealed through the Relief Motion is complex, and certain transactions may

13  be subject to challenge.[11]  Granting relief from stay, only to see the contractual predicates for the

14  LAAC position challenged and perhaps unwound, is not sensible.

15      Under such circumstances, the Relief Motion is certainly premature.

16  **B.      The Relief Motion Cannot be Evaluated by Interested Parties Until The
       Debtors, LAAC and Other Affiliated Entities Provide Transparency
17       Concerning The Pertinent Relationships, Transactions, and Assets**

18      On July 20, 2010, at the request of LAAC, Pangea Media Group, LLC, and the Debtors,

19  this Court entered a Confidentiality Order in light of their concerns about non-Trustee access to

20  information.  As first argued by Mr. Garfinkle, as counsel for LAAC and Pangea Media Group,

21  LLC (an entity that was subsequently revealed to be a wholly owned subsidiary of R2D2),[12]

22  "[g]iven the fact that we're dealing with non-debtor records, we'd like to have some kind of

23  protective order that would make sure that these would only be given to the trustee…."  [*RJN*, p.

24  2, ¶ 3, Exhibit C, p. 37, lns. 13-16.]  Mr. Garfinkle based this argument largely on the

---

26      [11]  *See, infra*, Section VI.

27      [12]  *See, e.g.*, *Debtor's Reply In Support of Imposition of Bond*, filed on September 29, 2010 in Case 2:10-bk-
19927, Docket no. 288, p. 21-23.

28

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

1  representation that "Pangea is an operating company managing multiple assets, many of which

2  don't belong [to the debtors]." [*Id.* at p. 39, lns. 22-25]  After some debate the Court ruled that the

3  Trustee alone would have access to the information, given the Court's "concern[] about the fact

4  that there are other individuals, other entities involved"  [*Id.* at p. 100, lns. 2-6]  The Court made

5  this ruling expressly without prejudice to the right of any creditor to move to vacate the

6  Confidentiality Order.[13]  Nevertheless, the Court felt  the Confidentiality Order should be entered

7  because the Court was "interested in the investigation – the trustee's investigation.  And I think the

8  more parties involved, it impairs that.  I think that's the problem."  [*Id.* at p. 99, lns. 10-14].

9       As this case unfolds, it now appears that the problem is not the number of parties involved,

10  but rather the manner in which discovery is thwarted by a "hide-the-ball" mentality.  At this time,

11  the question of confidentiality rights of Bergstein-controlled entities is increasingly outweighed by

12  the rights of third-party creditors to evaluate the merits of positions taken by LAAC.  By seeking

13  to eliminate the Debtors' rights to Image Entertainment receivables, LAAC is essentially

14  attempting to starve the Trustee into submission, in a war of attrition.  If those receivables are as

15  paltry as suggested by LAAC [*Warshawsky Decl.* at ¶¶ 48-63], then they will not go far toward

16  retiring the $46 Million debt asserted by LAAC, but they could fund the Trustee's investigation of

17  the Debtors' rights and remedies.  Third-party creditors therefore have a substantial interest in

18  evaluating the facts as asserted by LAAC, including  the existence of Debtors' equity and

19  prospects for reorganization; they need to know about the Debtors' economic condition, and need

20  to make decisions about their long-term involvement in this case.  But the Confidentiality Order

21  precludes dissemination of information by the Trustee.  Meanwhile, LAAC, owned and/or

22  operated by Bergstein and Tutor -- who singly or jointly also control Pangea -- moves for relief

23  that may beggar the estates, based on information that is not available to other creditors.

24       Without reasonable transparency, the bankruptcy process breaks down.  The American

25  bankruptcy system is often described as having two primary objectives: first, ensuring the

26

27      [13]  The Union Entities anticipate filing or participating in a motion to vacate the Confidentiality Order.

28

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California  91203-3345

9

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

1    equitable and timely repayment of creditors with valid claims; and second, affording debtors a

2    fresh start once they emerge from bankruptcy. In re T-H New Orleans Ltd. P'ship, 188 B.R. 799,

3    807 (Bankr. E.D. La. 1995), aff'd, 116 F.3d 790 (5th Cir. 1997)). In order for these twin goals to

4    be achieved -- indeed, in order for the bankruptcy system to function -- every entity involved in a

5    bankruptcy proceeding must fully disclose all relevant facts. In re Coastal Plains, Inc., 179 F.3d

6    197, 208 (5th Cir. 1999) ("The duty of disclosure in a bankruptcy proceeding is a continuing

7    one."); In re eToys, Inc., 331 B.R. 176, 187 (Bankr. Del. 2005) ("Disclosure 'goes to the heart of

8    the integrity of the bankruptcy system.' ") (citing In re B.E.S. Concrete Products, Inc., 93 B.R.

9    228, 236 (Bankr. E.D. Cal. 1988)); In re Sanchez, 372 B.R. 289, 296-97 (Bankr. S.D. Tex. 2007).

