1  JEFFREY K. GARFINKLE (SBN 153496)
   JOSEPH M. WELCH (SBN 259308)
2  BUCHALTER NEMER
   A Professional Corporation
3  18400 Von Karman Avenue, Suite 800
   Irvine, California 92612
4  Telephone: (949) 760-1121
   Facsimile: (949) 720-0182
5  Email:  jgarfinkle@buchalter.com
            jwelch@buchalter.com
6

7  Attorneys for Movant
   Library Asset Acquisition Company, Ltd.
8

9              UNITED STATES BANKRUPTCY COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                 LOS ANGELES DIVISION

12  In re                              Case No.  2:10-bk-19912-BR

13  ThinkFilm LLC,                     Chapter: 11

14              Alleged Debtor.        **OMNIBUS REPLY TO OPPOSITIONS TO
                                       MOTION FOR RELIEF FROM STAY BY
15                                     LIBRARY ASSET ACQUISITION
                                       COMPANY LTD**
16
                                       Hearing:
17                                     Date:       October 26, 2010
                                       Time:       2:00 p.m.
18                                     Place:      Courtroom 1668
                                                   255 E. Temple Street
19                                                 Los Angeles, California 90012

20

21

22

23

24

25

26

27

28

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
IRVINE

BN 7382985v3

**OMNIBUS REPLY TO OPPOSITIONS TO MOTION FOR RELIEF FROM STAY**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................ 1

II.   THE TRUSTEE'S ARGUMENTS ARE INCORRECT OR IRRELEVANT ................... 4

    A.    Ownership of LAAC; LAAC's Acquisition of the ThinkFilm Loan; Non-Insider Status of Tutor and LAAC. ............................................................ 4

    B.    LAAC Is Not and Was Never a Subsidiary of R2D2 or CT1 ................... 7

    C.    Admissible Evidence Has Been Submitted .......................................... 7

    D.    The Trustee and Other Objecting Parties Are Unable to Identify Any Facts Which Would Render the ThinkFilm Loan Unenforceable. ...................... 8

    E.    LAAC's Purchase of the ThinkFilm Loan Is Not an Insider Transaction ............. 9

    F.    The Trustee's Reliance on In re Hubbel Is Misplaced .......................... 11

    G.    LAAC Is Not Challenging the Enforceability or Legality of the ThinkFilm Loan. ................................................................................................. 12

III.  THE "UNION ENTITIES" OBJECTIONS ARE EQUALLY WITHOUT MERIT. ........ 14

    A.    The "Union Entities" Lack Standing ................................................. 14

    B.    Numerous "Union Entities" Objections Are Addressed Above ............ 14

    C.    The Lift Stay Motion is Not Premature .............................................. 14

    D.    The Trustee Is Prohibited From Using the Proceeds of LAAC's Collateral Without Providing Adequate Protection. .......................................... 15

    E.    LAAC's Security Interest in CT1's and ThinkFilm's Rights under the Image and Lions Gate Agreements Is Properly Perfected. .................... 16

    F.    Arguments Related to the Priority of the Guild's Liens against Certain Film Titles in the FPLAC Library Are Irrelevant to this Motion .................... 17

    G.    The Discussion of Contemplated Transactions in the United Kingdom Are Irrelevant and Replete with Rank Hearsay ...................................... 18

IV.   LIONS GATE'S ISSUES AND CONCERNS ARE RESOLVABLE. ...................... 18

    A.    ThinkFilm Has Two Agreements with Lions Gate .............................. 18

    B.    The Two Lions Gate Agreements Will be Carved out of Any Foreclosure Sale ................................................................................................ 19

    C.    Lions Gate's Other Rights in the TFC Library Remain Unclear ........... 19

    D.    Numerous Lions Gate Objections Are Addressed Above ..................... 20

    E.    Lions Gate Misreads the Lender Consent .......................................... 20

    F.    LAAC Has Submitted Admissible Evidence Regarding Its Security Interest and the Perfection of its Security Interest. .......................................... 21

V.    CONCLUSION ........................................................................................ 22

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alliance Fin. Capital, Inc. v. Herzfeld (In re Herzfeld)*, 2007 Bankr. LEXIS 4511
(Bankr. N.D. Ga. 2007) ........................................................................................................ 8

*Drake v. Franklin Equip. Co. (In re Franklin Equip. Co.)*, 416 B.R. 483
(Bankr. E.D. Va. 2009) .................................................................................................. 10, 11

*Freightliner Mkt. Dev. Corp. v. Silver Wheel Freightlines, Inc.*
*(In re Freightliner Mkt. Dev. Corp.)*,
823 F.2d 362 (9th Cir. 1987) .............................................................................................. 15

*Friedman v. Sheila Plotsky Brokers (In re Friedman)*,
126 B.R. 63 (9th Cir. BAP 1991) ....................................................................................... 12

*In re Hubbel*,
427 B.R. 789 (N.D. Cal 2010) ...................................................................................... 11, 12

*In re Kim*,
71 B.R. 1011 (Bankr. C.D. Cal. 1987) ............................................................................... 17

*Roost v. Timber Components, Inc. (In re Timber Components, Inc.)*, 139 B.R. 520
(Bankr. D. Ore. 1992) ........................................................................................................... 5

*Unsecured Creditors Committee of Pacific Express, Inc. v. Pioneer Comm.*
*Funding Corp. (In re Pacific Express, Inc.)*, 69 B.R. 112
(9th Cir. BAP 1986) ............................................................................................................ 11

## FEDERAL STATUTES

## 11 U.S.C.

§ 101(2)b .............................................................................................................................. 5
§ 362(d) .............................................................................................................................. 23
§ 362(g) .............................................................................................................................. 17
§ 363(c)(2) .................................................................................................................... 15, 16
§ 541(d) ........................................................................................................................ 17, 20

## 17 U.S.C.
§ 205 ................................................................................................................................... 17

## DELAWARE STATUTES

6 Del. C. § 9-310 ............................................................................................................... 16
6 Del. C. § 9-501(a) ........................................................................................................... 17

## I.    **INTRODUCTION**

Notwithstanding the loaded rhetoric contained in the oppositions, the pending relief from stay motion is very straightforward. Library Asset Acquisition Company Ltd., a company formed under the laws of England and Wales ("LAAC"), is the holder of a secured loan initially made in 2006 by D.B. Zwirn & Co. to certain debtors/alleged debtors, in an arms-length loan transaction. That loan is approximately two years in default and LAAC now seeks to foreclose on film library collateral, currently owned by a non-debtor—TFC Holdings LLC ("TFC"), an affiliate of the debtors. Only two of the five debtors/alleged debtors may hold interests in that film library collateral—ThinkFilm LLC ("ThinkFilm") and CT 1 Holdings LLC ("CT1"). Their interests are limited to rights under the various Image Agreements (as identified in the Lift Stay Motion) and under recently discovered agreements with Lions Gate Films, Inc. (the "Lions Gates Agreements") and potentially other arrangements with Lions Gate Films, Inc. and certain of its corporate affiliates ("Lions Gate") (as discussed below).

LAAC was originally owned by Ron Tutor ("Tutor") and an affiliate of David Bergstein ("Bergstein"), Veritum Limited ("Veritum"). This ownership structure has been widely disclosed throughout the seven months of these bankruptcy cases and is a matter of public record. LAAC is a United Kingdom corporation. Under the laws of the United Kingdom, unlike the United States, companies must file a list of shareholders with The Companies House. LAAC's public filings reveal that Tutor owned one (1) Class "A Ordinary Share" of LAAC while Veritum owned one (1) Class "B Ordinary Share." During their 2004 examinations, both Tutor and Bergstein testified about LAAC's ownership structure.

Setting aside all of the disparaging remarks, hyperbole and rhetoric, these key facts are undisputed:

- In 2006, DB Zwirn made a secured loan to ThinkFilm. After several amendments, the principal balance of that loan increased to $45.7 million. ***The loan was and remains secured by all assets of TFC, ThinkFilm, CT1, and R2D2. Stated another way, at all times after these loans were made, ThinkFilm, CT1 and R2D2 had no unencumbered assets.***

- Tutor personally guaranteed various loans made by DB Zwirn.