10   See also In re Plaza de Retiro,  417 B.R. 632, 641 (Bankr. D. N.M. 2009) (One of the most

11   fundamental and crucial duties of a debtor-in-possession is to keep the Court and creditors

12   informed about the nature, status and condition of the business undergoing reorganization.) (citing

13   In re V. Savino Oil & Heating Co., Inc., 99 B.R. 518, 526 (Bankr. E.D. N.Y. 1989).

14       Instead of transparency and disclosure, we have LAAC exploiting the Confidentiality

15   Order and moving for relief from stay under the cover of opacity.  In other words, LAAC now

16   seeks relief in a context where third-party creditors cannot evaluate the merits of the Relief

17   Motion, nor the defenses thereto, to a degree consistent with the expectation of  transparency that

18   permeates the Bankruptcy Code.  Indeed, the entire case is increasingly suffused with this "hide-

19   the-ball" dynamic that is at odds with fundamental bankruptcy policy, and the economic effect of

20   the Relief Motion suggests a desire to hamstring the trustee and eviscerate the estates before

21   anyone really knows what is going on.  Under such circumstances, this Court should deny relief

22   from stay; the proponents of confidentiality should not be permitted to use it as a sword as well as

23   a shield.

24   **IV.    EVEN IF THIS WERE A SIMPLE CASE, LAAC HAS NOT PROVIDED A *PRIMA
           FACIE* CASE FOR RELIEF FROM STAY**

25

26       LAAC  posits that its alleged secured debt of $45 Million is not adequately protected due

27   to declining value of the Image Entertainment receivables, that the applicable debtor cannot

28   provide LAAC with an equity cushion, and that the collateral in question is not necessary to an

10

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California  91203-3345

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California 91203-3345

1   effective reorganization.  LAAC therefore claims it is entitled to relief from stay, for cause

2   [Bankruptcy Code §362(d)(1)] or relating to lack of debtor's equity and necessity of the collateral

3   for effective reorganization [Bankruptcy Code §362(d)(2)].

4        While Bankruptcy Code §362(g) states the party resisting relief has the burden of proof on

5   all issues other than the debtor's equity in the property, to obtain relief for cause, "the party

6   seeking relief must first establish a *prima facie* case that "cause" exists for relief under

7   §362(d)(1)…If the movant fails to meet its initial burden to demonstrate cause, relief from the

8   automatic stay should be denied." In re Plumberex Specialty Products, Inc., 311 B.R. 551, 557

9   (Bankr. C.D. Cal. 2004).  And "the burden of proof on the question of a debtor's lack of equity in

10   property lies with the creditor."  In re Bialac, 712 F.2d 426, 432 (9th Cir. 1983); In re A Partners,

11   LLC., 344 B.R. 114, 121 (Bankr. E.D. Cal. 2006).  LAAC has not satisfied these standards.

12        First and foremost, LAAC has provided no genuine proof that its security interest is

13   perfected.  Under the World Auxiliary[14] line of cases, a security interest in registered motion

14   picture rights and proceeds must be perfected through recordation with the United States

15   Copyright Office ("USCO");  otherwise, the asserted lien is unperfected, unenforceable as such,

16   and certainly cannot support relief from stay.[15]  The Warshawsky Declaration refers to an

17   assignment of pre-existing copyright mortgages and UCC financing statements for the ThinkFilm

18   Credit Facility [*Warshawsky Decl.*, ¶14] and includes a copy of a UCC Financing Statement filed

19   by DBZ against CT-1 [*Warshawsky Decl.*, ¶19], but contains no evidence, such as certificates of

20   recordation or USCO Index volume and page numbers, that any of the secured positions asserted

21

_____

22     [14]  Perfection of security interests in intellectual property that has been registered for copyright, including

23   motion pictures and motion picture screenplays, is achieved through recordation with the United States Copyright
Office.  *See, e.g.*, In Re World Auxiliary Power Company, 303 F.3d 1120 (9th Cir. 2002); In Re Peregrine

24   Entertainment, Ltd. 116 B.R. 194 (C.D. Cal. 1990);  In re AEG Acquisition Corp., 127 B.R. 34, 44 (Bankr. C.D. Cal.
1991) *aff'd*, 161 B.R. 50 (B.A.P. 9th Cir. 1993) *lmtd. by*, In Re World Auxiliary Power Company, supra.

25     [15]  In order for a Creditor to obtain relief from the stay pursuant to 11 U.S.C. §362(d), a Creditor must first

26   establish a *prima facie* case as to the amount of its interest and that its interest is secured by valid, perfected liens in
bankruptcy estate property.  In re Elmira Litho, Inc., 174 B.R. 892, 900-901 (Bankr. S.D. N.Y. November 17,

27   1994).  A creditor fails to present a *prima facie* case for relief from the automatic stay when it fails to file
documentation of its security interest in accordance with Fed. R. Bankr. P. 3001  *Id*. at 901 *citing to* Fed. R. Bankr. P.

28   3001.  Rule 3001(d) mandates "evidence that the security interest has been perfected."

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

Bush Gottlieb Singer López Kohanski Adelstein & Dickinson
500 North Central Avenue, Suite 800
Glendale, California  91203-3345

1    by LAAC have been perfected at the USCO.  Absent such evidence of perfection, LAAC has

2    failed to make its *prima facie* case for relief from stay.