1    • In October 2008, following defaults and DB Zwirn's multiple demands on Tutor to

2 honor guaranties allegedly totaling approximately $82 million, Tutor began negotiating with DB

3 Zwirn.

4    • Those negotiations resulted in a March 12, 2009 agreement whereby a newly

5 formed company, LAAC, primarily owned by Tutor, would purchase certain of the DB Zwirn

6 loans and security related to certain other loans owned by DB Zwirn. In March and June 2009,

7 the closings of the first tranches of these purchases occurred with payment of $45 million to DB

8 Zwirn. That $45 million came directly from Tutor. No assets or funds of any of the debtors, or

9 any of their affiliates, paid or otherwise financed any portion of the $45 million purchase price.

10    • Tutor's ownership of LAAC has been fully disclosed. As admitted by counsel

11 for the trustee at the July 20, 2010 hearing,

12 > So Mr. Tutor needs to show up [for his 2004 examination] and *he*
   can't foreclose on assets until we get his testimony about what he
13 > knows and what the security interests are. And then we may not
   agree with his foreclosing.

14

15 *See* Transcript of July 20, 2010, p. 54, lns. 22-25 (emphasis added). [Docket No. 184; *In re*

16 *ThinkFilm LLC*]

17    • On August 3, 2009, ThinkFilm and five affiliated non-debtor companies

18 transferred their film libraries to TFC. To the best of LAAC's knowledge, TFC was and remains

19 a wholly-owned subsidiary of R2D2. This was done as part of an overall corporate restructuring

20 designed to enhance the raising of capital or alternative financing. *See e.g.* Warshawsky

21 Declaration in Support of Lift Stay Motion ("Warshawsky Decl."), ¶ 37.

22    • Neither Tutor nor LAAC have any interest in TFC. Rather, TFC appears owned

23 by R2D2.[1] That single subsidiary owns the film libraries previously owned by six of its separate

24 subsidiaries, including ThinkFilm. Regardless of TFC's ownership, all of its assets are subject to

25 _____

[1] The use of the word "appears" is deliberate. TFC was formed by Susan Tregub as a subsidiary of R2D2. She
26 maintained the corporate records of TFC. To LAAC's knowledge, ownership of TFC never was transferred from
R2D2. As part of trustee's discovery, requests were made of Tregub to produce the corporate records of TFC.
27 Tregub only produced the corporate articles of TFC. Tregub did not produce any minute books, or membership
interest ledger. Whether any of TFC's membership interests was officially issued remains unclear to LAAC. As a
28 result, LAAC assumes that TFC still is owned by R2D2.

1    perfected security interests in favor of LAAC that secure all of the obligations under the

2    ThinkFilm Loan.

3              • LAAC, in its capacity as the successor to DB Zwirn as the senior secured lender,

4    consented to this inter-company asset transfer.  It also exonerated ThinkFilm from any *in

5    personam* liability.  Had (1) this consent not been given and (2) LAAC not acquired the DB

6    Zwirn loans in the manner structured (including decoupling the ThinkFilm Loan from the other

7    DB Zwirn loans), ThinkFilm would be faced with over $100 million in additional claims.

8              • LAAC now seeks to enforce its rights under the ThinkFilm Loan as against the

9    TFC Film Library.  CT1 and ThinkFilm have very limited rights in the TFC Film Library—

10   namely those rights to receive payments during the remaining limited terms of the Image and the

11   Lions Gate Agreements.  That right to receive payments is strictly in an agent/fiduciary capacity,

12   on behalf of TFC.  Neither CT1 nor ThinkFilm possess any ownership rights in and to payments

13   by either Image or Lions Gate for film titles now owned by TFC.

14             • From shortly after its February 2009 formation through the commencement of

15   these bankruptcy cases, LAAC was owned as follows:  One (1) Class A Share—Tutor; One (1)

16   Class B Share—Veritum.  Veritum is owned by Bergstein.  At the time of LAAC's formation and

17   through the Petition Date, Veritum's stock was pledged to Tutor.  Recently, Tutor exercised his

18   rights and remedies and, as a result, he is the 100% owner of LAAC.   Simultaneously, Bergstein

19   resigned as a director of LAAC.  As a result of these recent events, neither Bergstein nor any of

20   his companies have any affiliation with LAAC.

21        The objectors cannot and do challenge these facts.  Instead, they proclaim that because

22   LAAC purchased the ThinkFilm Loan and because, in the objectors' view, LAAC is an insider of

23   the Debtors, the ThinkFilm Loan should not be enforced.  In their view, LAAC's perfected

24   security interests should be disregarded, and LAAC should not be granted relief from stay.  There

25   is no legal or equitable basis for any of these contentions.

26        The ThinkFilm Loan was an arms-length loan, enforceable at its inception.  It remains

27   fully enforceable today.  LAAC/Tutor paid $45 million to acquire the ThinkFilm Loan.  The fact

28   that an alleged insider—LAAC—now owns the ThinkFilm Loan is irrelevant to the issues before

1   the Court. Those issues are: Is there a validly perfected security interest against the collateral? Is

2   there equity in the collateral? Is the collateral necessary for an effective reorganization? Is the

3   collateral necessary for an effective reorganization? None of the objectors submit any evidence

4   to challenge LAAC's proof in support of each of these issues.

5        As explained in the Lift Stay Motion, the TFC Film Library against which LAAC will be

6   foreclosing is not owned by the debtors. The only interests that ThinkFilm and CT1 possess in

7   the TFC Film Library are extremely limited and restricted rights to receive revenue under the

8   Image Agreement and perhaps the Lions Gate Agreements. Those rights are fully encumbered

9   and deteriorating in value. For all the reasons set forth in the Lift State Motion and this Reply,

10  the automatic stay should lift.[2]

11  **II.    THE TRUSTEE'S ARGUMENTS ARE INCORRECT OR IRRELEVANT.**

12      **A.    Ownership of LAAC; LAAC's Acquisition of the ThinkFilm Loan; Non-Insider Status of Tutor and LAAC.**

13

14          *(a) LAAC:*

15        From the earliest stages of these cases, Tutor's and Bergstein's indirect ownership of

16  LAAC was known by all involved. During their respective 2004 examinations, both testified

17  under oath as to LAAC's ownership. The trustee's counsel spoke of this ownership during the

18  July 20, 2010 hearing. The ownership structure, through mid-September 2010, was as follows:

19        LAAC was formed on February 25, 2009. At the time of its formation, Tutor owned the

20  only Class A share. Veritum owned the only Class B share (by transfer from Bergstein).

21  Veritum's single Class B share was pledged to Tutor to secure certain obligations that Veritum

22

23

---

[2] The trustee's opposition contains threats of sanctions against LAAC and its counsel if they proceed with an as-yet unnoticed foreclosure sale against the TFC Film Library. *See* Trustee's Opposition, p. 1, lns. 25-27. Yet, the trustee fails to identify what interest, if any, he believes any of the debtors hold in that library. The only such interests that LAAC has identified are CT1's and ThinkFilm's limited and restricted rights under the Image and, potentially, the Lions Gate Agreements. CT1's and ThinkFilm's rights under those agreements are what necessitated the lift stay motion. If the trustee is aware of any interests that any of the debtors hold in the TFC Film Library, he needs to identify what those interests are with specificity and what adequate protection he is providing to the holders of secured claims.

1    and Bergstein owed to Tutor. *See* Declaration of Ronald N. Tutor in Support of Omnibus Reply

2    ("Tutor Decl."), ¶ 14.