3       LAAC also fails to provide *prima facie* evidence of a valid debt in the amount of $45

4    Million.  This amount is brandished throughout the Relief Motion and the Warshawsky

5    Declaration, but the existence of this debt  is evidenced only through recurrent recitals in a series

6    of transactions, many of them which feature insiders and related entities passing this debt around

7    among themselves.  There is no ledger, statement of accounts or anything else to substantiate this

8    claim.

9       LAAC asserts that it lacks adequate protection due to the declining value of the Image

10   Entertainment license, but, careful parsing of the Warshawsky materials shows that no *prima facie*

11   case has been made to support this assertion.  Warshawsky declares his conclusion that the TFC

12   Film Library is a "rapidly depreciating asset."  [*Warshawsky Decl.*, ¶28]  However, this assertion

13   tells us very little about whether the Image Entertainment receivables – the direct subject of the

14   Relief Motion – are a rapidly depreciating asset.  Moreover, Warshawsky notes that "the vast

15   majority of such depreciation occur[s…]in earlier years.," but fails to provide any guidance

16   whatsoever as to the extent to which the TFC Library contains recent product subject to such

17   depreciation, or instead contains older product that is already depreciated.[16]

18       In analyzing the Image Entertainment receivables, Warshawsky notes a rapid decline in

19   gross receipts on the Image license since 2008 [*Warshawsky Decl.*, ¶¶48-63], but glosses over the

20   obvious reason for this decline, which he himself notes: in the first year of this deal, "Image paid

21   approximately $11.5 Million in royalties *and advances…*" [*Warshawsky Decl.*, ¶48 (emphasis

22   added)].  Anyone familiar with distribution of independent motion pictures will immediately

23   recognize the inevitable steep decline in revenues once non-refundable advances have been paid;

24   indeed, such advances are often the only revenue seen on licenses to territorial distributors.

25   [*Kohanski Decl.*, ¶2].  In sum, the Image Entertainment receivables are not a declining asset, but

26

27        [16]  In this regard, note the age of the FPLAC library; all Guild-secured titles were produced before August of
2004.  [Declaration of Jana Campeau-Przebieda ("JCP Decl."), p. 3, ¶4, Exhibit A.]

28

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California  91203-3345

1    rather an asset that has already declined.  As noted by a leading bankruptcy treatise: "…the

2    existence or absence of an equity cushion does not support the inference that the collateral is

3    declining in value….the debtor's lack of equity  is immaterial to the secured creditor's case under

4    § 362(d)(1)…" 3 <u>Collier on Bankruptcy</u>, 16th Ed., §362.10, *quoting* <u>In re Elmira Litho, Inc.</u>, 174

5    B.R. 892, 902 (Bankr. S.D.N.Y. 1995).  With an asset that is only worth what it is worth, LAAC's

6    arguments concerning rapid depreciation are incorrect and certainly do not rise to the level of a

7    *prima facie* case for relief from stay.

8         Further to the question of an equity cushion, LAAC acknowledges the existence of  other

9    "primary" collateral in addition to the Image Entertainment receivables – the value of the 570

10   titles in the TFC Film Library and the 220-film ThinkFilm library.  [*Relief Motion*, p. 18, lns. 10-

11   12].  LAAC ignores the value of that additional collateral – along with any unspecified secondary

12   collateral – and argues that this Court should only consider a reading of  §362(d)(2) that looks

13   solely to the equity of CT-1.  [*Relief Motion*, p. 19, lns. 16-17; n. 22].  LAAC's suggestion that the

14   Court only consider the debtor's equity is an improper constriction on this Court's authority and

15   discretion to grant or deny relief from the automatic stay.  LAAC's citations to case law are

16   neither controlling nor persuasive; unlike the movant in those decisions, LAAC is attempting to

17   obtain relief from the stay prior to any determination of the value of LAAC's interest, its position

18   relative to other creditors, or a valuation of the assets affected by the Relief Motion.

19        Concerning the necessity of this property to an effective reorganization, the Union Entities

20   can only express a preliminary opinion because they have not had access to data subject to the

21   Confidentiality Order.  However, the Union Entities note the apparent lack of Debtor cooperation

22   with respect to forthright provision of  information concerning the Debtors' economic situation,

23   the extent to which LAAC is aligned with Pangea, Bergstein and Tutor, and the extent to which all

24   such interests are incentivized  not to provide critical information and to profit from such a

25   vacuum of data.  The Union Entities also note that the relationships among the five Debtor entities

26   suggest a strong case for substantive consolidation, in which instance it would be incorrect to

27   consider CT-1 prospects for reorganization in isolation from the prospects for reorganization

28   among all five Debtors as a whole.

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

1    In sum, the Relief Motion must be denied, as LAAC has failed to make its *prima facie*

2  case.