3        Under LAAC's Articles of Incorporation, only Class A shares have voting rights. *See*

4    LAAC's Articles of Incorporation, § 12 (attached as Exhibit 4 to the Tutor Declaration). Thus,

5    from its inception, Tutor was the only holder of voting rights in LAAC. Tutor Decl., ¶ 12;

6        Tutor financed LAAC by lending (through his wholly-owned company, Library Liquidity

7    LLC ("LL")) $45 million to LAAC. That loan is secured by all assets of LAAC. LL holds

8    perfected security interests in both the United States and the United Kingdom against all of

9    LAAC's assets. LAAC, in turn, tendered the $45 million lent by Tutor/LL to DB Zwirn to

10   acquire the DB Zwirn Loan and security for certain other DB Zwirn loans. Tutor Decl., ¶ 17.

11       LAAC was never an insider of any of the debtors. In order to be an insider, LAAC would

12   have to be classified as an "affiliate." Bankruptcy Code section 101(2)(b) contains the only

13   possible applicable definition of affiliate:

14           The term "affiliate" means—

15           (B) corporation 20 percent or more of whose outstanding voting
             securities are directly or indirectly owned, controlled, or held with
16           power to vote, by the debtor, or by an entity that directly or
             indirectly owns, controls, or holds with power to vote, 20 percent or
17           more of the outstanding voting securities of the debtor . . .

18       Here, under the controlling corporate documents of LAAC, neither Veritum nor Bergstein

19   owned, controlled or held with power to vote twenty percent (20%) of the voting securities of

20   LAAC. All voting securities of LAAC have been and are held and controlled by Tutor—a non-

21   insider since mid to late February 2009. **As result, LAAC is not an insider of any of the**

22   **debtors.**[3] *See e.g.*, *Roost v. Timber Components, Inc.* (*In re Timber Components, Inc.*), 139 B.R.

23   520, 524-25 (Bankr. D. Ore. 1992) (holder of preferred corporate stock with limited voting rights

24   not an affiliate of the debtor and not an insider).

25

26

27   ---
     [3] Very recently, Tutor exercised certain of his rights and remedies against Veritum. Specifically, Veritum's 1 Class
28   B Share was transferred to Tutor. Whereupon, Bergstein resigned as a director of LAAC. Tutor Decl., ¶ 15.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
IRVINE

BN 7382985v3                                5

**OMNIBUS REPLY TO OPPOSITIONS TO MOTION FOR RELIEF FROM STAY**

1

    *(b) Tutor:*

2           As to Tutor, he ceased being an insider of the debtors in mid to late February 2009. Tutor

3    Decl., ¶¶ 7, 8. This change in status was before (1) LAAC's purchase of the ThinkFilm Loan;

4    and security for certain other DB Zwirn loans, and (2) the transfer of the TFC Film Library from

5    ThinkFilm and the five other affiliated non-debtor companies to TFC.

6           Contrary to the trustee's arguments and this Court's initial impression, there was nothing

7    unusual or "curious" about Tutor's February 2009 transfer of his 50% ownership interest in R2D2

8    to Bergstein. In September 2008, DB Zwirn made demand upon Tutor to honor approximately

9    $82 million of guaranties for the various debt instruments issued in favor of DB Zwirn. Tutor

10   Decl., ¶ 5. Over the next four to five months, extensive and robust negotiations took place

11   between Tutor and DB Zwirn over these guaranties. Tutor Decl., ¶ 6. Ultimately, in early

12   February 2009, Tutor began very active negotiations with DB Zwirn to acquire certain of the

13   notes and security for other notes. Tutor Decl., ¶ 9. Those negotiations culminated in the March

14   12, 2009 Note Purchase Agreement between LAAC and DB Zwirn.[4] Tutor Decl., ¶ 10.

15          In January 2009, as Tutor was dealing with the issues surrounding his guaranties of the

16   various obligations to DB Zwirn (with demands totaling in excess of $82 million) and attempting

17   to create a resolution to those personal financial issues, Tutor determined that his investment in

18   R2D2 was worthless. Tutor Decl., ¶ 7. At that time, Tutor decided to divest his ownership

19   interest in R2D2—a very understandable step under these circumstances. *Id.* On or about

20   January 23, 2009, Bergstein agreed to purchase Tutor's ownership interest in R2D2 for Ten

21   Dollars ($10). *Id.* That transfer was evidenced by a Membership Interest Purchase Agreement.

22   While dated as of January 23, 2009, the Membership Interest Purchase Agreement was signed in

23

24
_____

25   [4] Contrary to the trustee's self-serving argument, the Note Purchase Agreement was not a "triparty agreement" to
which the debtors were parties. Trustee Opposition, p. 7, ln. 13. None of the debtors or other borrowers were parties

26   to the Note Purchase Agreement. Rather, they merely signed an addendum to the Note Purchase Agreement to
acknowledge and agree to the transfer of the ThinkFilm Loan and security for other loans to LAAC and LAAC's

27   substitution as administrative agent under the ThinkFilm Loan. None of the debtors' or other borrowers' rights and
obligations under the ThinkFilm Loan (or any other loan) were altered by the Note Purchase Agreement. This type

28   of addendum is a standard and customary provision in asset based loan transfer agreements.

1    mid to late February 2009.[5]  Tutor Decl., ¶ 8.  Thus, by the end of February 2009, Tutor ceased

2    being an insider of the debtors.

3    **B.      LAAC Is Not and Was Never a Subsidiary of R2D2 or CT1.**

4          Purposefully disregarding the actual and extensive corporate documents evidencing the

5    ownership and funding of LAAC, the trustee relies on one paragraph in a declaration which

6    David Bergstein signed on or about March 25, 2010 in litigation involving Susan Tregub.

7    However, as Lucia Coyoca, an attorney representing Bergstein in that lawsuit, explained in an e-

8    mail sent on October 12, 2010 (almost immediately after first being alerted to the language in this

9    paragraph):

10          As you likely have surmised by now, there was a mistake in
            paragraph 2 of the David Bergstein declaration that was filed on
11          March 25, 2010, in support of plaintiffs' application for a temporary
            restraining order against Susan Tregub, in the Los Angeles Superior
12          Court state lawsuit filed by certain plaintiffs against Susan Tregub
            for breach of fiduciary duty and attorney malpractice.  Neither
13          Library Asset Acquisition Company Ltd. ("LAAC") nor Library
            Rights Company Ltd. ("LRC") should have been included in the list
14          of entities referenced in paragraph 2 as being indirectly owned by
            R2D2 LLC or CT1 Holdings, LLC.  Neither LAAC nor LRC is
15          owned, directly or indirectly, by R2D2 or CT1, or any of the other
            debtors or alleged debtors.  Those two entities were inadvertently
16          included in the list set forth in paragraph 2, as we were working
            under tight time constraints necessarily mandated by the
17          requirements imposed when seeking a temporary restraining order.
            Thank you for drawing our attention to this error.  Attached is a
18          Notice of Errata correcting Mr. Bergstein's declaration, and a
            corrected declaration, which will be filed with the Los Angeles
19          Superior Court tomorrow morning.

20   *See* Declaration of Lucia Coyoca in Support of Omnibus Reply ("Coyoca Decl."), ¶¶ 2, 3; Exh. 1.

21   **C.      Admissible Evidence Has Been Submitted.**

22          As more fully set forth in the LAAC's response to the Trustee's evidentiary objections,

23   Evan Warshawsky is competent to testify about all the topics contained in his declaration.  The

24   Trustee's challenges to Warshawsky's Declaration are more appropriately challenges to the

25   weight of the evidence, not whether the evidence is admissible.  Clearly, Warshawsky, as one of

---

26   [5] The exact date in February 2009 that the Membership Interest Purchase Agreement was fully signed is unclear.  For

27   argument sake, LAAC assumes the agreement was signed on February 28, 2009.  Whether this agreement was signed
     on January 23, 2009 or February 28, 2009, or a date in between these two dates, is not material to any issue in these

28   cases.