3  **V.    THE RELIEF MOTION REQUIRES HEIGHTENED SCRUTINY AS LAAC HAS
        MISREPRESENTED ITS RELATIONSHIP TO THE COLLATERAL**

4

5    In Footnote 8 to the Motion, LAAC asserts that its "security interest in the TFC Film

6  Library is of a first priority and senior to all other potential interests." [*Relief Motion*, p. 7, n. 8]

7  *This is incorrect; the Guilds hold senior liens in most of the rights that were transferred from*

8  *FPLAC, LLC ("FPLAC") to TFC Library LLC*; and for the same reasons that these particular liens

9  enjoy priority over the LAAC position, it is likely that the Guilds hold senior liens in many

10  additional TFC Library titles.  Tracking the history of the FPLAC Library is instructive not only

11  with respect to the existence of senior Guild liens, but also in connection with the manner in which

12  various entities owned or controlled by Bergstein conduct their business.

13    **A.    FPLAC Had Actual Notice of The Existence of Guild Liens and FPLAC's
        Lenders Knew or Should Have Known of Them As Well**

14

15    In 2004, Franchise Pictures, LLC and numerous affiliated entities filed voluntary Chapter

16  11 petitions; ultimately, several dozen affiliated entities (collectively, the "Franchise Debtors")

17  filed voluntary petitions, and through a Plan of Reorganization confirmed on  March 15, 2010,

18  they were substantively consolidated in the case styled as *In re Franchise Pictures LLC, et al.*,

19  Case No. SV 05-13855-MT (U.S. Bankruptcy Court, Central District of California, San Fernando

20  Valley Division).  [*Kohanski Decl.*, ¶5]  In September, 2006 the Court approved an asset purchase

21  agreement (the "APA"), by which  film rights held by the Franchise Debtors were separated into

22  two separate libraries.  Certain rights were sold to Morgan Creek Productions, Inc.; remaining

23  rights were sold to FPLAC, and the APA was executed by Bergstein – who had personally

24  negotiated his interest from inception of the case -- as "Manager" of FPLAC.  Schedule 3.2(a) of

25  the APA establishes the "FPLAC Purchased Assets:" the FPLAC Library.[17]  [*Kohanski*

26

27    [17] The Union Entities do not know whether additional film rights came to be held by FPLAC.

28

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California  91203-3345

14
MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

*Decl.,* ¶6; *RJN*, p. 3,¶ 4]

As of the Effective Date (October 3, 2006) of the Franchise/FPLAC transaction, there is no question that the Guilds held numerous liens in the FPLAC Library. SAG had a long-standing practice of taking security interests in motion pictures as a vehicle toward collection of residuals: payments to Guild-represented employees, negotiated through Guild collective bargaining agreements, when motion pictures containing their work are exploited in non-theatrical markets. For motion pictures produced under Guild agreements, producers and distributors are responsible for payment of residuals, which are calculated as percentages of exploitation proceeds.[18] Guild liens are generally taken prior to principal photography, granted by the signatory entity and any other entities controlling the right, under Copyright law, to make and distribute the picture.[19] By 1993, SAG and the DGA were regularly taking such security interests in a systemic fashion, and the WGA joined in by the end of the decade. To perfect these security interests, each Guild records its security interests with the United States Copyright Office and obtains and files UCC-1 financing statements in jurisdictions applicable to each covered production. [*Kohanski Decl.,* ¶4]

Accordingly, the APA and Sale Order contain numerous provisions reflecting the existence of these liens and clarifying that the FPLAC Library was not sold "free and clear" of these liens. The Sale Order provides that the APA is approved in its entirety, that the assets "shall be sold free and clear of any and all liens, claims, encumbrances and interests, other than the liens, claims and encumbrances of WB and the Union Entities, [*RJN,* p. 3, ¶4, Exhibit D, p. 8 lns. 9-12] and excepts the Union Entities from those entities holding liens, claims and encumbrances that are "forever

---

[18] The Guild agreements require residuals obligors to periodically report on exploitation, and to pay the residuals accrued during the reporting period.

[19] The Guilds essentially follow the same practice as production lenders, and also customarily enter into intercreditor agreements with such lenders by which lien priority is subordinated to the lender but the lender agrees to deal with residuals payments under certain circumstances, and the Guilds rise to the senior position once the picture has generated value equal to the production loan. In most instances, such production loans are paid off in the first few years after completion of the picture.

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

Bush Gottlieb Singer López Kohanski Adelstein & Dickinson
500 North Central Avenue, Suite 800
Glendale, California 91203-3345

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California 91203-3345

1    barred, estopped and permanently enjoined" from asserting such rights with respect to the

2    Purchased Assets.  [ *Id.* at p. 10, lns. 14-24; *Kohanski Decl.*, ¶5].[20]

3         At the October 2006 asset sale closing,  Bergstein executed FPLAC assumption

4    agreements in favor of each Guild and the MPIPHP.  Each Guild assumption agreement contains

5    the following language:  "To the extent the [producer] has executed a security agreement and

6    financing statement in the Guild's favor in the Pictures and related collateral as defined in the

7    [Guild]-Security Agreement  ("[Guild]" Security Interest), [FPLAC] agrees and acknowledges that

8    [FPLAC] rights in the Pictures acquired pursuant to the Asset Purchase Agreement (to the extent

9    those rights are included in the collateral covered by the Security Agreement) are subject and

10   subordinate to the [Guild] Security Interest."  Each Guild assumption agreement also attaches a

11   "Schedule 1" listing all titles subject to collective bargaining agreements with each Guild.