1   the debtors' former chief financial officer and consultants and as one of LAAC's custodians of

2   record, is competent to testify about documents that he reviewed and relied upon during the

3   course of his employment by the debtors and the documents that comprise LAAC's business

4   records. All of this testimony is within Warshawsky's personal knowledge. *Alliance Fin.*

5   *Capital, Inc. v. Herzfeld* (*In re Herzfeld*), 2007 Bankr. LEXIS 4511 (Bankr. N.D. Ga. 2007)

6   ("Debtor questions the ability of [] an individual to give an affidavit with respect to the business

7   records of the entity prior to his employment. Such a challenge goes to the weight and not

8   admissibility of the evidence and is not an appropriate basis for a court to grant a[n evidentiary

9   objection].")

10          As to the lack of the words "under penalty of perjury," that inadvertent omission was

11   immediately corrected upon review of the objections to the Lift Stay Motion. On October 13,

12   2010, Warshawsky submitted a corrected declaration under penalty of perjury in each of the two

13   cases.

14   **D.       The Trustee and Other Objecting Parties Are Unable to Identify Any Facts
             Which Would Render the ThinkFilm Loan Unenforceable.**

15

16          These bankruptcy cases have now been pending for more than 7 months. During the last

17   210+ days, the trustee has conducted dozens of formal and informal interviews of numerous

18   people involved in any way with the debtors. (The exact number of people interviewed by the

19   trustee is unknown; the trustee has however noticed eighteen (18) separate 2004 examinations).

20   Those examinations have included four days of depositions of Bergstein, two days of depositions

21   of Tutor (on behalf of himself and LAAC), one day of deposition of a former officer of Image,

22   and about a dozen other 2004 examinations. Hundreds of thousands of pages of documents have

23   been turned over by the debtors or produced by subpoenaed parties. Notwithstanding this

24   massive investigation, the trustee is unable to articulate *any* reason why the ThinkFilm Loan is

25   unenforceable. He can only point to a lawsuit that Tutor and LAAC (and other parties) are

26   prosecuting against DB Zwirn and certain affiliated parties and a disclosure paragraph in the Note

27   Purchase Agreement. That lawsuit and the disclosure paragraph in the Note Purchase Agreement

28   are discussed in more detail below.

The trustee tries to impugn Tutor and LAAC by pointing out that both raised objections to the Rule 2004 examinations. The trustee, however, fails to mention that as soon as this Court overruled those objections, Tutor and LAAC fully cooperated with the trustee. Both produced all non-privileged subpoenaed documents and Tutor appeared twice for his 2004 examination.

As to supposed privileged files belonging to the debtors, LAAC understands that those have been turned over to the trustee. Obviously, if those privileged files provide information to the trustee to establish that the ThinkFilm Loan somehow is unenforceable, the trustee will have ample time to commence a lawsuit against LAAC and, perhaps, others.

The overriding and insurmountable hurdles the trustee will face in prosecuting such a lawsuit are as follows:

- At the time the ThinkFilm Loan was initially made, enforceability and perfection opinions ("Legal Opinions") were issued on behalf of the borrowers in favor of DB Zwirn and the other lenders. *See* Declaration of Michael Barnes in Support of Omnibus Reply ("Barnes Decl."), ¶ 3.

- DB Zwirn and the other lenders advanced $45.7 million to ThinkFilm and the other borrowers/guarantors under the ThinkFilm Loan—an arms-length transaction with a non-insider, third party. Even if the ThinkFilm Loan contains usurious interest, which it does not by virtue of the decoupling from the other DB Zwirn loans, the principal amount of the ThinkFilm Loan (approximately $45.7 million) would still be owing.

- If the trustee does seek to set aside or reverse the intercompany asset transfer (from ThinkFilm and the other five non-debtor transferors to TFC) and rescind or reverse the Note Purchase Agreement, all the assets of ThinkFilm would still be encumbered by the ThinkFilm Loan and the perfected security interests under that loan. Moreover, reversal of these transactions would result in ThinkFilm becoming personally liable (once again) for both the ThinkFilm Loan and, perhaps, the other DB Zwirn Loans. That would result in upwards of another $100 million of claims against this debtor. The corresponding dilutive effect to the other creditors of ThinkFilm would be extreme, with no corresponding benefit since all of ThinkFilm's and CT1's assets would still be fully encumbered with perfected security interests.

The trustee and the Union Entities conveniently ignore these facts, while attacking the underlying transactions and Bergstein.

**E.    LAAC's Purchase of the ThinkFilm Loan Is Not an Insider Transaction.  Nor Is the ThinkFilm Loan Subject to Strict Scrutiny.**

In his opposition, the trustee blithely states that LAAC's purchase of the ThinkFilm Loan (with Tutor's own money) is an insider transaction that must be subjected to strict scrutiny.  The trustee is in error.

As explained above, by March 1, 2009, neither Tutor nor LAAC were insiders of any of the debtors.  Even assuming, *arguendo*, that Tutor and LAAC are insiders, the ThinkFilm Loan is not subject to strict scrutiny.  And, relief from stay still should be granted.  *See e.g., Drake v. Franklin Equip. Co. (In re Franklin Equip. Co.)*, 416 B.R. 483 (Bankr. E.D. Va. 2009).

The *Franklin Equipment* case presents similar facts to those present in these cases, and similar objections to those raised by the trustee (and the other objectors) in opposition to LAAC's lift stay motion.  In *Franklin Equipment*, prior to bankruptcy, certain insiders of a corporate debtor purchased a secured promissory note held by a third party lender (SunTrust Bank).  *Id.* at 497.  Following bankruptcy, the insider holders of the SunTrust bank loan moved for relief from stay to foreclose against their collateral.  *Id.* at 489.  The Chapter 7 trustee in *Franklin Equipment* opposed that lift stay motion on the theory that the SunTrust bank loan could be recharacterized as equity, or otherwise challenged.  In rejecting these challenges and granting relief from stay, the *Franklin Equipment* court noted as follows:

> The Court is unable to locate any decision that has considered whether a loan indisputably originated as a debt by a non-insider lender that is subsequently purchased and continued by insiders can ever have its certain origin as debt "transformed" into capital contribution.  Remembering decisions teach that a court considering recharacterization must center its focus on the time of origination of a challenged transaction, a strong argument may be waged that a transaction originated as a loan may not change its fundamental character, unless perhaps the purchasing insiders effect such a radical modification of the terms and condition of the transaction after acquisition so as to remove its original character.

1    *Id.* at 519 (citations omitted).  The *Franklin Equipment* then examined the post-acquisition

2    modifications to the SunTrust bank loan and concluded that there had not been radical

3    modifications to that loan.  *Id.* at 519-522.

4         In these cases, the ThinkFilm Loan was a non-insider loan, provided by a third party at its

5    inception and later amendments.  It remained a non-insider loan following its acquisition by

6    LAAC.  Regardless of whether LAAC is an insider, following LAAC's acquisition of the

7    ThinkFilm Loan, there was no modification to the ThinkFilm loan other than the *in personam*

8    exoneration of ThinkFilm in connection with the film libraries transfer of six entities to TFC.

9    That modification materially benefitted ThinkFilm.[6]

10        This is why the trustee is unable to point to *any* facts that would support recharacterizing,

11   equitably subordinating or otherwise disallowing LAAC's secured claim.

12   **F.    The Trustee's Reliance on *In re Hubbel* Is Misplaced.**

13        In his Opposition, the Trustee relies on *In re Hubbel*, 427 B.R. 789 (N.D. Cal 2010)[7] to

14   argue that this Court can hear issues relating to the enforceability of a security interest in

15   connection with an opposition to a lift stay motion.  The trustee then attempts to extend the

16   holding in *Hubbel* to argue that automatic stay should stay in place pending the outcome of

17   litigation over "the voidability of, and/or defects in, a purported secured creditor's claim."