12   [*Kohanski Decl.*, ¶7]

13        There can therefore be no question that FPLAC – including Bergstein -- was aware of

14   Guild security interests in the FPLAC Library at the time these assets were sold to FPLAC.

15   Extensive measures had been taken to establish continuation of those liens through the sale

16   process and FPLAC expressly agreed, via the APA, the Sale Order approving the APA and each

17   Guild assumption agreement, that it was taking subject to all such liens.  But there is more.

18   Throughout the Franchise bankruptcy, each Guild filed proofs of claim spanning multiple bar

19   dates, and attached copies of each available security agreement and proof of recordation with the

20   United States Copyright Office (the "USCO").  [*Kohanski Decl.*, ¶5]  Review of Guild security

21   agreements submitted with those proofs of claim, which are a matter of public record, reveals 45

22   security position recorded with the USCO , spanning 30 of the 50 FPLAC titles.  [*JCP Decl.*, pp.

23   2-3, ¶ 3]. [21]

---

24

25        [20]  Similarly, Section 3.4 of the APA establishes that FPLAC acquires Purchased Assets subject to pre-
existing and post-closing Guild Liens, and Section 3.5(b) expressly states, in pertinent part, that "The applicable Pre-

26   Existing Guild Liens shall be retained as to each applicable Covered Picture purchased by FPLAC to secure
performance by FPLAC in connection with Post-Closing Union Entity Claims…" [*Id.*]

27        [21]  While this indicates a significant secured position, it does not mean the Union Entities are fully secured;
the MPIPHP is unsecured, and all Guilds do not hold liens in all covered product.  Moreover, there is the prospect that

28                                            (footnote continued)

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

1    FPLAC was therefore on constructive notice, and had to be on actual notice, with respect

2    to the scope of Guild liens encumbering the FPLAC Library at the time of the Franchise

3    bankruptcy.  By virtue of Section 205(c) of the Copyright Act, FPLAC  – and any potential lender

4    to FPLAC – was also on constructive notice, as a matter of law.

5    **B.    Perfected Guild Liens in the FPLAC Library are Undeniably Senior to any
         LAAC Position**

6

7    When a motion picture is registered with the USCO, Section 205(d) of the Copyright Act

8    [17 U.S.C. §205(d)] governs priority between conflicting transfers.  In essence, the first party to

9    file prevails, except for a one-month grace period that applies to the time between execution and

10   recordation of a document executed within the United States (or two months for documents

11   executed outside of the United States), and excepting certain qualifications that could limit the

12   ability of the second transferee to trump the first.

13   Here, each of the Guild Liens on the FPLAC library had been perfected, through

14   recordation with the USCO,  no later than August, 2004.  [*JCP Decl.*  p. 3, ¶4, Exhibit A]  Each of

15   those liens was perfected years before October 3, 2006,  the Effective Date of the sale of the

16   FPLAC Library to FPLAC.  Meanwhile, the Relief Motion recites that specified "Borrowers,"

17   including FPLAC, entered into the "ThinkFilm Credit Agreement" with "Bernard National" and

18   "Bernard," with the D.B. Zwirn Special Opportunities Fund, L.P. ("DBZ") as agent, on or about

19   March 2, 2007.  If this is the case, and DBZ immediately executed an appropriate security

20   agreement, the resultant security agreement, by operation of 17 U.S.C. 205(d), would be still be

21   junior – by several years -- to the existing Guild liens in the FPLAC Library.  *As LAAC is*

22   *described as holding its interest in the FPLAC Library as transferee of DBZ's interest in that*

23   *Library, LAAC is also necessarily junior to the existing Guild/FPLAC liens.*  Simply put, LAAC

24   is, at best, incorrect in asserting it is the senior lienor in the TFC Library.

25

26   _____

27   certain Guild positions are undersecured. The Guilds reserve all rights to supplement the record in the event
     information concerning additional security agreements and perfection documents  should come available.

28

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California  91203-3345

17

**MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY**

C.      **The Guilds Likely Hold Perfected Liens Senior to any LAAC Position with Respect to Many Other Titles Upon Which LAAC Seeks Relief from Stay**

The Relief Motion was filed late on the night of Friday, October 2; it advises of LAAC plans to foreclose on a library of approximately 570 films, and seeks relief from stay relating to receivables from Image Entertainment for a library of 143 films. [*Relief Motion*, p. 1, ln. 6; *Warshawsky Decl.*, Ex. 22]. Given the size of this library of rights, the Guilds are hard-pressed to survey files, perform USCO searches and assess relative priority in the short period of time mandated by the timeframe of the Relief Motion. However, the same factors leading to Guild senior liens in the FPLAC Library would apply to numerous pictures associated with the other libraries – Zoopraxis, ThinkFilm, CFA and CTFH [*Relief Motion*, p. 7, lns. 23-24] – assigned to TFC Library, and to the 143 Image Entertainment titles. For each picture, any Guild lien would be taken at the time of principal photography and recorded shortly thereafter.[22] With adequate time, the Guilds expect that similar evidence could also be developed in connection with other titles purportedly covered by LAAC interests and the Union Entities suspect that other secured creditors may be similarly situated.