18   Trustee Opposition, p. 20, lns. 4-11.  That argument is not the ruling in *Hubbel*.

19        In *Hubbel*, a bankruptcy court was faced with a security interest against residential real

20   property where the underlying loan arguably had been rescinded timely by the debtor, as

21   permitted under applicable Federal law (the Truth in Lending Act (TILA)).  In affirming the

22   bankruptcy court's refusal to lift the stay, a District Court judge opined that is was proper for the

23

24

25   ---

[6] This analysis is based upon an assumption that recharacterization is a defense available to the trustee.  However, under controlling Ninth Circuit law, recharacterization is not recognized.  *See Unsecured Creditors Committee of Pacific Express, Inc. v. Pioneer Comm. Funding Corp. (In re Pacific Express, Inc.)*, 69 B.R. 112, 115 (9th Cir. BAP 1986).

26

27   [7] In his Opposition, the trustee states that *In re Hubbel* is a 2010 decision of the Ninth Circuit Bankruptcy Appellate Panel.  It is not.  Rather, it is a 2010 decision issued by a Northern California District Court judge.

28

1    bankruptcy court to examine the efficacy of the TILA rescission and the legitimacy of the

2    creditor's security interest in the context of a lift stay motion. *Id.* at 792-93.

3        Here, there is no articulated challenge to the original security interest against ThinkFilm

4    and CT1 (who, as a fiduciary agent to TFC, only hold bare legal title to any payments received

5    from Image or Lions Gate). LAAC's evidence submitted in support of the Lift Stay Motion

6    establishes that ThinkFilm and CT1 granted security interests against all of their assets in October

7    2006. *See* Warshawsky Declaration, Exhibits 1 and 4. As set forth in the Legal Opinion issued

8    by Barnes Morris (Barnes Declaration, Exhibit 1), issued on October 20, 2006, those security

9    interests were effective and enforceable:

10            To the extent that a security interest may be created in such
               property under Article 9 of the Uniform Commercial Code (the
11             "UCC"), each of the Credit Agreement and the Security Agreement
               (collectively, the "Security Documents") are effective to create in
12             favor of the Administrative Agent for the benefit of itself and the
               Lenders a valid security interest under the UCC in the rights of the
13             Loan Parties in the personal property purported to be subject to the
               Lien of the Security Documents (the "Collateral") as collateral
14             security for the Obligations specified in the Security Documents.

15        The trustee's Opposition does not contain any factual basis or legal analysis to support a

16    conclusion that LAAC's security interest as granted in the applicable ThinkFilm Loan documents

17    is unenforceable. In the absence of an articulated challenge to LAAC's security interest, LAAC

18    is entitled to relief from the automatic stay.[8]

19    **G.**    **LAAC Is Not Challenging the Enforceability or Legality of the ThinkFilm**
            **Loan.**
20
            In his Opposition, the trustee claims that LAAC is seeking to "rescind for illegality in
21
22    state court litigation the same loans that LAAC insists" are valid and enforceable. Trustee

23    Opposition, p. 3, lns. 17-21; p. 7, lns. 23-27. The trustee is incorrect in these arguments.

24

25    _____
      [8] In his opposition, the trustee proclaims that LAAC's security interest could be subject to avoidance or equitable
      subordination. Trustee's Opposition, p. 20, lns. 9-11. The trustee even proclaims that LAAC should have the burden
26    of proving that its claim is *not* subject to avoidance or equitable subordination. No authority is proffered to support
      this incorrect legal statement. In any avoidance or equitable subordination lawsuit, even those involving alleged
27    insiders, the burden of proof is always on the plaintiff. *See e.g. Friedman v. Sheila Plotsky Brokers (In re Friedman)*,
      126 B.R. 63, 71 (9th Cir. BAP 1991).
28

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
IRVINE

1  Since March 2010, there has been litigation involving Tutor, Bergstein, LAAC and other

2  plaintiffs, on the one hand, and DB Zwirn and other affiliated defendants, on the other hand.  That

3  lawsuit is pending in the United States District Court for the Central District of California (the

4  "DB Zwirn Litigation").  On October 6, 2010, a Second Amended Complaint was filed in the DB

5  Zwirn Litigation.  Coyoca Decl., ¶ 4.  A copy of the Second Amended Complaint is attached to

6  the Coyoca Declaration as Exhibit 2.

7  The only causes of action to which LAAC is a party are the Seventh and Eighth Causes of

8  Action.  In these causes of action, LAAC seeks to rescind the Note Purchase Agreement and

9  restitution in the event the District Court determines that any of the various DB Zwirn loans are

10  unenforceable.   In that litigation LAAC is not asserting that the principal balance of the

11  ThinkFilm Loan (which is merely one of several DB Zwirn loans at issue in that case), is

12  unenforceable.  Instead, LAAC contends that if the contentions of the other plaintiffs in that case

13  are found to be correct, *i.e.*, that the interest, fees, and penalties charged on certain of the D.B.

14  Zwirn loans are usurious and therefore such provisions are not enforceable, then LAAC is entitled

15  to rescission and restitution of the Note Purchase Agreement.  This contention as to the interest

16  provision, however, does not challenge the validity of the principal of the loan.  LAAC asserts

17  that the principal balance of the ThinkFilm Loan (which by virtue of the global amendments is no

18  longer connected with the other DB Zwirn loans) is valid and fully enforceable.[9]  Coyoca Decl.,

19  ¶ 5.

20  One additional point raised by the trustee deserves a response.  In numerous pleadings

21  filed in these bankruptcy cases and in arguments to the Court, the trustee asserts that in separate

22  litigation against Susan Tregub, Tutor, Bergstein and LAAC represented that "numerous films

---

[9] As this Court itself recognized at a recent hearing, allegations in a complaint filed in another court are just that.
They care little to no weight until such time as there has been adjudication by the trial court.  There has been no such
adjudication in the DB Zwirn lawsuit.

Similarly, the recitals in the Note Purchase Agreement about defenses which Tutor previously asserted in response to
the demands on his guaranties, allegedly totaling $82 million, have no relevance to whether the ThinkFilm Loan is
enforceable.  To the extent the trustee believes that the ThinkFilm Loan is unenforceable, he needs to explain why
with specificity.  He cannot merely rely upon generic disclosure language contained in one sentence of a multi-page
Note Purchase Agreement.

1   were 'in' the film library of CT1.  Trustee Opposition, pp. 12-13, lns. 25-10.  Not only does this

2   grossly misrepresent and distort what was actually written in the subject paragraph, but it also

3   disregards the numerous transactional documents that have been provided to the trustee regarding

4   the chain of title for each film title in different film libraries owned by the various affiliated

5   entities.  As the trustee knows or should know by now, after conducting his massive investigation,

6   at considerable expense, CT1 never owned a film library.  It was merely a holding company.

7   Rather, the various film libraries were owned by CT1's subsidiaries and affiliates.  And, as the

8   trustee should know by now, each of those libraries is fully encumbered by secured indebtedness

9   owing either to LAAC or DB Zwirn.

10          Regardless, this entire argument is irrelevant to the pending lift stay motion.  The pending

11  lift stay motion merely addresses CT1's and ThinkFilm's limited and restricted rights under the

12  Image and Lions Gate Agreements.  LAAC is not seeking relief from stay against a "film library"

13  owned by CT1 since CT1 does not own and never did own such a library.

14  **III.    THE "UNION ENTITIES" OBJECTIONS ARE EQUALLY WITHOUT MERIT.**

15          **A.    The "Union Entities" Lack Standing.**

16          The pending Lift Stay Motion only involves two debtors—CT1 and ThinkFilm.  The

17  following entities:  Directors Guild of America, Inc. ("DGA"), Screen Actors Guild, Inc.

18  ("SAG"), Writers Guild of America, West, Inc. ("WGA") and the respective pension and health

19  plans (collectively the "Union Entities") filed an objection to the lift stay.  Yet, nowhere in that

20  objection do the Union Entities, or any of them, claim to be creditors of CT1 or ThinkFilm.  It is

21  notable that none of the Union Entities were petitioning creditors against either CT1 or

22  ThinkFilm.  Until such time as each Union Entity sets forth the basis for its claim against either

23  CT1 or ThinkFilm, none of them have standing to oppose the Lift Stay Motion.

24          **B.    Numerous "Union Entities" Objections Are Addressed Above.**

25          The Union Entities' Objection echoes many of the same objections raised by the trustee.

26  Those objections include:  (a) a supposed lack of candor regarding the ownership of LAAC;

27  (b) supposed lack of cooperation by Tutor and LAAC; (c) the ThinkFilm Loan, and its acquisition

28  by LAAC, are insider transactions that supposedly should be subjected to strict scrutiny; and

1  (d) LAAC's supposed status as an insider.  LAAC addresses these issues in its reply to the

2  trustee's objections, and those responses apply with equal force to the Union Entities' objections.