This casual disregard for underlying facts – facts that are a matter of public record through the USCO, that can be easily adduced with adequate time, and that knowledge of which can be imputed through constructive notice – suggests this Court should view the Relief Motion with genuine caution. Indeed, the peculiar context of this case demands heightened scrutiny when LAAC's relationship to the collateral is misrepresented to this Court, and LAAC, in sharing an active and controlling principal with FPLAC, is well aware that LAAC is not the senior secured creditor for all TFC Library collateral.

/ / /

/ / /

---

[22] To be clear, the Guilds note that the Image Entertainment library does not appear to include the FPLAC Library titles discussed above [*Warshawsky Decl.*, Ex. 22], and that the Zoopraxis library includes certain titles financed by Comerica Bank, in which the Guilds may not have senior liens.

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California  91203-3345

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

**VI.    RELIEF FROM STAY IS INAPPROPRIATE WHEN TRANSACTIONS UNDERGIRDING THE PURPORTED RIGHTS OF LAAC ARE SUBJECT TO SUBSTANTIAL ATTACK**

**A.    Questionable Transactions in the United States**

When counter-claims or affirmative defenses – equitable subordination, fraudulent transfer and the like – are raised and would alter the lien rights of a movant for relief from stay (and therefore affect the debtor's equity), such counter-claims or affirmative defenses are properly considered by the bankruptcy court as a defense to a motion seeking relief from the automatic stay. In re Bialac, 694 F.2d 625, 627 (9th Cir. 1982); In re Palmdale Hills Property, LLC, 423 BR. 655, 664 (9th Cir. BAP 2009); In re Poughkeepsie Hotel Associates Joint Venture, 132 B.R. 287, 291-292 (Bankr. S.D.N.Y. 1991). While this is territory better traversed by the Trustee than by the Union Entities, the transactions appended to the Warshawsky Declaration reveal potential causes of action against LAAC and its affiliates that could increase the Debtor's equity in consistent collateral.

Tracking the ThinkFilm Credit Facility into the Note Purchase Transaction reveals a third-party loan of approximately $29 million to various Bergstein entities being transformed into a $45 million loan held by one Bergstein entity (LAAC) against others, and the loan balance never declines, even though Image Entertainment paid $11.5 Million in royalties and advances, presumably to CT-1 as the servicing agent and as a guarantor of the applicable loan.

The Library Assignors transfer to TFC Library strips assets out of one Bergstein entity and into another, in a manner intended to leave creditors behind. Film assets subject to third-party obligations are transferred without any consideration other than "release of *in personam* liability" of the transferor Bergstein shells, and with deliberate abandonment of third party obligations. Consider the "October 24, 2008" Asset Purchase Agreement, by which FPLAC Zoopraxis, CF Acquisitions, ThinkFilm, LLC, Capco TF Holdings LLC and Capco US Film Holdings LLC transferred all film rights to TFC Library LLC. Section 2.4 of this agreement recites a "purchase price" that is nonsensical insofar as LAAC already controlled the loan position, through the Note

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California  91203-3345

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California 91203-3345

1  Purchase Transaction having already closed.[23]  Perhaps this is why LAAC can only point to

2  "release of *in personam* liability," as among entities under common control, as the sole

3  consideration for transfer of 570 films to TFC Library LLC.  Meanwhile, Sec. 2.2(b) of the

4  agreement specifies that prior tax, payroll, health, pension, severance or other labor liabilities,

5  liabilities in connection with pre-Closing activity are not being assumed.  Stated simply, all assets

6  were shifted to one Bergstein entity from a set of others, but all liabilities were left behind.

7  It is this same sort of creditor cleansing that Bergstein and Tutor's LAAC  now proposes to

8  perform, through foreclosure on TFC Library, aided and abetted by relief from stay.

9  **B.      Questionable Transactions in the United Kingdom**

10  Bergstein and Tutor have purposefully further confused matters by conducting their

11  business across international borders.  Indeed, LAAC is "a private limited liability company

12  organized and existing under the laws of England and Wales."  [*Relief Motion*, p. 1, lns. 1-2]  The

13  Warshawsky Declaration also features multiple references to certain UK entities sporting the name

14  "Capitol Films."  Capitol Films Group Ltd., Capitol Films Partners Limited and Capitol Films

15  Limited are described as borrowers under separate loan agreements with DBZ; this loan was later

16  cross-collateralized with other DBZ loans for a year, then un-crossed. [*Warshawsky Decl.*, ¶¶9-12]

17  Capitol Films Limited and Capitol Films Group Limited appear as guarantors on the CT-1

18  Guaranty.  [*Warshawsky Decl.,* ¶15].  Footnotes 10 and 11 to the Relief Motion refer to certain

19  titles as "owned or controlled by Pangea Media Holdings Limited, a UK Corporation, as successor