3  **C.   The Lift Stay Motion is Not Premature.**

4  The Union Entities claim that the Lift Stay Motion is premature because an order for relief

5  was just entered against ThinkFilm and no order for relief has been entered against CT1.[10]  Yet,

6  the Union Entities fail to mention that these two bankruptcy cases have been pending for more

7  than 7 months.  They likewise fail to mention that the trustee has been in place since April

8  2010—more than 210 days.  He has conducted extensive investigation into all the secured claims

9  of LAAC and DB Zwirn.  By now, the trustee ought to have reached some decisions regarding

10  property owned by CT1 and ThinkFilm.[11]  In addition, the trustee ought to have reached some

11  determination as to whether the film library previously owned by ThinkFilm has any value above

12  the secured indebtedness owed to LAAC under the ThinkFilm Loan.[12]  The absence of any

13  declaration from the trustee on these issues speaks volumes.  One can rightfully conclude from

14  the trustee's silence that the trustee recognizes the current and former assets of ThinkFilm and

15  CT1 are fully encumbered by the DB Zwirn and LAAC loans.

16

17

18  [10] The Union Entities also mention the order for relief entered against Capitol Films Development LLC and that no
orders for relief have been entered against R2D2 or CapCo LLC.  However, those cases are entirely separate.  There
19  is no allegation that Capitol Films Development, R2D2 or CapCo has any interest in the TFC Film Library or the
Image and/or Lions Gate Agreements.
20

21  [11] From the earliest days of this case, the trustee has had a list of the film titles formerly owned by ThinkFilm and its
five corporate affiliates, and now owned by TFC.  Those films titles are referenced in the numerous 2004
applications.  On or about July 27, 2010, counsel for LAAC and Tutor provided copies of all agreements with Image
22  and a list of the film titles that LAAC had identified as being still owned by ThinkFilm.  As a result, the trustee has
had months to evaluate these assets and make some assessment regarding these assets, their value and whether they
23  are fully encumbered.

24  [12] The handbook for Chapter 7 trustees issued by the US Trustee admonishes trustees that they generally should not
administer fully secured assets of nominal value to the estate.  Rather, such fully secured assets should be abandoned.
25  *See* http://www.justice.gov/ust/eo/private_trustee/library/chapter07/docs/ch7_handbook/ch7_handbook_pii_2010.pdf
("US Trustee Handbook").  See U.S. Trustee Handbook, Ch. 6D (Duties of a Trustee) ("The trustee should
26  immediately abandon fully secured property . . . of no value to the estate"); Ch. 8D (same); Ch.8K(4)
("Administering fully secured property should always be viewed as the exception taking into account the particular
27  circumstances of each case.").  These guidelines, as set forth in the US Trustee Handbook, apply with equal force to a
Chapter 11 trustee.

28

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
IRVINE

BN 7382985v3

15

**D.    The Trustee Is Prohibited From Using the Proceeds of LAAC's Collateral Without Providing Adequate Protection.**

The Union Entities, in their opposition, make the following contention: "If [the Image] receivables are as paltry as suggested by LAAC, then they will not go far toward retiring the $46 Million debt asserted by LAAC, but they could fund the Trustee's investigation of the Debtor's rights and remedies." Union Entities Opposition, p. 9, lns. 14-17.  The Union Entities are wrong. Under the Bankruptcy Code and settled Ninth Circuit law, a trustee is prohibited from using the proceeds of a secured creditor's collateral without either the secured creditor's consent or court order upon a showing that the secured creditor is adequately protected. *See* 11 U.S.C. Section 363(c)(2) ("The trustee may not use . . . cash collateral unless (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use . . ."; *Freightliner Mkt. Dev. Corp. v. Silver Wheel Freightlines, Inc.* (*In re Freightliner Mkt. Dev. Corp.*), 823 F.2d 362, 368-69 (9th Cir. 1987) (the purposes underlying section 363(c)(2) require that a debtor seek affirmative express consent from all parties before using cash collateral).

Here, LAAC does not and will not consent to the trustee using the proceeds of its collateral.  Nor will the trustee be able to provide adequate protection to LAAC, since none of the debtors have any unencumbered assets (aside from potential avoidance actions, which to the extent they involve identifiable transfers of LAAC's collateral, would still belong to LAAC).

**E.    LAAC's Security Interest in CT1's and ThinkFilm's Rights under the Image and Lions Gate Agreements Is Properly Perfected.**

The Union Entities contend that LAAC has not established its perfected security in CT1's rights under the Image Agreements (and, presumably, the Lions Gate Agreements).  Union Entities Opposition, p. 11, lns. 12-16.  The Union Entities again are wrong.  Beyond the fact that numerous filings were made with the United States Copyright Office ("USCO") by both DB Zwirn and LAAC, as to the Image and Lions Gate Agreements, which are sub-distribution agreements, those agreements were never recorded with the USCO.  As a result, the only place to perfect a security interest in such agreements is with the Secretary of State of the debtor's state of incorporation.  *See* UCC § 9-310 (codified in Delaware as 6 Del. C. § 9-310) ("a financing

1   statement must be filed to perfect all security interests..."); UCC § 9-501(a) (codified in Delaware

2   as 6 Del. C. § 9-501(a)) ("if the local law of this State governs perfection of a security interest ...,

3   the office in which to file a financing statement to perfect the security interest ... is... the office of

4   the [Delaware] Secretary of State...").

5          Here, with respect to CT1 and ThinkFilm, UCC-1 financing statements were filed with the

6   Delaware Secretary of State.  Copies of the relevant grants of security interests and UCC-1

7   financing statement are attached to Warshawsky Declaration as Exhibits 1, 4 and 5.  Thus, LAAC

8   has provided sufficient proof of its perfected security interest.  It is notable that the trustee is not

9   challenging LAAC's perfection.  In addition, CT1's and ThinkFilm's rights in the Image and

10  Lions Gate Agreements are extremely limited, and subject to the statutory limitations of § 541(d)

11  of the Bankruptcy Code.

12         As to the challenges to the Warshawsky Declaration regarding the amounts advanced

13  under the ThinkFilm Loan, LAAC has provided the loan documents that evidence the amounts

14  advanced.  In addition, the debtors have turned over all of their financial records and the trustee

15  has subpoenaed records from DB Zwirn.  Combined, those records conclusively establish receipt

16  of the $45.7 million that DB Zwirn advanced under the ThinkFilm Loan.  Notably, the trustee is

17  not disputing that DB Zwirn advanced $45.7 million.[13]

18         As to the challenges to the Warshawsky Declaration regarding the lack of adequate

19  protection, it is the burden of the parties opposing relief from stay to establish that the secured

20  creditor is adequately protected.  *See* 11 U.S.C. § 362(g).  Merely challenging a witness and his

21  conclusions regarding a secured creditor's lack of adequate protection is insufficient.  *See In re*

22  *Kim*, 71 B.R. 1011, 1015 (Bankr. C.D. Cal. 1987) ("A creditor who has established a *prima facie*

23  case is entitled to relief from stay if a debtor fails to carry the burden of persuasion in

24  opposition.")

---

[13] As to the Union Entities' contention that the $11.5 million advanced by Image reduced the principal amount of the obligations under the ThinkFilm Loan (see Union Entities Opposition, p. 19, lns. 14-18), the Union Entities are incorrect.  Documents provided by Image as well as the financial records of DB Zwirn and the debtors establish that these advances were never remitted to DB Zwirn.  They were used for other purposes.