20  to Capitol Films Limited, a UK Corporation."  [*Relief Motion, p.* 9]

21  Given the role of these Capitol UK entities throughout the Relief Motion and supporting

22  exhibits, as well as the likelihood that Capitol Films Limited ("CFL" or, the "Company") is owned

23  by the Debtors,[24]  it is instructive to review a recent ruling in the UK courts, concerning efforts by

---

25  [23] Warshawsky declares this agreement was actually entered into on August 3, 2009, sometime after
completion of the Note Purchase Transactions by which the DBZ position was taken by LAAC.  [*Warshawsky Decl.*,
26  ¶¶30, 20, Ex. 12]

27  [24] The Debtors' ownership of the Company is certainly evident from the record in the present Bankruptcy
matter.  One example comes from Bergstein's own sworn declaration filed with this Court on March 23, 2010 (the
28  "Bergstein Declaration").  Bergstein declares that CT-1 conducts its film distribution business through, inter alia,
(footnote continued)

20
MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California 91203-3345

1  entities controlled by Bergstein and Tutor to deal with the consequences of: (i) a transaction by

2  which Pangea Media Holdings Limited came to obtain most of the film rights held by CFL while

3  Bergstein was a director of both companies, before resigning directorship at CFL and placing that

4  company into Administration; and (ii) efforts by yet other Bergstein and Tutor entities – ultimately

5  rejected by the UK court through creditor intervention – to purchase remaining CFL assets,

6  including CFL causes of action against Bergstein.

7       In the context of the CFL Administration [*In The Matter of Capitol Films Limited, Case*

8  *No. 407 of 2010*], Bergstein and Tutor sought to employ a similar strategy to the Relief Motion;

9  namely, to obtain the UK Court's implicit approval of a transaction with both sides under their

10  common control, and structured to negatively impact creditors while cleansing potential liabilities.

11  The Union Entities and the rest of the objecting creditor body objected strenuously, and in a well-

12  reasoned opinion, the UK Court explained why the evidence presented would not support approval

13  of a sale to the Tutor/Bergstein interests. [*Hows Decl.*, p. 4, ¶8, Exhibit B]

14       In brief, the pertinent facts of the UK Administration are as follows:

15      1.   "[F]rom the beginning of 2008 the Company encountered severe cashflow
   pressure…" and Bergstein approached the Administrator regarding
16          "insolvency advice" concerning the Company and informs the
   Administrator that the Company holds rights to a "sizeable quantity of
17          films…" [*Hows Decl.,* Exhibit B, ¶¶23, 24, and 40];

18      2.   The Company is subsequently placed in administration and thereafter
   Bergstein provides "a number of documents between the Company and
19          Pangea [Media Holdings Limited[25] – 'Pangea']" demonstrating that "81

20  _____

21  "Capitol Films Ltd. UK" and that "Capco acquired Capitol UK in January, 2006. [*Bergstein Decl., Par. 8*]. Capitol
   UK was the operating company handling all films for which Capitol UK had a distribution license, and handled all
22  aspects of the licensing and distribution of these films." [*Bergstein Decl. Par. 9*]. Correspondingly, ThinkFilm
   "handles the distribution of all ThinkFilm and Capitol UK Films in the United States." [*Bergstein Decl., Par. 11*].
23  *See Also,* <u>RJN</u> pp. 2-3, ¶ 9, Exhibit B [Bergstein declares under penalty of perjury that "Capitol Films Ltd. U.K. [is]
   (an operating company owned by Plaintiff CT-1"].

24      [25] Given the convoluted manner in which Tutor and Bergstein have structured their business interests, it is
   very difficult to be completely sure which entity is conducting what business. In the UK matter, Pangea Media
25  Holdings Limited is identified as the entity that is the recipient of the assignment of 81 films. This
   entity is distinct in name from Pangea Media Group, LLC – the entity that has been the subject of the Trustee's Rule
26  2004 investigations and which the Debtors recently revealed is a wholly owned subsidiary of R2D2. *See, supra,* p. 7,
   n. 9. Moreover, per the records of the Companies House registry, Pangea Media Holdings Limited "was dissolved on
27  12/10/10." [*Patanian Decl.*; p. 3, ¶5(F), Exhibit 4; *Hows Decl.* ¶¶11-13] However, another Pangea named UK entity,
   Pangea Media Limited, remains an operating entity. [*Id.*]

28

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California  91203-3345

Films were purportedly assigned to Pangea" out of the administration estate ("Pangea Assignment") leaving the estate with "a much smaller quantity of films, all of which were likely to be of fairly minimal value" [*Hows Decl.,* Exhibit B, ¶¶7, 32 and 40];

3.   Both the Administrator and the UK Court observed that "Bergstein controlled, or at least closely identified himself with, Pangea"  and independent research conducted by the Union Entities confirms that Bergstein was at least the Director of this particular Pangea entity [*Hows Decl.,* Exhibit B, ¶31, and *Patanian Decl.*, p. 3, ¶5(E), Exhibit F];