**F.** **Arguments Related to the Priority of the Guilds' Liens against Certain Film Titles in the FPLAC Library Are Irrelevant to the Lift Stay Motion.**

The Union Entities devote a significant portion of their Opposition to challenging whether LAAC holds a senior security interest in the entire TFC Film Library. Union Entities Opposition, pp. 14-18. The Union Entities point out that they likely hold senior interests in certain film titles acquired by FPLAC (a non-bankrupt subsidiary of CT1) out the Franchise Picture bankruptcy cases.

On this issue, LAAC agrees with the Union Entities. Federal law controls the relative priorities with respect to copyrighted assets. *See* 17 U.S.C. § 205. Obviously, as to any film titles in the TFC Film Library to which the Guilds (or any of them) or any other third party hold a senior lien, the contemplated foreclosure sale would be of no consequence to the Guilds or such third party senior rights holder. Any purchaser of assets at a foreclosure sale against the TFC Film Library would take subject to the rights of all senior rights holders—be they senior interests held by any of the Guilds, Lions Gate or any other third party.

Regardless of this black letter law, this entire argument is a red herring. FPLAC is not a debtor in these cases. The Lift Stay Motion does not involve FPLAC's assets, now owned by TFC. Rather, it only involves CT1's and ThinkFilm's limited and restricted rights under the Image Agreements and, potentially, the Lions Gate Agreements. As a result, this Court need not concern itself with the relative priorities between LAAC and the Guilds (or any of them) with respect to the FPLAC film library, now owned by TFC. Of course, to the extent the Guilds hold senior liens in film properties belonging (either now or in the past) to ThinkFilm, such liens further undermine any contention that ThinkFilm has any equity in any film library.

**G.** **The Discussion of Contemplated Transactions in the United Kingdom Are Irrelevant and Replete with Rank Hearsay.**

The Union Entities devote three pages of their Opposition (pp. 20-23) and one declaration to discuss a recently proposed transaction involving the Capitol Films entities that are the subject of their own bankruptcy proceeding in the United Kingdom. Those cases and the proposed transaction have absolutely no relevance to LAAC or this Lift Stay Motion. The Union Entities

1   include a discussion of this topic in a transparent attempt to disparage LAAC and Tutor (who

2   through one of his other companies submitted an offer to the administrators of the Capitol Film

3   administration to purchase certain of its assets).  Because this portion of the Opposition does not

4   involve either LAAC or the debtors, it is entirely irrelevant to these bankruptcy cases and the Lift

5   Stay Motion.  LAAC will not dignify this kind of disparagement and irrelevant testimony with

6   any response.

7   **IV.    LIONS GATE'S ISSUES AND CONCERNS ARE RESOLVABLE.**

8          **A.    ThinkFilm Has Two Agreements with Lions Gate.**

9                Upon receipt of Lion Gate's Opposition, LAAC (through its counsel) immediately

10  requested copies of any agreements between Lions Gate, on the one hand, and CT1 or ThinkFilm,

11  on the other hand.  Those agreements, along with the most recent participation statement, were

12  provided by the debtors.  Those documents reveal the following:

13         • In July 2005, prior to CT1/R2D2's acquisition of the stock of ThinkFilm,

14  ThinkFilm entered into a multi-picture output distribution agreement with Lions Gate Films, Inc.

15  That agreement, dated as of July 11, 2005, is attached to the Declaration of Jeffrey Garfinkle

16  ("Garfinkle Decl."), as Exhibit 1.  The term of the July 11, 2005 agreement was three (3) years,

17  while the distribution term was five (5) years from the release date of each film title covered by

18  July 11, 2005 agreement.  *See* July 11, 2005 Agreement, ¶ 6(a) and (b).  Thus, for the most part,

19  Lions Gate's distribution rights under this agreement have expired.[14]

20         • In September 2005, again prior to CT1/R2D2's acquisition of the stock of

21  ThinkFilm, ThinkFilm entered into a distribution agreement with Lions Gate Films, Inc. for the

22  film *Murderball*.  That agreement, dated as of September 12, 2005, is attached to the Garfinkle

23  Declaration as Exhibit 2.  The term of the September 12, 2005 agreement is five years from the

24  date of *Murderball*'s release.  While the exact release date of *Murderball* is unknown, given the

25  dates involved with this agreement, it has either expired or will expire soon.

26

27  ───────────────

28  [14] It is possible that certain films were first released after July 11, 2005 and the distribution term for those films has not yet expired.

**OMNIBUS REPLY TO OPPOSITIONS TO MOTION FOR RELIEF FROM STAY**

- The last statement received from Lions Gate was for the Second Quarter of 2009. A copy of the statement for that period is attached to the Garfinkle Declaration as Exhibit 3. That statement reflects that no moneys are due to ThinkFilm under these agreements.

**B.    The Two Lions Gate Agreements Will be Carved out of Any Foreclosure Sale.**

In light of the very short remaining term of the Lions Gate Agreements and the economics involved, the Lions Gate Agreements will be carved out of any foreclosure sale. This means that any purchaser of the TFC Film Library will be required to acquire the TFC Film Library subject to all of Lions Gate's rights under the two Lions Gate Agreements. And, ThinkFilm will continue to possess its rights to receive any revenue under the two Lions Gate Agreements (subject to LAAC's perfected security interest and the limitations of Bankruptcy Code § 541(d)).

**C.    Lions Gate's Other Rights in the TFC Library Remain Unclear.**

In Lions Gate's opposition, Lions Gate claims to have distribution rights in approximately 150 film titles in which LAAC claims a security interest. Lions Gate Opposition, p. 3, lns. 14-16. Lions Gate does not specify what those rights are and how and when they were acquired.

As a preliminary matter, LAAC notes that the last statement Lions Gate sent to ThinkFilm only listed 15 film titles. Presumably, the distribution rights to any other film titles were owned by non-debtors, prior to the transfer to TFC.

Regardless of Lions Gate's distribution rights in non-debtor film titles now owned by TFC, the Court need not concern itself with such issues. The Lift Stay Motion only involves the possibility that CT1's and ThinkFilm's limited and restricted rights to receive revenues under the Image and the Lions Gate Agreements would be extinguished by virtue of a foreclosure sale against the TFC Film Library. Now that the two Lions Gate Agreements have been carved out of the foreclosure sale and ThinkFilm will retain its rights under the two Lions Gate Agreements, there is no legitimate reason for Lions Gate to oppose stay relief.

Lions Gate asserts that with respect to these 150 film titles it may hold perfected security interests. Just as with the Guilds, LAAC's foreclosure sale will not extinguish any senior perfected security interests. As such, this is a non-issue.

### D.    Numerous Lions Gate Objections Are Addressed Above.

The Lion Gates Objection echoes many of the same objections raised by the trustee and by the Union Entities.  Those objections include:  (a) the lift stay motion is premature; (b) LAAC has not carried its burden of proof, including a supposed lack of proof regarding the perfection of LAAC's security interest against CT1 and ThinkFilm; and (c) the supposed lack of cooperation by Tutor and LAAC.  LAAC addresses these issues in its reply to the trustee's and the Union Entities' objections, and those responses apply with equal force to Lions Gate's objections.

### E.    Lions Gate Misreads the Lender Consent.

In its opposition, Lions Gates quotes the following paragraph from the Lender Consent, whereby LAAC agreed to the transfer of the film libraries from ThinkFilm and five other affiliated companies to TFC:

> [O]n and after [July 20, 2009], LAAC shall have no recourse or remedies against any of the Assignors under the Assignor Loan Documents and Lender shall look solely to Purchaser and the collateral which has been, or may be pledged to secure the loans under the Assignor Loan Agreement and the Loan Documents.