4.   In addition to the 44 films of little value, the remaining assets of the Company's estate include ***claims or causes of action*** that the "Company might have against any person in relation to its business and assets (including the [Pangea Assignment]…)." [*Hows Decl.,* Exhibit B, ¶4]; and

5.   After the administrator indicated that he would entertain bids by entities directly associated with Bergstein (including Veritum), resulting in strenuous objections by the creditor body, an entity wholly owned by Tutor called Exodus Film Company Limited ("Exodus"), submitted a 'time-pressure' bid, expressly supported by Bergstein, for the remaining assets of the Company, including the claims concerning the Pangea Assignment. [*Hows Decl.,* ¶¶2, 4, 11-13; Exhibit B, ¶¶5-9].

In its analysis, the UK Court describes its dismay at the Tutor/Bergstein interests'  failure to be forthright:

"I would in passing observe that I find it both remarkable and unsatisfactory that Mr. Jones' affidavit did not mention that he and Mr. Bitton had only very recently been appointed directors of the Company…In particular, ***Mr. Jones made no mention of Mr. Bergstein's prior control of the Company or his very recent resignation***" (emphasis added). [*Hows Decl.*, Exhibit B, ¶28]

As with the transactions underpinning LAAC's claims, the UK Court noted that every document in the Pangea Assignment was signed by Bergstein "on behalf of both companies…." and in one instance, executed by Bergstein almost a year before he actually was appointed a director of Pangea.  [*Hows Decl.*, Exhibit B, ¶¶35, 32-39].  In summing up its observations and its decision to withhold the approval of the Sale to Exodus, the UK Court observed:

"I have seen no evidence to suggest that Mr. Bergstein gave any thought as to whether the interests of the secured or unsecured creditors of the Company would be served by entering into the Pangea Assignment…[when] it is likely to have been obvious to Mr. Bergstein that the Company was at least in dire financial difficulties…***Nor is there any evidence to suggest that Mr. Bergstein recognized or gave any consideration as to whether the fact that he was interested in both the Company and Pangea gave rise to any conflict of interest in relation to the 'negotiation' or determination of the terms of the transaction***…"  [*Hows Decl.*, Exhibit B, ¶¶51 and 52] (emphasis added)

22

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

The UK Court thus concluded it could not approve sale of claims against Bergstein to Tutor's Exodus.

Much like the CFL Administration, LAAC now seeks this Court's implicit approval of questionable transactions that undergird its request for relief from stay.  It is not for this memorandum to serve as a complaint toward enforcement of rights and remedies arising from such actions.  But as LAAC's position – and evaluation of Debtor equity –  is a function of such transactions, the potential for significant effects on Debtor's equity through counter-claims or through affirmative defenses of equitable subordination, fraudulent transfer, and other legal doctrines must be taken into account.  LAAC should not be granted relief  from stay when the released assets would be subject to such counter-claims or affirmative defenses.

**VII.    IF THE COURT ORDERS RELIEF FROM STAY, RELIEF SHOULD EXTEND TO ALL SECURED CREDITORS WITH AN INTEREST IN THE PURPORTED COLLATERAL OF LAAC**

If this Court is inclined to grant relief from stay at this time, the Union Entities ask that any such order provide that relief extends to all parties asserting rights in all assets within the scope of such Order.

/ / /

/ / /

/ / /

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California  91203-3345

23
MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY

## VIII.    CONCLUSION

Operating through a tangled web of controlled entities, Bergstein and Tutor have structured numerous insider transactions  demonstrating a pattern of self-dealing and callous disregard for the rights of legitimate creditors.  In seeking relief from stay while a Confidentiality Order is in effect and before the Trustee can consolidate Debtor resources  -- indeed, in seeking relief that manifests a strategic intention to choke off sources of Debtor funding that could be used to investigate Debtor causes of action with respect to asset transfers -- LAAC furthers this pattern, in a context that has been engineered to obscure the nature and consequences of their activities.  Such activity contravenes core bankruptcy principles intended to promote outcomes  resulting from transparent processes that bring all parties to the table, and should not be condoned by this Court.

WHEREFORE, the Union Entities respectfully request that LAAC's motion for relief from stay be denied.

DATED: October 12, 2010                Respectfully submitted,

JOSEPH A. KOHANSKI
DAVID E. AHDOOT
MELVIN YEE
BUSH GOTTLIEB SINGER LÓPEZ
KOHANSKI ADELSTEIN & DICKINSON
A Law Corporation


By:  /s/ Joseph A. Kohanski
         JOSEPH A. KOHANSKI
Attorneys for Creditors
Directors Guild of America, Inc., Screen Actors Guild, Inc., Writers Guild of America, West, Inc., Directors Guild of America- Producer Pension and Health Plans, Screen Actors Guild-Producer Pension and Health Plans, Writers Guild - Industry Health Fund and Producer-Writers Fuild of America Pension Plan, and Motion Picture Industry Pension and Health Plans

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California  91203-3345

24

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM STAY