Under this sentence of the Lender Consent, LAAC limited itself to TFC **and** the collateral that previously had been pledged by the Assignors (here, ThinkFilm and the other five transferors).  Thus, this paragraph confirms that the historic collateral under the ThinkFilm Loan remains subject to the previously granted security interest.  Consistent with this structure, each of the UCC-1 financing statements which previously had been issued against the "Assignors" in favor of DB Zwirn was assigned to LAAC.  Had the parties intended to release Assignors' collateral from the security interest previously granted to DB Zwirn, termination statements would have been filed.  Of course, they were not because this clause in the Lender Consent preserved LAAC's security interest against any remaining assets in ThinkFilm and the other Assignors.

Lions Gate's argument regarding *in rem* relief is completely off point.  Non recourse secured claims are quite common in California—particularly in view of California's anti-deficiency statutes.  Allowing a secured creditor to proceed as part of the granting of a lift stay motion is very typical.

**F.** **LAAC Has Submitted Admissible Evidence Regarding Its Security Interest
and the Perfection of its Security Interest.**

Lions Gate challenges the Lift Stay Motion on the grounds that the testimony of Evan
Warshawsky and the exhibits to his declaration are inadmissible. LAAC has separately
responded to these evidentiary objections. Suffice it to say, the evidence and exhibits to
Warshawsky's declaration are admissible.

Lions Gate questions whether LAAC provided evidence of the perfected security interest
favoring DB Zwirn against CT1. As was already explained by LAAC, DB Zwirn holds a
perfected security interest in all assets of CT1. That security interest is memorialized in the
numerous agreements entered into between or among ThinkFilm, CT1, DB Zwirn and LAAC.
Those agreements included (1) the ThinkFilm Credit Agreement, as amended (Exhibits 1, 2 and 8
to the Warshawsky Declaration); (2) the Amended and Restated Continuing Guaranty issued by
CT1 (Exhibit 3 to the Warshawsky Declaration); (3) the UCC-1 Financing Statement recorded on
October 23, 2006 against CT1 by DB Zwirn (Exhibit 5 to the Warshawsky Declaration) and (4)
the Tranche C Intercreditor Agreement (Exhibit 10 to the Warshawsky Declaration).

Lions Gate argues that the Assignment and Assumption Agreement entered into by LAAC
and TFC (Exhibit 14 to the Warshawsky Declaration) somehow released ThinkFilm and CT1
from their prior grant of a security interest in favor of DB Zwirn. It did not. There is no such
release language contained in that agreement. And, as explained above, Lions Gate misreads the
Lender Consent, which clearly states that LAAC will continue to "look to . . . the collateral which
has been [historically], . . ., pledged under the [ThinkFilm] loan documents." More significantly,
as to the Lift Stay Motion, CT1 is the counter-party to the Image Agreement. Payments under
those agreements are tendered to CT1—in a fiduciary relationship for TFC. Nowhere in the
Lender Consent did LAAC release its security interest against CT1 or TFC.

## V.    CONCLUSION

LAAC legitimately purchased a non-insider secured loan.  That loan has been in default for at least two years.  There is no legitimate dispute that ThinkFilm and CT1 lack any equity in the collateral that they possess, which secures the ThinkFilm Loan.  No declarations were submitted by the opposing parties that address any of the issues under 11 U.S.C. § 362(d).

Rather, the objecting parties seek to disparage Tutor, LAAC and Bergstein.  While their approach to this matter is unfortunate, LAAC has established all grounds to lift the automatic stay.

In the meantime, the trustee for ThinkFilm (now a debtor) is free to pursue whatever litigation he believes is appropriate against LAAC and other parties.  LAAC, of course, will vigorously defend itself.  Regardless, consistent with the doctrinal underpinnings of lift stay motions in bankruptcy, that threatened litigation does not prevent the Bankruptcy Court from lifting the automatic stay.

For all of these reasons, the Lift Stay Motion should be granted.

DATED: October 19, 2010                          BUCHALTER NEMER
                                                 A Professional Corporation


                                                 By: /s/ Jeffrey K. Garfinkle
                                                 _____
                                                     JEFFREY K. GARFINKLE
                                                       Attorneys for Movant
                                                 LIBRARY ASSET ACQUISITION COMPANY,
                                                 LTD

| In re:<br>Thinkfilm LLC.<br><br>Debtor(s). | CHAPTER: 11<br><br>CASE NUMBER: 10-19912 |
| --- | --- |

**NOTE**: When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on a CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 18400 Von Karman Ave., Ste. 800, Irvine, CA 92612

A true and correct copy of the foregoing document described as <u>OMNIBUS REPLY TO OPPOSITIONS TO MOTION FOR RELIEF FROM STAY BY LIBRARY ASSET ACQUISITION COMPANY LTD.</u> will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d), and **(b)** in the manner indicated below:
Overnite Express

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** - Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On <u>10/19/10</u>          I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email addressed indicated below:

- David E Ahdoot    dahdoot@bushgottlieb.com, tjimines@bushgottlieb.com
- Steven A Alpert    cacbefile@pricelawgroup.com
- Todd M Arnold    tma@lnbrb.com
- David M Bass    dbass@basslawla.com
- Hartford O Brown    hbrown@klinedinstlaw.com
- John P Byrne    John.Byrne@byrnelaw.biz
- Jennifer S Chang    jsc@birdmarella.com, krw@birdmarella.com
- Sara Chenetz    chenetz@blankrome.com
- Russell Clementson    russell.clementson@usdoj.gov
- Joseph A Eisenberg    jae@jmbm.com
- Philip A Gasteier    pag@lnbrb.com
- Thomas M Geher    tmg@jmbm.com
- Irving M Gross    img@lnbrb.com, angela@lnbrb.com
- Leonard L Gumport    lgumport@grlegal.com, lgumport@gumportlaw.com
- Michael C Heinrichs    mheinrichs@omm.com
- Joseph A Kohanski    jkohanski@bushgottlieb.com, tjimines@bushgottlieb.com
- Jeffrey A Krieger    jkrieger@ggfirm.com
- Richard Levy    rlevy@pryorcashman.com
- Michael S Lurey    michael.lurey@lw.com, colleen.rico@lw.com
- Michael L Martucci    Michael@radlegal.com
- Peter J Mastan    pmastan@grlegal.com
- Hayes F Michel    hmichel@bakerlaw.com
- David L. Neale    dln@lnbrb.com
- Timothy R Pomeroy    tpomeroy@klinedinstlaw.com
- Vince Ravine    vince@vravinelaw.com, melissa@vravinelaw.com
- Andrew S. Rotter    arotter@grlegal.com, arotter@gumportlaw.com
- Mark M Sharf    mark@sharflaw.com, msharf00@gmail.com
- Adam M Starr    starra@gtlaw.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- David Weinstein    david.weinstein@hro.com
- Sharon Z Weiss    sharon.weiss@hro.com

☐ Service information continued on attached page

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                                        F 9013-3.1

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served):
On 10/19/10 _____ I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follow. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

10th & Wolf LLC
Jeffrey W tott, Managing Member
Barberry Farm
4 Barberry Rd
Sewickley, PA 15143

Tracy L Ashmore
Holme Roberts & Owen LLP
800 W Olympic Blvd 4th Fl
Los Angeles, CA 90015

Jennifer S Chang
Bird, Marella, Boxer & Lincenberg, P.C
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067

Lucia E Coyoca
Mitchell Silberberg & Knupp LLP
11377 W Olympic Blvd
Los Angeles, CA 90064

Dox Productions Limited
c/o Jeff Sanders Esq
Roberts Ritholz et al LLP
235 Park Ave South 3d Fl
New York, NY 10003

Ronald L Durkin (TR)
633 West Fifth St, 24th Fl
Los Angeles, CA 90071-2008

Durkin Forensic Inc
601 S Figueroa St Sge 2080
Los Angeles, CA 90017

Steven M Nachman
675 Third Ave 29th Floors
New York, CA 10017

Frank M Radoslovich
601 University Ave Ste 250
Sacramento, CA 95825

☐ Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____ I served the following person(s)

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009

**F 9013-3.1**

and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method) by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 10/19/10 | Loretta Goodwin | |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                    **F 9013-3.1**